*Appeal No. 24-3770*

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

OREGON ASSOCIATION OF HOSPITALS AND HEALTH SYSTEMS,

*Plaintiff-Appellant,*

v.

STATE OF OREGON, OREGON HEALTH AUTHORITY, and DR. SEJAL HATHI, in her official capacity as Director of Oregon Health Authority,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Oregon
The Honorable Michael H. Simon
Case No. 3:22-cv-01486-SI

---

## PLAINTIFF-APPELLANT'S OPENING BRIEF

---

BRAD S. DANIELS
NATHAN R. MORALES
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480

WHITNEY A. BROWN
Stoel Rives LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900
Facsimile: 907.277.1920

*Attorneys for Plaintiff-Appellant*

## FRAP 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Oregon Association of Hospitals and Health Systems, d/b/a Hospital Association of Oregon states that it is a statewide nonprofit trade association representing Oregon hospitals and health systems with a principal business address of 4000 Kruse Way Place, Building 2, Suite 100, Lake Oswego, Oregon 97035. Oregon Association of Hospitals and Health Systems has no parent company and no publicly held corporation owns 10 percent or more of its stock.

## TABLE OF CONTENTS

**Page**

I.    JURISDICTIONAL STATEMENT .................................................1

II.   ISSUE PRESENTED FOR REVIEW ...........................................1

III.  INTRODUCTION .........................................................................2

IV.  STATEMENT OF THE CASE .....................................................5

     A.   HB 2362's Unique Provisions—and Problems....................5

     B.   HB 2362's Definitions ..........................................................7

         1.    "Health Care Entity"...................................................7

         2.    "Material Change Transaction" ..................................8

     C.   Review and Approval Requirements ...................................10

     D.   Procedural History...............................................................13

V.    STATEMENT REGARDING ADDENDUM .............................15

VI.  SUMMARY OF THE ARGUMENT ..........................................15

VII. ARGUMENT................................................................................17

     A.   Standard of Review .............................................................17

     B.   Facially Vague Statutes Violate the Fourteenth Amendment............20

     C.   HB 2362 Is Hopelessly and Unconstitutionally Vague ......................22

         1.    The Definition of "Health Care Entity" Does Not
Define to Whom the Law Applies...........................................22

             a.   "Health Care Entity" Is Non-Exclusive and
Open-Ended ..................................................................22

i

b.     The Hospital Association Has Standing to Raise a Vagueness Challenge to the Definition of "Health Care Entity"..................................................27

2.     The Definition of "Material Change Transaction" Lies Solely in the Agency's Hands...........................................30

3.     The Criteria for Approval or Denial (and the Conditions on Which Transactions Depend) Are Unconstitutionally Vague ........................................34

D.     The District Court Erred in Its Analysis and Conclusion ..................37

1.     Administrative Regulations and Sub-Regulatory Guidance Fail to Cure the Statute's Vagueness ......................37

a.     Allowing Formal and Informal Agency Determinations and Statements to Complete an Otherwise Vague Statute Is Inconsistent with Due Process ....................................................37

b.     The District Court Overlooked the Arbitrary and Discriminatory Enforcement Concern. ...................39

c.     The Agency's Regulations and Guidance Prove Plaintiff's Point ..................................................41

2.     The Opportunity for Pre-Notice Review Is Not a Mitigating Factor ....................................................46

3.     Neither the "Economic" Nature of the Statute Nor Its Targets Justifies a Lenient Standard of Review ................47

VIII.   CONCLUSION..............................................................49

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alphonsus v. Holder*, 705 F.3d 1031 (9th Cir. 2013) ...............................................19

*Ams. for Prosperity Found. v. Bonta*,
 594 U.S. 595 (2021) ...........................................................................................20

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
 729 F.3d 937 (9th Cir. 2013) .............................................................................17

*Bittner v. United States*,
 598 U.S. 85 (2023) .............................................................................................20

*Burgess v. United States*,
 553 U.S. 124 (2008) ...........................................................................................23

*California Pacific Bank v. Federal Deposit Insurance Corp.*,
 885 F.3d 560 (9th Cir. 2018) .............................................................................46

*Carroll v. Trump*,
 49 F.4th 759 (2d Cir. 2022) ...............................................................................23

*City of Chicago v. Morales*,
 527 U.S. 41 (1999).................................................................................28, 29, 45

*City of L.A., Cal. v. Patel*,
 576 U.S. 409 (2015)............................................................................................27

*Coates v. City of Cincinnati*,
 402 U.S. 611 (1971).....................................................................................26, 28

*Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.*,
 660 F.3d 612 (2d Cir. 2011) ..............................................................................41

*FCC v. Fox Television Stations, Inc.*,
 567 U.S. 239 (2012)......................................................................4, 21, 26, 39

*Giaccio v. Pennsylvania*,
 382 U.S. 399 (1966)............................................................................................28

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ................................................................*passim*

*Groman v. Comm'r*,
  302 U.S. 82 (1937) ...........................................................................23

*Guerrero v. Whitaker*,
  908 F.3d 541 (9th Cir. 2018) ............................................................19

*Gundy v. United States*,
  588 U.S. 128 (2019) (Gorsuch, J., dissenting) .................................44

*Isaacson v. Mayes*,
  84 F.4th 1089 (9th Cir. 2023) ...........................................................30

*Johnson v. United States*,
  576 U.S. 591 (2015) ...............................................................*passim*

*Knox v. Brnovich*,
  907 F.3d 1167 (9th Cir. 2018) ..........................................................20

*Kolender v. Lawson*,
  461 U.S. 352 (1983) .....................................................................41, 44

*Krause v. Titleserv, Inc.*,
  402 F.3d 119 (2d Cir. 2005) ..............................................................32

*McBoyle v. United States*,
  283 U.S. 25 (1931) ............................................................................20

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024) ......................................................................19

*Papachristou v. City of Jacksonville*,
  405 U.S. 156 (1972) ..........................................................................23

*Perrin v. United States*,
  444 U.S. 37 (1979) ............................................................................31

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ..........................................................................33

*Robinson v. Comm'r*,
119 T.C. 44 (2002) .............................................................. 23

*Sabri v. United States*,
541 U.S. 600 (2004) ....................................................... 28, 29

*Sandifer v. U.S. Steel Corp.*,
571 U.S. 220 (2014) ............................................................ 31

*Sessions v. Dimaya*,
584 U.S. 148 (2018) (plurality opinion) ........................ *passim*

*United States v. Cook*,
914 F.3d 545 (7th Cir.), *judgment vacated on other grounds*,
140 S. Ct. 41 (2019) ........................................................... 19

*United States v. Davis*,
588 U.S. 445 (2019) ................................................... 2, 21, 38

*United States v. L. Cohen Grocery Co.*,
255 U.S. 81 (1921) ......................................................... 34, 38

*United States v. Lachman*,
387 F.3d 42 (1st Cir. 2004) ............................................... 41

*United States v. Lucero*,
989 F.3d 1088 (9th Cir. 2021) ...................................... 26, 45

*United States v. Salerno*,
481 U.S. 739 (1987) .................................................. 17, 19, 20

*United States v. Van Hawkins*,
899 F.2d 852 (9th Cir. 1990) ............................................. 29

*United States v. Williams*,
553 U.S. 285 (2008) ......................................................... 4, 21

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) ..................................................... *passim*

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) ........................................................... 20

v

*Winters v. New York*,
333 U.S. 507 (1948)..........................................................................34


**Statutes**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1367 ...............................................................................1

42 U.S.C. § 1983 ...............................................................................1

740 Ill. Comp. Stat. 10/7.2a ...........................................................5

Mass. Gen. Laws ch. 6D § 13 .........................................................5

Or. Rev. Stat. § 414.690...................................................................9

Or. Rev. Stat. § 415.500.............................................................*passim*

Or. Rev. Stat. § 415.501.............................................................*passim*

Or. Rev. Stat. § 415.900(1) ..........................................................13

Wash. Rev. Code ch. 19.390..........................................................5


**Other Authorities**

*Black's Law Dictionary* 928 (5th ed. 1979)................................32

Fed. R. App. P. 4(a)(1)(A) .............................................................1

House Bill 2362, codified at Or. Rev. Stat. § 415.500, *et seq.* ........*passim*

Oregon Administrative Rule 409-070-0000(2).............................36

Oregon Administrative Rule 409-070-0060 ............................35, 36

Oregon Administrative Rule 409-070-0065 .................................36

Oregon Constitution ...........................................................................1, 14

Lauren Norris Donahue et al., *State Pre-Merger Notification Requirements for Healthcare Transactions: Increased Regulatory Scrutiny for Small, Sub-HSR Transactions,*
36 No. 2 HEALTH LAW. 24 (2023) ......................................................5

N. Singer & J. Singer, *Sutherland on Statutory Construction* § 47:7
(7th ed. 2007) ...................................................................................23

Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 YALE L. J. 1672, 1722 (2012) .........................................38

OHA, *Defining Essential Services & Significant Reduction*,
https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO-Essential-Services-and-Significant-Reduction-Guidance-FINAL.pdf (last accessed Nov. 20, 2024) ..............................................................................42, 43

U.S. Const. art. I...............................................................................28

U.S. Const. amd. I ....................................................................*passim*

U.S. Const. amd. V ...........................................................................30

U.S. Const. amnd. XIV ..............................................................*passim*

## I. JURISDICTIONAL STATEMENT

The Oregon Association of Hospitals and Health Systems, d/b/a Hospital Association of Oregon (the "Hospital Association"), filed this action in the U.S. District Court for the District of Oregon seeking declaratory and prospective injunctive relief under 42 U.S.C. § 1983 and declaratory relief under the Oregon Constitution. *See* Complaint, No. 3:22-cv-01486-SI, ECF 1 (D. Oregon Oct. 3, 2022); ER-49–80 (First Amended Complaint). The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367.

The district court entered final judgment on May 20, 2024. ER-3. The Hospital Association timely filed a notice of appeal on June 18, 2024. ER-81–83; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## II. ISSUE PRESENTED FOR REVIEW

Where a state statute regulating the health care marketplace is hopelessly vague as to which entities or transactions lie within its scope, or what conduct is permitted or prohibited, and delegates to a state agency standardless authority to make those determinations and impose conditions without restriction, is the statute unconstitutional in violation of the Fourteenth Amendment's due-process guarantee?

### III.  INTRODUCTION

"In our constitutional order, a vague law is no law at all."  *United States v. Davis*, 588 U.S. 445, 447 (2019).  The Due Process Clause of the Fourteenth Amendment requires laws to provide fair notice to regulated parties of the conduct the law prohibits, and to be sufficiently specific to ensure that those who apply the law do not do so arbitrarily or untethered from any legislative standard.  When a law fails to meet those basic requirements, and threatens penalties and sanctions for an incorrect guess, it is void for vagueness.

In 2021, the Oregon legislature passed an unprecedented statute, House Bill 2362, codified at Or. Rev. Stat. § 415.500, *et seq.* ("HB 2362"), that violates those fundamental principles.  The State of Oregon has regulated certain aspects of health care for over a century, but it historically allowed hospitals, clinics, and health care providers to meet the needs of their patients and local communities— from rural to urban—without undue government interference.  HB 2362, however, is a radical break from that approach.  Rather than authorizing the agency to fill in the gaps, or enact regulations consistent with a broad normative command, HB 2362 gives the agency unchecked and exclusive authority to approve, deny, and dictate the terms of any "transaction" involving "health care entities," without providing any legislative standard against which the agency's determinations can be assessed.  Put simply, no health care transaction or contract involving entities of

2

a certain size can occur in Oregon without Oregon Health Authority's ("OHA") say-so.

In general terms, HB 2362 requires that certain "health care entit[ies]" notify a state agency, OHA, before engaging in a "material change transaction."  It further prohibits those entities from engaging in a covered transaction until OHA reviews it and either approves the transaction outright, imposes any conditions that it sees fit, or prohibits the transaction altogether.  *See* Or. Rev. Stat. § 415.501.

Determining whether HB 2362 is applicable to any given entity or transaction, however, has proven effectively impossible.  Unlike other statutes that provide a broad, but comprehensible, normative standard that later may be refined by judicial or agency interpretations, HB 2362 presents the illusion of standards.  It leaves critical terms undefined and delegates wholesale authority to OHA to clarify their meaning, resulting in the absence of an objective legislative standard by which to measure whether a given entity or transaction is covered.  The statute further conscripts OHA to do the fundamentally legislative task of deciding which transactions should be approved, which should be approved only with conditions (simultaneously allowing the agency to dream up what those conditions will be), and which should be denied.  Ultimately, when faced with the question, "what do I need to do to ensure that my conduct conforms to the law?," HB 2362's answer is, "whatever the agency tells you to do."  Such a regime gives neither parties nor the

enforcing agency "a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). And it is "'so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). HB 2362 is therefore unconstitutionally vague in violation of the Fourteenth Amendment.

The district court's application of due-process vagueness standards—and its conclusion that HB 2362 satisfied those standards—was erroneous. The district court initially erred when it failed to address the Hospital Association's challenge to the definition of "health care entity." Citing inapposite criminal cases, the court confused standing (which the Hospital Association certainly has) with the substantive standard in a facial vagueness challenge. Then, on the merits, the district court's analysis of both the definition of "material change transaction" and the agency's approval power was fundamentally flawed. Neither the presence of administrative regulations, or sub-regulatory guidance, nor the character of the statute as "economic" cures HB 2362's constitutional defects.

In sum, while the Hospital Association's legal challenge requires a detailed analysis of the words chosen by the legislature and the structure of the bill that the legislature passed, the fundamental flaw of this law is obvious to those who have been attempting to navigate its requirements. Under HB 2362, unelected officials

in a state agency can shape the future of health care in Oregon in whatever way they want without any legislative limitation. The Constitution demands more. And Oregonians deserve better.

## IV. STATEMENT OF THE CASE

A.   **HB 2362's Unique Provisions—and Problems**

In recent years, a growing number of states have enacted laws requiring pre-merger review of proposed transactions involving health care entities. *See* Lauren Norris Donahue et al., *State Pre-Merger Notification Requirements for Healthcare Transactions: Increased Regulatory Scrutiny for Small, Sub-HSR Transactions*, 36 No. 2 HEALTH LAW. 24 (2023). In most cases, those state laws employ the playbook of federal antitrust laws by requiring state-level, pre-transaction notice of (health care) mergers. As in the antitrust context, this notice allows state attorneys general to review transactions for compliance with existing state or federal antitrust laws and to invoke express standards related to competition or monopolization when challenging them. *See, e.g.*, 740 Ill. Comp. Stat. 10/7.2a (Illinois); Mass. Gen. Laws ch. 6D § 13 (Massachusetts); Wash. Rev. Code ch. 19.390 (Washington).

Oregon took a qualitatively and materially different approach. Oregon's HB 2362 is not simply a notice statute that operates to alert enforcement officials to a transaction that may violate a defined standard. Instead, HB 2362 is an

5

approval regime that puts a state health agency in charge of deciding which transactions are lawful based on standards that the agency creates without legislative guardrails or input, and it allows the agency free rein to shape those transactions (through the imposition of conditions) into whatever the agency's staff would like them to be. In effect, the legislature charged OHA with regulating and shaping the health care marketplace, but gave the agency no standard (such as preventing anticompetitive or monopolistic behavior) by which its decisions can be reviewed.

At a superficial level, HB 2362 appears to offer detailed definitions and even specific standards. But as the following sections will demonstrate, the statute uses terms that lack a common meaning and that the agency is directed to define in the first instance. Key definitions and review criteria in HB 2362 are characterized by lists containing several conjunctive requirements, where the first item (or first several items) in the list states a definition or standard, but the last item consists of an open-ended delegation to the state agency (meaning that the agency can supply its own definition or normative standard that must be satisfied independent of the statute). By the statute's express terms, even if parties can determine that their conduct is lawful pursuant to legislative requirements A and B, they still must discern and satisfy agency requirement C. And as to that latter, necessary requirement, the legislature provided no standard or limit on what the agency could

do.  The agency decides to whom and to what the statute applies, and then, critically, what must be done in order to comply with the law.

In that way, HB 2362 goes well beyond any other antitrust or market regulation statute.  Instead, it gives OHA the unchecked authority to approve or disapprove transactions, and to impose whatever conditions the agency wishes on transactions that it chooses to regulate.  That legislative structure leaves OHA free to effectively block or change any transaction with which it disagrees based on criteria that it alone establishes.

**B.    HB 2362's Definitions**

**1.    "Health Care Entity"**

HB 2362 applies to "health care entit[ies]."  *See, e.g.*, Or. Rev. Stat. § 415.501(2), (9).  The statute defines "health care entity" to "include," among other things, individual health providers, hospitals, and "[a]ny other entity that has as a primary function the provision of health care items or services or that is a parent organization of, or is an entity closely related to, an entity that has as a primary function the provision of health care items or services."  *Id.* § 415.500(4)(a)(A)–(F).  HB 2362 does not define the terms "primary function," "the provision of health care items or services," or what constitutes "a parent organization" or "entity closely related to" another.

7

2.    **"Material Change Transaction"**

HB 2362 also purports to define the transactions to which the statute applies.

It defines "[m]aterial change transaction" as:

> (A) A *transaction* in which at least one party had average revenue of $25 million or more in the preceding three fiscal years and another party:
>
> (i) Had an average revenue of at least $10 million in the preceding three fiscal years; or
>
> (ii) In the case of a new entity, is projected to have at least $10 million in revenue in the first full year of operation at normal levels of utilization or operation as prescribed by the authority by rule.
>
> (B) If a transaction involves a health care entity in this state and an out-of-state entity, a transaction that otherwise qualifies as a material change transaction under this paragraph that may result in increases in the price of health care or limit access to health care services in this state.

*Id.* § 415.500(6)(a) (emphasis added).  A "transaction," in turn, is statutorily defined as:

> (a) A merger of a health care entity with another entity;
>
> (b) An acquisition of one or more health care entities by another entity;
>
> (c) New contracts, new clinical affiliations and new contracting affiliations that will *eliminate or significantly reduce*, *as defined by the authority by rule*, *essential services*;
>
> (d) A corporate affiliation involving at least one health care entity; or

        (e) Transactions to form a new partnership, joint venture, accountable care organization, parent organization or management services organization, as prescribed by the authority by rule.

*Id.* § 415.500(10) (emphasis added).

Importantly, the definitions of "material change transaction" and "transaction" leave critical terms undefined and delegate to the agency the authority to define the scope of others. For example, the definition of "transaction" makes clear that HB 2362 does not only apply to mergers and transactions. It applies to whatever contractual arrangements the agency decides should be included. *See id.* § 415.500(10)(c). The legislature also did not specify how the agency should determine whether a service has been "eliminate[d] or significantly reduce[d]." It left the agency to create those standards in the first instance. And although the legislature made a fledgling effort to define "essential services," its definition—"[s]ervices that are funded on the prioritized list described in ORS 414.690" and "[s]ervices that are essential to achieve health equity," *id.* § 415.500(2)—refers to yet another term ("health equity") that the legislature failed to define. HB 2362 provides only that "health equity" means whatever OHA and the Oregon Health Policy Board say it means. *See id.* § 415.500(5) ("'Health

9

equity' has the meaning prescribed by the Oregon Health Policy Board and adopted by the authority by rule.").[1]

Similarly, although HB 2362 defines "transaction" to mean (among other things) "a *corporate affiliation* involving at least one health care entity," the statute does not define the term "corporate affiliation." Instead, it provides that a "corporate affiliation" "has the meaning prescribed by the Oregon Health Authority by rule," and otherwise offers just two examples of affiliations encompassed by the term. *See id.* § 415.500(1).

## C.   Review and Approval Requirements

HB 2362 establishes four stages applicable to health care entities that plan to engage in a material change transaction: (1) notice, (2) preliminary review, (3) comprehensive review, and (4) fees and penalties.

With respect to notice, HB 2362 requires any health care entity to provide OHA not less than 180 days' advanced notice of any material change transaction. *Id.* § 415.501(3), (4). After receiving the required notice from the parties, the statute directs OHA to "conduct a preliminary review to determine if the transaction has the potential to have a negative impact on access to affordable

---

[1] The Oregon Health Policy Board is a nine-member citizen board that oversees OHA. ER-35.

health care in this state **and** meets the criteria in subsection (9) of this section." *Id.* § 415.501(5).

Following preliminary review, a proposed transaction "shall" be approved or approved with conditions "*based on criteria prescribed by the authority by rule, including but not limited to*":

> (a) If the transaction is in the interest of consumers and is urgently necessary to maintain the solvency of an entity involved in the transaction; or

> (b) If the authority determines that the transaction does not have the potential to have a negative impact on access to affordable health care in this state or the transaction is likely to meet the criteria in subsection (9) of this section.

*Id.* § 415.501(6)(a)–(b) (emphases added).

Once again, the legislature provided OHA with the ability to create the criteria it would use to determine whether to approve a proposed transaction after preliminary review, or whether a proposed transaction would be approved with conditions. *Id.* § 415.501(6). The statute expressly leaves the door open for the agency to devise and apply criteria other than those listed in the statute. *Id.* Nothing in the statute prevents the agency from imposing such onerous conditions on a proposed transaction that the transaction cannot proceed, and nothing in the law provides even a general standard against which those conditions can be measured for consistency with the legislature's command. This structure goes far

11

beyond regulation designed to effectuate a legislative choice.  Instead, it gives the agency unrestrained, and unreviewable, power.

The reference to "the criteria in subsection (9)" reinforces the enormous scope of authority the statute delegates to the agency.  Subsection (9) provides that a health care entity may engage in a material change transaction if "the authority determines that the transaction meets the criteria adopted by the department" and the criteria enumerated in subsection (9) itself.  *Id.* § 415.501(9).  One of the criteria announced in subsection (9) is "[r]ectifying historical and contemporary factors contributing to a lack of health equities."  *Id.* § 415.501(9)(a)(A)(iii).  As previously noted, "health equity" has "the meaning prescribed by the Oregon Health Policy Board and adopted by the authority by rule."  *Id.* § 415.500(5). Thus, the determination of whether to approve a proposed transaction is not based on criteria established by the legislature, but rather by an executive agency— including the agency's assessment of whether a particular transaction is likely to rectify a lack of health equity (a term that HB 2362 charges the Oregon Health Policy Board with defining).

If a transaction fails to meet OHA's standards for preliminary approval, then OHA conducts a "comprehensive review."  *Id.* § 415.501(7)(a).  Importantly, the stated criteria for approval after the comprehensive review process are a conjunctive list.  Parties seeking to enter into a material change transaction must

demonstrate both (1) that the transaction will "benefit the public good and communities" by causing any one of a number of positive effects, *id.* § 415.501(9)(a)(A); *and* (2) that there is no substantial likelihood of anticompetitive effects that outweigh the benefits of the transaction in increasing or maintaining services to underserved populations, *id.* § 415.501(9)(b). Even if the parties satisfy both of those requirements, they once again must persuade OHA "that the transaction meets the criteria adopted by the department by rule." *Id.* § 415.501(9). Thus, as with preliminary review, the comprehensive review process requires, as a necessary condition, satisfying whatever criteria the agency sees fit to establish, and the legislature has placed no limits on those criteria.

HB 2362 provides for two types of remedies when OHA determines that a covered entity has violated the law. First, "[w]henever it appears to the Director of [OHA] that any person has committed or is about to commit a violation" of the statute or a related administrative rule, the Director may seek an injunction and "such other equitable relief as the nature of the case and the interest of the public may require." *Id.* § 415.501(22). Second, HB 2362 authorizes the Director to impose civil penalties of up to $10,000 for each violation. *Id.* § 415.900(1).

## D. Procedural History

The Hospital Association is a statewide nonprofit trade association representing Oregon hospitals and health systems. ER-52 ¶ 7. The Hospital

Association's members include hospitals and health systems that may be subject to HB 2362's requirements. ER-52 ¶ 8. The Hospital Association filed the operative complaint on December 19, 2022, alleging that HB 2362 violates the Due Process Clause of the Fourteenth Amendment and the Oregon Constitution's nondelegation doctrine. *See* ER-49–80. The parties filed competing motions for summary judgment. *See* Defendants' Motion for Summary Judgment, ECF 28 (May 26, 2023); Plaintiff's Cross-Motion for Summary Judgment, ECF 31 (July 14, 2023). The Hospital Association argued that on its face, HB 2362 was void for vagueness under the Due Process Clause of the Fourteenth Amendment because it fails to provide fair notice of what is prohibited and because it encourages arbitrary enforcement. The Hospital Association further asserted that HB 2362 violates nondelegation principles in the Oregon Constitution. Defendants, by contrast, argued that HB 2362 is not unconstitutionally vague. They took the position that the district court should decline to exercise supplemental jurisdiction over the Hospital Association's state-law claim, and that HB 2362 comports with nondelegation principles in any event.

The district court granted Defendants' motion for summary judgment on the Hospital Association's facial vagueness challenge and declined to exercise supplemental jurisdiction over its claim under the Oregon Constitution. ER-4–48. This appeal followed.

## V. STATEMENT REGARDING ADDENDUM

Pertinent constitutional, statutory, and regulatory provisions appear in the Addendum to this brief.

## VI. SUMMARY OF THE ARGUMENT

The Due Process Clause of the Fourteenth Amendment prevents a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108. The prohibition against vagueness "is a well-recognized requirement" that is required by both "ordinary notions of fair play and the settled rules of law." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (internal quotation marks and citation omitted). To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and—equally if not more importantly—must include sufficient standards to prevent arbitrary and discriminatory enforcement. *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018) (plurality opinion).

HB 2362 fails that constitutional test. First, the key statutory definitions do not, in fact, identify to whom and to what the law applies. HB 2362 purports to define the "health care entit[ies]" and the "material change transactions" that will be covered by the law. *See* Or. Rev. Stat. § 415.500(4), (6). But the definitions of

15

those phrases do not provide fair notice of whether the law applies to any person, nor whether that person may face penalties for engaging in a particular transaction. The definition of "health care entity" is, in fact, a non-exclusive list of some, but not all, of the types of entities "include[d]" in the statute's sweep. It also contains a residual clause that leaves critical terms undefined and requires any entity that conceivably could touch on some aspect of health care, and the agency tasked with enforcing the law, to attempt to divine what types of entities the Oregon legislature intended to include.

The definition of "material change transaction" also leaves important terms undefined and wholly subject to the agency's discretion, requiring entities potentially subject to the law and courts to guess at whether a particular transaction is one that will, for example "eliminate or significantly reduce . . . essential services." *Id.* § 415.500(10)(c). In the absence of even a general legislative standard against which to measure the lawfulness or unlawfulness of a particular transaction, the agency's attempt to bring clarity to HB 2362 through extensive rulemaking and sub-regulatory guidance only underscores the statute's fatal vagueness.

In addition to its ill-defined sweep, HB 2362 delegates standardless authority to the agency to determine the criteria to be used when deciding whether a particular transaction is lawful. In other words, the statute puts the fox in charge of

16

guarding the henhouse. The very purpose of the vagueness doctrine's prohibition against arbitrary enforcement, which the district court all but ignored, is to guard against this sort of regime. By delegating unrestricted authority to OHA to decide what conduct lies within its reach and will be permitted, and what conduct is impermissible, HB 2362 is unconstitutionally vague.

## VII. ARGUMENT

### A. Standard of Review

"Whether a statute or regulation is unconstitutionally vague is a question of law reviewed de novo." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 946 (9th Cir. 2013) (internal quotation marks and citation omitted).

In the district court, OHA argued that to pursue a facial vagueness challenge, the Hospital Association must establish that HB 2362 is vague in every conceivable application. *See* Defendants' Motion for Summary Judgment, ECF 28 (May 26, 2023), at 9–10. As the Hospital Association pointed out below, *see* Plaintiff's Cross-Motion for Summary Judgment, ECF 31 (July 14, 2023), at 17–19, that is not the current law in the Supreme Court or this Circuit. In the past, plaintiffs raising a facial vagueness challenge had to "establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). But two Supreme Court decisions, *Johnson*

17

and *Dimaya*, altered the test. In *Johnson*, the Court concluded that a criminal statute "produce[d] more unpredictability and arbitrariness than the Due Process Clause tolerates" and was unconstitutionally vague in its entirety, even though there were some "straightforward cases"—crimes that clearly would qualify as violent felonies—that fell within its scope. 576 U.S. at 598, 602. Although it acknowledged the language of previous cases requiring vagueness to be proven in all applications or all circumstances, the Court then explained that "our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Id.* at 602.

In *Dimaya*, the Court reaffirmed that principle. *Dimaya*, 584 U.S. at 159 n.3. The Court invalidated as facially vague a similarly worded residual clause in an immigration statute that authorized the removal of aliens convicted of "a crime of violence." *See id.* at 154–63. Responding to points made in dissent (which reiterated the vague-in-all-applications test), the majority confirmed that "*Johnson* made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'" *Id.* at 159 n.3 (quoting *Johnson*, 576 U.S. at 602).

In *Guerrero v. Whitaker*, 908 F.3d 541 (9th Cir. 2018), this Court addressed the legal standard for facial void-for-vagueness challenges in light of *Johnson* and *Dimaya*. The Court explained:

> Applying the teachings of *Johnson* and *Dimaya* here, we conclude that we applied the wrong legal standard in *Alphonsus [v. Holder*, 705 F.3d 1031 (9th Cir. 2013)]. There, we held that the petitioner "must establish that no set of circumstances exists under which the statute would be valid." *Alphonsus*, 705 F.3d at 1042 (brackets omitted) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In a footnote, we observed that the "no set of circumstances" standard was subject to some doubt but that we would continue to apply that standard "until a majority of the Supreme Court directs otherwise." *Id.* at 1042 n.11 (internal quotation marks and brackets omitted). That day has come. *Johnson* and *Dimaya* expressly rejected the notion that a statutory provision survives a facial vagueness challenge merely because some conduct clearly falls within the statute's scope. *Johnson*, 135 S. Ct. at 2561; *Dimaya*, 138 S. Ct. at 1214 n.3.

*Id.* at 544; *see also United States v. Cook*, 914 F.3d 545, 553 (7th Cir.) (explaining that *Johnson* "put[] to rest the notion . . . that a litigant must show that the statute in question is vague in all of its applications in order to successfully mount a facial challenge" (emphasis omitted)), *judgment vacated on other grounds*, 140 S. Ct. 41 (2019).

Supreme Court cases since *Guerrero* have validated that view. When describing the standard for a facial challenge, the Court has twice phrased the test in the disjunctive. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (in

19

cases not based on the First Amendment "a plaintiff cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep'" (alterations in original; citation omitted)); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) ("Normally, a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,' *United States v. Salerno*, 481 U.S. 739, 745 (1987), or show that the law lacks 'a plainly legitimate sweep,' *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation marks omitted)."). Thus, a void-for-vagueness challenge may proceed even if the defendant identifies some conduct that clearly falls within the challenged statute's reach.[2]

## B.  Facially Vague Statutes Violate the Fourteenth Amendment

An unconstitutionally vague statute can result in two fundamental problems. *Knox v. Brnovich*, 907 F.3d 1167, 1182 (9th Cir. 2018).  First, a statute may fail to provide fair notice.  The Due Process Clause requires that "'a fair warning . . . be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'"  *Bittner v. United States*, 598 U.S. 85, 102 (2023) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)).  Put

---

[2] The district court declined to take a position on the standard that applies to a facial void-for-vagueness challenge. ER-21.

differently, a statute must "provide a person of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304; *see Fox Television*, 567 U.S. at 253 (explaining that "regulated parties should know what is required of them so they may act accordingly"). Second, laws must provide proper "precision and guidance" to ensure that "those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television*, 567 U.S. at 253 (citing *Grayned*, 408 U.S. at 108–09); *see id.* (explaining that a law is unconstitutionally vague if it "'is so standardless that it authorizes or encourages seriously discriminatory enforcement'" (quoting *Williams*, 553 U.S. at 304)). When laws fail to "provide explicit standards for those who apply them," they "impermissibly delegate[] basic policy matters . . . for resolution on an ad hoc and subjective basis." *Grayned*, 408 U.S. at 108–09.

The vagueness doctrine "is a corollary of the separation of powers— requiring that [the legislature], rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Dimaya*, 584 U.S. at 156 (plurality opinion); *see also id.* at 181 (Gorsuch, J., concurring in part and concurring in the judgment) ("Although today's vagueness doctrine owes much to the guarantee of fair notice embodied in the Due Process Clause, it would be a mistake to overlook the doctrine's equal debt to the separation of powers."); *Davis*, 588 U.S. at 451

(noting that "[v]ague laws . . . undermine the Constitution's separation of powers and the democratic self-governance it aims to protect").

## C. HB 2362 Is Hopelessly and Unconstitutionally Vague

### 1. The Definition of "Health Care Entity" Does Not Define to Whom the Law Applies

#### a. "Health Care Entity" Is Non-Exclusive and Open-Ended

HB 2362 purports to define who will be covered by the law: any "health care entity." *See* Or. Rev. Stat. § 415.500(4)(a). That definition, of course, is critical, because it dictates to whom HB 2362 applies. The definition of "health care entity," however, does not provide parties fair notice of whether the law applies to them nor whether they may face penalties for conducting a particular transaction. Instead, in two critical respects, the definition leaves it entirely up to OHA to determine whether the law will apply.

First, the statute does not provide a definition; it provides a suggestion. The definition of "health care entity" is a non-exclusive list of six examples of what a health care entity "includes" and two examples of what it "does not include." *See id.* § 415.500(4)(a), (b). This structure contrasts with HB 2362's other definitions, which define *every other* term to "mean[]" something or "ha[ve] the meaning" provided in another statute. *See id.* § 415.500(1), (2), (3), (5), (6), (7), (8), (9), (10). That distinction is significant. The Supreme Court and other courts have recognized that "the term 'means'. . . generally signifies the presence of 'an

22

exclusive definition.'" *Carroll v. Trump*, 49 F.4th 759, 769 (2d Cir. 2022) (quoting *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008)). The term "includes," by contrast, "'is usually a term of enlargement, and not of limitation.'" *Burgess*, 553 U.S. at 131 n.3 (quoting 2A N. Singer & J. Singer, *Sutherland on Statutory Construction* § 47:7, at 305 (7th ed. 2007)); *see also Groman v. Comm'r*, 302 U.S. 82, 86 (1937) ("[W]hen an exclusive definition is intended the word 'means' is employed . . ., whereas here the word used is 'includes.'"); *Carroll*, 49 F.4th at 769 (noting the "expansive meaning generally ascribed to" the term "include"); *Robinson v. Comm'r*, 119 T.C. 44, 57 (2002) ("If . . . the statute in question uses the word 'includes' rather than 'means' to define a term, then there is an indication that the definition of the term is exemplary rather than exclusive.").

HB 2362, in other words, provides an open-ended list of entities to which it applies and to which it does not apply. But the statute does not actually define the outer boundaries of the "health care entities" that will be subject to its requirements or excluded from its scope. Where a statute leaves persons and courts to guess whether any person falls within its grasp, it suffers from fundamental vagueness. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'" (alteration in original; citation omitted)).

Even if HB 2362's non-exclusive definition of "health care entity" did not alone present a fatal constitutional flaw (which the Hospital Association believes it does), the term's indefinite scope, combined with the statute's open-ended residual clause, renders it fundamentally defective. The definition of "health care entity" includes a residual clause encompassing "[a]ny other entity that has as a primary function the provision of health care items or services or that is a parent organization of, or is an entity closely related to, an entity that has as a primary function the provision of health care items or services." Or. Rev. Stat. § 415.500(4)(a)(F). The term "primary function" is undefined, as is what qualifies as a "health care item[] or service[]" and what it means to be "closely related to" another entity.

The Supreme Court has sustained a vagueness challenge to a residual clause that, like this one, used terms that injected imprecision and uncertainty into the statutory standard. In *Johnson*, the Court analyzed the Armed Career Criminal Act's definition of "violent felony." 576 U.S. at 593–94. The statute defined the term to mean, in relevant part, a crime punishable by more than a year in prison that "'is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*.'" *Id.* at 596 (citation omitted; emphasis added). The Court concluded that although other parts of the definition provided clear standards, the residual clause

24

italicized above "le[ft] grave uncertainty" about how to estimate the risk posed by a crime, and how much risk would suffice for a crime to qualify as a violent felony. *Id.* at 597. The Court reasoned that several of the terms used in the residual clause, including "serious potential risk," provided an imprecise standard requiring "judge-imagined abstraction." *Id.* at 598.

Here, as in *Johnson*, HB 2362's definition of "health care entity" leaves "grave uncertainty" regarding how to determine whether an entity is covered by the law and what facts or standards are to be used to answer that question. *Id.* at 597. As in *Johnson*, other parts of the definition—like the fact that "health care entity" includes individual health professionals and hospitals—provide ascertainable standards. Or. Rev. Stat. § 415.500(4)(a)(A), (B). But the residual clause's failure to define critical terms requires entities like the Hospital Association and courts to imagine what the Oregon legislature might have intended by "health care items or services," "primary function," or "closely related." Are manufacturers of health care drugs, supplies, and equipment, such as N95 masks, bandages, or instant-read thermometers, "health care entit[ies]" because their primary function is the provision of "health care items"? What about a company that manufactures components essential for health care devices or equipment, but that have non-health care uses? Is a company's "primary function" determined by the share of revenue derived from health care items, share of profits, or some other

25

metric related to the customers it serves? Is a software company that offers an application to help diabetics track blood sugar a "health care entity," or are those services not "health care" services because the software company is not a licensed provider? Does a key customer or supplier qualify as "closely related to" a "health care entity"? Or must the entity have some ownership interest or stake in the "health care entity"? These unsettled questions evince just some of the "abstractions" that HB 2362 demands of those seeking to interpret its dictates. Ultimately, its "residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson*, 576 U.S. at 598.

Critically, the ambiguity in the meaning of "health care entity" is central to HB 2362's operation. The term "health care entity" identifies which entities must provide notice to OHA of a covered transaction and submit to the agency's approval process. But the term is not defined in a manner that gives a reasonable person fair notice of what is prohibited. In other words, it "'specifie[s]'" "'no standard of conduct . . . at all.'" *United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)); *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 495 n.7 (1982).

The risk of arbitrary and uneven enforcement is also present. *Fox Television*, 567 U.S. at 253. The enforcing authority here—OHA—has no

apparent or demonstrated expertise in evaluating corporate relationships, functions, or affiliations, or identifying what a company's "primary purpose" may be. Thus, this is not a circumstance where filling in the gaps of a technical definition is left to the expertise of an agency clearly qualified to do so. Instead, OHA is tasked with defining in the first instance a company's primary functions and affiliations within a corporate structure. Without any common or even recognized standard by which it can make such determinations, the result must necessarily be ad hoc and created out of whole cloth.

> **b.    The Hospital Association Has Standing to Raise a Vagueness Challenge to the Definition of "Health Care Entity"**

The district court concluded that the Hospital Association could not bring a facial challenge to the definition of "health care entity" because the Hospital Association had not argued that the term is vague as applied to any of its members. ER-33. But the court's conclusion is clearly at odds with the nature of a facial challenge and the exception to standing requirements that such a challenge entails. "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of L.A., Cal. v. Patel*, 576 U.S. 409, 415 (2015). Facial vagueness challenges unquestionably are appropriate even when the regulated activity is not speech and does not implicate the First Amendment. The Supreme Court, for example, has considered a variety of vagueness challenges that fall

outside the First Amendment context. *Johnson*, 576 U.S. 591; *Dimaya*, 584 U.S. 148; *see also City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (clarifying that the overbreadth doctrine applies to First Amendment issues, but, "even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards"); *Coates*, 402 U.S. at 614 (holding that an ordinance prohibiting annoying conduct was facially vague); *Giaccio v. Pennsylvania*, 382 U.S. 399, 403 (1966) (invalidating law that allowed juries to transfer the prosecution's costs to the defendant because the law gave "jur[ies] such broad and unlimited power in imposing costs on acquitted defendants that the jurors must make determinations of the crucial issue upon their own notions of what the law should be instead of what it is"). And, as outlined above, the Court no longer requires—in a pre-enforcement facial vagueness challenge—that the plaintiff meet the "no set of circumstances" standard, either in their own right or as applied to others.

The criminal cases on which the district court relied are distinguishable. In *Sabri v. United States*, 541 U.S. 600 (2004), the defendant challenged his indictment pursuant to a federal anti-bribery statute as an invalid exercise of congressional authority under Article I of the Constitution. He argued that the statute was facially invalid because it failed to require proof of any connection between federal funds and the alleged bribe, even though his conduct easily would

28

have satisfied such a statutory nexus if it were in fact required.  *Id*. at 603–04.  The Court rejected the defendant's argument on the merits, but also observed, regarding the defendant's facial challenge, that facial attacks are disfavored when an "overbreadth" challenge is made by a person whose conduct clearly falls within the statute's scope.  Similarly, *United States v. Van Hawkins*, 899 F.2d 852 (9th Cir. 1990), involved a facial challenge to the term "cocaine base" in an indictment as unconstitutionally vague.  The court observed that "when a vagueness challenge is not based on First Amendment freedoms, the challenge must be examined in light of the facts of the case at hand."  *Id*. at 854.

For the reasons outlined above, however, that standard is not applicable to a facial challenge after *Morales*, *Johnson*, and more recent cases—all of which permit facial vagueness challenges outside the First Amendment context.  Under these cases, when a party brings a pre-enforcement challenge and contends that the law lacks any plainly legitimate sweep or defines no standard of condut to begin with, then a facial challenge is appropriate even if the party bringing the challenge clearly falls within the statute's ambit.

In addition, neither *Sabri* nor *Van Hawkins* analyzed Article III standing for purposes of a facial vagueness challenge.  As the Hospital Association demonstrated below, it has both organizational and representational standing to bring this challenge because HB 2362 results in a diversion of the Hospital

Association's resources, frustration of its mission, and threatens to harm its members that are engaged in a course of conduct that HB 2362 arguably proscribes. *See* Plaintiff's Supplemental Briefing in Response to March 11, 2024, Order, ECF 43 (Mar. 25, 2024), at 12–19. As this Court has observed, "[a] void-for-vagueness challenge is rooted in the Due Process Clause. And an imminent threat to life, liberty, or property interests without due process of law, in violation of the Fifth and Fourteenth Amendments, is a cognizable injury." *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023); *see also Vill. of Hoffman Ests.*, 455 U.S. at 497 ("A law that does not reach constitutionally protected conduct . . . may nevertheless be challenged on its face as unduly vague, in violation of due process."); *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023).

For at least those reasons, the district court should have reached the merits of the Hospital Association's vagueness challenge to the definition of "health care entity" and concluded that the definition is void for vagueness.

## 2. The Definition of "Material Change Transaction" Lies Solely in the Agency's Hands

HB 2362's definition of "material change transaction"—which defines the conduct that is subject to regulation—is also unconstitutionally vague, providing a separate and independent reason for reversal. Once one navigates the various cross-references in the statute, a fundamental problem emerges: What does or does not constitute a "material change transaction" is left entirely up to the agency to

determine. Put simply, the agency has complete and standardless discretion to define whether a contract, relationship, or other affiliation qualifies as a "transaction," which leaves both parties and OHA adrift.

The plain terms of the statute compel that result. HB 2362 defines "material change transaction" as a "transaction" that meets certain revenue thresholds. Or. Rev. Stat. § 415.500(6)(a). "Transaction," in turn, includes not only well-understood transactions—such as mergers and acquisitions—but any "[n]ew contracts, new clinical affiliations and new contracting affiliations that will *eliminate or significantly reduce*, as defined by the authority by rule, *essential services*." *Id.* § 415.500(10)(c) (emphases added). The term "eliminate or significantly reduce" is not defined in the statute. "Essential services" is defined to mean, among other things, "[s]ervices that are *essential* to achieve *health equity*." *Id.* § 415.500(2)(b) (emphasis added).

This definitional chain has two fundamental problems. First, the statute does not define "health equity," nor does that term have an "'ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Instead, the phrase "health equity" is left to the Oregon Health Policy Board and the agency to define. Or. Rev. Stat. § 415.500(5) ("'Health equity' has the meaning prescribed by the Oregon Health Policy Board and adopted by the authority by rule."). Thus, the

31

statute does not just use a new and uncertain phrase. It makes that phrase entirely subject to whatever definition the agency provides.

Second, the term "essential" is a chameleon. Courts have recognized that "[i]n use, its meaning varies considerably from one context to another." *Krause v. Titleserv, Inc.*, 402 F.3d 119, 126 (2d Cir. 2005). "For example, one might say it is 'essential' when driving a car to stay alert. This does not mean it is impossible to drive a car without being alert, but rather stresses the importance of staying alert. Similarly, one might ask an 'essential' question. This does not mean the question had to be asked, but rather that it goes to the heart of the matter." *Id.* When used as a synonym of "necessary," the term "'may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought.'" *Id.* (quoting *Black's Law Dictionary* 928 (5th ed. 1979)).

Thus, HB 2362's laborious and costly processes might apply only to transactions that "eliminate or significantly reduce" services without which it would be *impossible* to achieve "health equity," or it could instead apply to transactions that "eliminate or significantly reduce" services that would be *conducive* to achieving "health equity." The transactions to which HB 2362 applies turn on which understanding the legislature intended. But the statute does not make its intention clear, leaving parties to take their best guess and risk

significant financial penalties if their guess proves (based on the agency's say-so) to be incorrect.

As a result of the statutory text and structure, whether a contract will qualify as a "material change transaction" depends entirely on undefined impacts that the agency, in its complete and sole discretion, will identify. A transaction will qualify as a "transaction" for purposes of HB 2362 if it significantly reduces *something*, but it is entirely up to the agency to define what that something is. And it is also up to the agency to define what constitutes a "significant[]" reduction of that something. The problems with this approach are evident. Are particular types of surgery or procedures essential to achieving health equity? If so, which ones? If a transaction will reduce or eliminate the availability of a procedure for everyone, is that inequitable? Are impacts judged on an overall net basis, or would the elimination of one service be sufficient to trigger the statute?

All of those questions, and more, are left open by the statute without any guidance or limitation. "The requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values . . . and permits meaningful judicial review." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984). HB 2362 frustrates those goals. Ultimately, OHA could define what is "essential" to achieve "health equity" in any way that it chooses. And

33

because the statute gives OHA the express ability to supply that definition, there would be no way to measure whether the agency's command is consistent with any legislative policy or standard. Contrary to the district court's conclusion, that problem is not solely one of delegation, but of vagueness as well. Such a statute does not pass constitutional muster. *See Winters v. New York*, 333 U.S. 507, 519 (1948) (striking as vague a clause that left open "'the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against'" (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921))).

### 3. The Criteria for Approval or Denial (and the Conditions on Which Transactions Depend) Are Unconstitutionally Vague

As explained above, HB 2362's problems begin with the triggering definitions—who is subject to its requirements and which transactions are subject to its notice and review requirements. Once one gets past those requirements, however, the criteria (or lack thereof) for determining whether conduct is permissible confirm the statute's fatal vagueness. Approval or denial of a transaction (or the imposition of conditions on the transaction) requires wholly subjective judgments without legislative definitions, narrowing context, or settled legal meanings.

HB 2362 does not include sufficiently objective and defined criteria for OHA to apply when conducting a review of a proposed "material change

34

transaction."  With respect to preliminary review of a proposed transaction, the cross-references to subsection (9) require transactions to satisfy criteria that the agency alone establishes.  In addition, because the transaction must comply with whatever rules the agency promulgates, and it provides no standard or guidance for what those rules must require, the result is that a transaction may be approved or not approved based on the agency's say-so.  The statutory text and structure leave both the parties and the agency uncertain of what exactly the law requires.

The criteria for approval after comprehensive review suffer from a similar flaw.  Even if parties navigate the other criteria for approval—including whether the transaction will "benefit the public good and communities"—they still must show that "the transaction meets the criteria adopted by the department by rule under subsection (2)."  Or. Rev. Stat. § 415.501(9)(a)(A).  As a result, parties might be able to satisfy every requirement that the *legislature* imposed, but the transaction would still not be approved because it did not satisfy the *agency's* additional requirements.  And there is no legislative standard by which to measure those additional requirements.  They could be (and are) anything.  Including some specific requirements, but leaving a key and essential requirement open-ended, is not sufficient to provide adequate notice or prevent arbitrary enforcement.

Indeed, the relevant rules prove this point.  Oregon Administrative Rule 409-070-0060(6)(a)(B) provides that a transaction is prohibited if it is "contrary to

law." Yet that requirement—compliance with the "law"—is only in the administrative rule and has no basis in the statute itself. And the authority that the agency has given to itself is breathtaking. Apparently, if the agency believes that there is *any* "substantial likelihood" that the transaction would run afoul of *any* statutory or common law principle, it can be made subject to onerous conditions or denied outright.

Similarly, Oregon Administrative Rule 409-070-0060(6)(a)(D) provides that a transaction is prohibited, and will not receive agency approval, if it would "[o]therwise be hazardous or prejudicial to consumers or the public." That open-ended and hopelessly vague requirement is also nowhere to be found in the statute, but as a result of the statutory text, it must be met before a transaction can be deemed lawful.

Equally important, the statute does not give the agency any direction as to which conditions would advance the "public interest," or even what considerations would inform the imposition of conditions to advance that goal. Indeed, OHA's rules allow the agency to impose conditions on transactions *even when the transaction meets all of OHA's criteria for approval*. Or. Admin. R. 409-070-0065. The only possible limiting principle is that the conditions serve the "public interest." Or. Admin. R. 409-070-0000(2); Or. Rev. Stat. § 415.501(1). Thus, even if the parties to a transaction somehow satisfy the agency's arbitrary and

vaguely defined standards for approval, the agencies can still place onerous conditions on the parties' future behavior with no meaningful limiting principle or standard.

## D.    The District Court Erred in Its Analysis and Conclusion

### 1.    Administrative Regulations and Sub-Regulatory Guidance Fail to Cure the Statute's Vagueness

At Defendants' urging, the district court concluded that, even if HB 2362 is itself vague in critical ways, the Hospital Association's constitutional challenge should be rejected because OHA has issued regulations and "sub-regulatory guidance" that allegedly clarify the vagueness inhering in the statute itself.  ER-30.  In other words, the court agreed that any unconstitutional vagueness in the statute is fixed by later agency interpretations, including documents (such as sub-regulatory guidance) that do not have the force of law.  The district court's and Defendants' reliance on OHA's regulations and sub-regulatory guidance as a cure for HB 2362's vagueness was misplaced for several reasons.

#### a.    Allowing Formal and Informal Agency Determinations and Statements to Complete an Otherwise Vague Statute Is Inconsistent with Due Process

The district court repeatedly noted that OHA's regulations and other agency information could provide parties with notice of what *the agency* would require or how *the agency* interpreted the statute.  ER-38, 40.  Preventing unconstitutional vagueness, however, is a *legislative* task.  Due process requires, first and foremost,

37

an ascertainable *legislative* standard. *Grayned*, 408 U.S. at 108 ("[A]n enactment is void for vagueness if its prohibitions are not clearly defined."). Otherwise, agency (or judicial) interpretations are essentially ad hoc and arbitrary. Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 YALE L. J. 1672, 1722 (2012) (explaining that "the Due Process Clause was originally understood to apply to legislative as well as executive and judicial acts"); *L. Cohen Grocery*, 255 U.S. at 87 (a vague statute "amount[s] to a delegation by Congress of legislative power to courts and juries to determine what acts should be held to be criminal and punishable"). As the Supreme Court has recently emphasized, the vagueness doctrine acts as a corollary of the separation of powers. *Davis*, 588 U.S. at 451 ("Our doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers."). As Justice Gorsuch explained (first in concurrence in *Dimaya* and then for the Court in *Davis*), "[v]ague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect." *Id.*; *Dimaya*, 584 U.S. at 181 (Gorsuch, J., dissenting in part and concurring in the judgment) ("Although today's vagueness doctrine owes much to the guarantee of fair notice embodied in the Due Process Clause, it would be a mistake to overlook the doctrine's equal debt to the separation of powers."). Enacting basic policy choices in a manner that provides fair notice to regulated parties and prevents enforcement

that is untethered to any standard is a feature of democratically elected legislatures and cannot be left wholly to agency discretion. OHA cannot solve through rulemaking and agency guidance the fundamental problem that the legislature created by enacting an unconstitutionally vague statute.

### b. The District Court Overlooked the Arbitrary and Discriminatory Enforcement Concern.

Related to that point, the vagueness doctrine not only requires the legislature to fulfill its basic responsibility—giving fair notice of its prohibitions and restrictions—but also is designed to prevent arbitrary and discriminatory enforcement. *Fox Television*, 567 U.S. at 253 ("precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way"). A premise of the vagueness doctrine is that parties cannot be expected to simply trust the executive absent sufficiently clear standards from democratically elected representatives. For an agency to have the power to save an otherwise unconstitutionally vague statute by setting its own guidelines is precisely what the arbitrary-enforcement prong of the void-for-vagueness analysis is designed to prevent.

The court's reliance on administrative regulations and sub-regulatory guidance entirely ignores those concerns. *See id.* at 255 ("Just as in the First Amendment context, the due process protection against vague regulations 'does not leave [regulated parties] . . . at the mercy of *noblesse oblige*.'" (brackets and

ellipsis in original; citation omitted)); *Grayned*, 408 U.S. at 110 (when assessing whether a statute is vague, court looks to "'the words of the ordinance itself,' to the interpretations the court below has given to analogous statutes, and, *perhaps to some degree*, to the interpretation of the statute given by those charged with enforcing it" (emphasis added)). The district court not only cited promulgated rules, but sub-regulatory guidance and Q&A documents that provide "high-level information" about the statute, which are published on OHA's website or elsewhere. If those documents are sufficient to cure a statute's vagueness, then the law necessarily demands that regulated parties (which, for HB 2362, is an undefined and vast population) not only stay abreast of interpretations, regulations, and documents, but also shift behavior in reaction to any changes in such documents, no matter how radical. But doctors, entities, or others subject to HB 2362's requirements should not have to hunt and peck for administrative-agency-supplied materials on websites to know what a statute requires, nor should the legislature be relieved of its constitutional burden because the agency can attempt to fix it later through a Q&A document. Pointing to regulations or informal guidance and statements by the agency (some of which could be changed without warning or justification) does not address, much less solve, the basic problem; would undermine the arbitrary-enforcement prong of vagueness analysis;

40

and is also inconsistent with the separation-of-powers rationale that underlies the vagueness doctrine.

### c.    The Agency's Regulations and Guidance Prove Plaintiff's Point

The district court also concluded that, at least when a statute regulates only "economic activity," a vagueness challenge "cannot succeed if 'administrative regulations . . . *sufficiently narrow* potentially vague or arbitrary interpretations of the [law].'"  ER-29 (emphasis added).  Of course, "'[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered.'"  *Kolender v. Lawson*, 461 U.S. 352, 355 (1983) (citation omitted).  But that is an interpretive rule governing a federal court's analysis of state law.  And there is a difference between a "limiting construction" on a broad but definite standard and the wholesale creation of standards in the first instance.  Indeed, one reason that courts examine administrative interpretations or enforcement history is that the executive's interpretations may reinforce, rather than ameliorate, the law's vagueness.  *Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.*, 660 F.3d 612, 622 (2d Cir. 2011) ("Defendants' various interpretations of . . . [the] requirements serve only to reinforce our view that the ordinance's vagueness authorizes arbitrary enforcement."); *cf. United States v. Lachman*, 387 F.3d 42, 57 (1st Cir. 2004) ("When the agency itself issues contradictory or misleading public interpretations

of a regulation, there may be sufficient confusion for a regulated party to justifiably claim a deprivation of fair notice.").

That is the case here, as OHA's regulations, guidance, and other documents confirm. The agency's regulations and sub-regulatory guidance in this case inject *more*, not less, vagueness into the regulatory framework. For example, in the district court, Defendants identified sub-regulatory documents that offered hypothetical examples of the types of scenarios OHA believes constitute a transaction that "significantly reduces" what it understands as "essential services." *See* OHA, *Defining Essential Services & Significant Reduction*, https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO-Essential-Services-and-Significant-Reduction-Guidance-FINAL.pdf (last accessed Nov. 20, 2024). The document pronounces that "a significant reduction of essential services occurs when the transaction will result in a change of one-third or more" on any one of a variety of metrics. *Id.* at 3. It offers as an example a hypothetical "contracting affiliation" in which an existing hospital and clinic propose to move some primary care providers from the clinic to the hospital's campus. *Id.* at 11. The agency explains that it would analyze eight criteria to determine whether the transaction will result in a reduction of essential services, although the agency does not explain how OHA selected those criteria. *Id.* After applying the hypothetical facts to its newly created criteria, OHA concludes the transaction would not reduce

the overall number of providers; would not reduce the number of providers serving new, uninsured, or underinsured patients; would not reduce the availability of essential services; would not increase appointment wait times; would not increase barriers to community members seeking care; and would not reduce any specific type of care. *Id.* Nevertheless, the agency concludes that the hypothetical affiliation would result in a "significant reduction" of essential services because it would increase by five miles the median distance traveled by patients, from 10 to 15 miles, an increase of more than one third. *Id.*

The agency's own example makes plain the absurdity of the standard it created in the absence of any legislative guidance. Under a different hypothetical, a difference of one third could mean less than a mile or more than 100 miles. Is a five-mile difference meaningful enough to be "significant"? What if, as one might expect, patients have access to a variety of forms of public transportation when traveling to the hospital but not when traveling to the clinic? And as a practical matter, how reliable are the data used to make this assessment and how much time and money will providers and OHA have to spend to find out whether the transaction meets the agency's arbitrary threshold?

Nothing in HB 2362 gives parties or the agency even a general normative standard against which to measure the lawfulness or unlawfulness of a transaction that increases patient travel time by one third where the transaction would

43

otherwise preserve the status quo. OHA's inability to craft an understandable and predictable approach to assessing when a transaction is permissible or impermissible demonstrates that HB 2362 lacks any standard to guide OHA and underscores the statute's incurable vagueness.

The district court acknowledged the difference between fair notice and the risk of arbitrary enforcement but ultimately categorized the Hospital Association's arbitrary-enforcement argument as "one of delegation," faulting the Hospital Association for failing to point to authority "to support the proposition that a risk of arbitrary enforcement that violates due process may be found only because a statute delegates to an agency the authority to develop rules to guide implementation." ER-44. That was wrong. The purpose of the second, and independent, prong of the vagueness inquiry is to ensure that legislatures provide sufficient criteria for executive agencies to apply, rather than handing over standardless power. *See Kolender*, 461 U.S. at 358. In other words, the question whether a statute authorizes arbitrary enforcement is inextricably intertwined with the extent of a legislature's delegation. *See Dimaya*, 584 U.S. at 156 (plurality opinion) (noting that the vagueness doctrine is a corollary of the separation of powers); *Gundy v. United States*, 588 U.S. 128, 168 (2019) (Gorsuch, J., dissenting) ("It's easy to see . . . how most any challenge to a legislative delegation can be reframed as a vagueness complaint: A statute that does not contain

sufficiently definite and precise standards to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed at once presents a delegation problem and provides impermissibly vague guidance to affected citizens." (internal quotation marks and citation omitted)).

The district court also faulted the Hospital Association for failing to show a "significant risk" of arbitrary enforcement. ER-44, 45 (referring to absence of "clear indication" of arbitrary enforcement). But the risk here was obvious. The legislature simply provided no guardrails that the agency should follow in making certain critical determinations, including which transactions are permissible, which are impermissible, and what sort of conditions (which can entirely reshape the transaction) can or should be applied to transactions that are conditionally approved. By design, the agency has unfettered authority and will be able to wield it in whatever way it sees fit. The delegation is simply too absolute to pass muster under the Fourteenth Amendment. *See Morales*, 527 U.S. at 57 (explaining that "the vagueness that dooms [the "loitering" ordinance at issue in the case] is not the product of uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance and what is not"); *Lucero*, 989 F.3d at 1101 (explaining that a statute is unconstitutionally vague if it "'specifie[s]'" "'no standard of conduct . . . at all'" (citation omitted)).

## 2. The Opportunity for Pre-Notice Review Is Not a Mitigating Factor

Relatedly, the district court also concluded that "any possibility of arbitrary enforcement is mitigated by the processes available to regulated parties and under which OHA implements the law." ER-45. The district court's observation, however, attempts to prove too much. The benefit of such review may inform whether a party actually had notice, but advance review does not diminish the importance of providing fair notice in the law itself, mitigate the risk of arbitrary enforcement, or correct for an overbroad delegation of authority to the agency in the first place. And if the relevant legislation is hopelessly vague, then merely being aware that the law exists and being able to consult it in advance (with or without the agency's assistance) cannot rectify the entrenched due-process problem.

For that reason, cases like *California Pacific Bank v. Federal Deposit Insurance Corp.,* 885 F.3d 560, 571 (9th Cir. 2018), are distinguishable. In that case, the question was whether the statute and/or its implementing regulations "were precise enough to inform [*i.e.*, notify] the Bank of its required conduct." *Id*. In such a case, the regulated entity's "'ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process'" mitigated vagueness concerns. *Id.* (citation omitted). That is not the case where the vagueness concern is not about fair notice, but instead is whether the statute

46

delegated so much authority to an agency that there is a significant risk of arbitrary enforcement. Because HB 2362 delegates unrestricted authority to OHA to decide what conduct lies within its reach, it is unconstitutionally vague.

### 3. Neither the "Economic" Nature of the Statute Nor Its Targets Justifies a Lenient Standard of Review

Relying on the factors outlined in *Village of Hoffman Estates*, 455 U.S. at 498–99 (the "*Hoffman* factors"), the district court concluded that HB 2362 should be subjected to less searching vagueness scrutiny. ER-32. Examined closely, however, the *Hoffman* factors are not dispositive, and the district court gave them outsized weight in the specific circumstances of this case.

The first *Hoffman* factor focuses on the "economic" nature of the regulation. The two reasons for applying a less strict vagueness test to economic regulation are that (1) "its subject matter is often more narrow" and (2) "because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Id*. at 498. Neither rationale applies to HB 2362. HB 2362 is unlike the vast majority of administrative or regulatory legislation that applies to a narrow activity, or that regulates a highly specialized or technical industry in a specific way. Instead, by its terms, HB 2362 encompasses not just a vast sector of the economy, but entities and services necessary for health and welfare; it has the potential to affect where people receive care, from whom they may receive it, and what services will be offered. And

while the regulated parties in this case may meet certain revenue thresholds that would suggest some level of sophistication, hospitals, medical groups, or other health-care-related entities do not specialize in interpreting state laws that contain no meaningful standards and that could easily confound individuals with legal education and experience. Unlike the subject matter of those entities' day-to-day operations (such as patient care, nurse staffing, and the like), at its core, HB 2362 regulates business transactions and asks both OHA (an agency focused on public health) and health care entities to navigate its open-ended provisions. Thus, while HB 2362 is distinguishable from a criminal anti-loitering statute applicable to the general public, it is also a far cry from a quintessentially narrow economic regulation that sophisticated actors can be expected to understand.

The remaining *Hoffman* factors also do not support the level of leniency that the district court applied. It does not matter that HB 2362 is civil and not criminal. In *Village of Hoffman Estates*, the Court did not create such a clean divide. There, the local ordinance required businesses to obtain a license in order to sell items "designed or marketed for use with illegal cannabis or drugs" or be subject to civil penalties. The Court noted that it historically exhibited "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," but went on to describe the ordinance at issue as "quasi-criminal," noting that "its prohibitory and stigmatizing effect may

48

warrant a relatively strict test." *Id*. at 498–500. Deciding whether to apply the "traditional" vagueness test or the vague-in-all-applications test based on whether a law is criminal, quasi-criminal, or civil is not, in other words, invariably appropriate. *See Dimaya*, 584 U.S. at 184–85 (Gorsuch, J. concurring in part) ("any suggestion that criminal cases warrant a heightened standard of review does more to persuade me that the criminal standard should be set above our precedent's current threshold than to suggest the civil standard should be buried below it" (emphases omitted)). Thus, the prospect of civil enforcement can be as stigmatizing, and impactful, as the fear of criminal prosecution. That is particularly so where, as here, the law lacks any scienter or *mens rea* component. The district court's failure to appreciate as much, and the other errors it made in its analysis of the *Hoffman* factors, led the court to the conclusion that it should apply a "lenient standard of review" to HB 2362. For the reasons described above, that was error.

## VIII. CONCLUSION

For the foregoing reasons, the Hospital Association respectfully asks this Court to reverse the district court's grant of summary judgment in favor of Defendants.

DATED: November 20, 2024     Respectfully submitted,

STOEL RIVES LLP


  *s/ Brad S. Daniels*
BRAD S. DANIELS
WHITNEY A. BROWN

*Attorneys for Plaintiff-Appellant*

## STATEMENT OF RELATED CASES

No cases are related to this appeal within the meaning of the Ninth Circuit

Rule 28-2.6.

DATED: November 20, 2024

STOEL RIVES LLP


_s/ Brad S. Daniels_
BRAD S. DANIELS
WHITNEY A. BROWN

*Attorneys for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 24-3770 |

I am the attorney or self-represented party.

**This brief contains** | 11,388 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | |.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Brad S. Daniels | **Date** | 11/20/24 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*

# ADDENDUM

## TABLE OF CONTENTS TO ADDENDUM

Page

**U.S. Constitutional Provisions**

    U.S. Const. amend. XIV ................................................. ADD-1

**Federal Statutes**

    42 U.S.C. § 1983 ............................................................. ADD-3

**State Statutes**

    Or. Rev. Stat. § 415.500 ............................................... ADD-4

    Or. Rev. Stat. § 415.501 ............................................... ADD-8

    Or. Rev. Stat. § 415.900 ............................................... ADD-14

**State Rules and Regulations**

    Or. Admin. R. 409-070-0000......................................... ADD-15

    Or. Admin. R. 409-070-0060......................................... ADD-16

    Or. Admin. R. 409-070-0065......................................... ADD-19

**U.S. Const. amend. XIV**

**Section 1.**  All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Section 2.**  Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.  But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Section 3.**  No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof.  But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.**  The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned.  But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.**  The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

**42 U.S.C. § 1983. Civil action for deprivation of rights**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**Or. Rev. Stat. § 415.500. Definitions**

As used in this section and ORS 415.501 and 415.505:

(1) "Corporate affiliation" has the meaning prescribed by the Oregon Health Authority by rule, including:

(a) Any relationship between two organizations that reflects, directly or indirectly, a partial or complete controlling interest or partial or complete corporate control; and

(b) Transactions that merge tax identification numbers or corporate governance.

(2) "Essential services" means:

(a) Services that are funded on the prioritized list described in ORS 414.690; and

(b) Services that are essential to achieve health equity.

(3) "Health benefit plan" has the meaning given that term in ORS 743B.005.

(4)    (a) "Health care entity" includes:

(A) An individual health professional licensed or certified in this state;

(B) A hospital, as defined in ORS 442.015, or hospital system, as defined by the authority by rule;

(C) A carrier, as defined in ORS 743B.005, that offers a health benefit plan in this state;

(D) A Medicare Advantage plan;

(E) A coordinated care organization or a prepaid managed care health services organization, as both terms are defined in ORS 414.025; and

(F) Any other entity that has as a primary function the provision of health care items or services or that is a parent organization of, or is an entity closely related to, an entity that has as a primary function the provision of health care items or services.

(b) "Health care entity" does not include:

**ADD-4**

(A) Long term care facilities, as defined in ORS 442.015.

(B) Facilities licensed and operated under ORS 443.400 to 443.455.

(5) "Health equity" has the meaning prescribed by the Oregon Health Policy Board and adopted by the authority by rule.

(6)  (a) "Material change transaction" means:

(A) A transaction in which at least one party had average revenue of $25 million or more in the preceding three fiscal years and another party:

(i) Had an average revenue of at least $10 million in the preceding three fiscal years; or

(ii) In the case of a new entity, is projected to have at least $10 million in revenue in the first full year of operation at normal levels of utilization or operation as prescribed by the authority by rule.

(B) If a transaction involves a health care entity in this state and an out-of-state entity, a transaction that otherwise qualifies as a material change transaction under this paragraph that may result in increases in the price of health care or limit access to health care services in this state.

(b) "Material change transaction" does not include:

(A) A clinical affiliation of health care entities formed for the purpose of collaborating on clinical trials or graduate medical education programs.

(B) A medical services contract or an extension of a medical services contract.

(C) An affiliation that:

(i) Does not impact the corporate leadership, governance or control of an entity; and

(ii) Is necessary, as prescribed by the authority by rule, to adopt advanced value-based payment methodologies to

**ADD-5**

meet the health care cost growth targets under ORS 442.386.

(D) Contracts under which one health care entity, for and on behalf of a second health care entity, provides patient care and services or provides administrative services relating to, supporting or facilitating the provision of patient care and services, if the second health care entity:

(i) Maintains responsibility, oversight and control over the patient care and services; and

(ii) Bills and receives reimbursement for the patient care and services.

(E) Transactions in which a participant that is a health center as defined in 42 U.S.C. 254b, while meeting all of the participant's obligations, acquires, affiliates with, partners with or enters into any agreement with another entity unless the transaction would result in the participant no longer qualifying as a health center under 42 U.S.C. 254b.

(7)    (a) "Medical services contract" means a contract to provide medical or mental health services entered into by:

(A) A carrier and an independent practice association;

(B) A carrier, coordinated care organization, independent practice association or network of providers and one or more providers, as defined in ORS 743B.001;

(C) An independent practice association and an individual health professional or an organization of health care providers;

(D) Medical, dental, vision or mental health clinics; or

(E) A medical, dental, vision or mental health clinic and an individual health professional to provide medical, dental, vision or mental health services.

(b) "Medical services contract" does not include a contract of employment or a contract creating a legal entity and ownership of the legal entity that is authorized under ORS chapter 58, 60 or 70 or under

any other law authorizing the creation of a professional organization similar to those authorized by ORS chapter 58, 60 or 70, as may be prescribed by the authority by rule.

(8) "Net patient revenue" means the total amount of revenue, after allowance for contractual amounts, charity care and bad debt, received for patient care and services, including:

(a) Value-based payments;

(b) Incentive payments;

(c) Capitation payments or payments under any similar contractual arrangement for the prepayment or reimbursement of patient care and services; and

(d) Any payment received by a hospital to reimburse a hospital assessment under ORS 414.855.

(9) "Revenue" means:

(a) Net patient revenue; or

(b) The gross amount of premiums received by a health care entity that are derived from health benefit plans.

(10) "Transaction" means:

(a) A merger of a health care entity with another entity;

(b) An acquisition of one or more health care entities by another entity;

(c) New contracts, new clinical affiliations and new contracting affiliations that will eliminate or significantly reduce, as defined by the authority by rule, essential services;

(d) A corporate affiliation involving at least one health care entity; or

(e) Transactions to form a new partnership, joint venture, accountable care organization, parent organization or management services organization, as prescribed by the authority by rule.

**Or. Rev. Stat. § 415.501. Material change transactions**

(1) The purpose of this section is to promote the public interest and to advance the goals set forth in ORS 414.018 and the goals of the Oregon Integrated and Coordinated Health Care Delivery System described in ORS 414.570.

(2) In accordance with subsection (1) of this section, the Oregon Health Authority shall adopt by rule criteria approved by the Oregon Health Policy Board for the consideration of requests by health care entities to engage in a material change transaction and procedures for the review of material change transactions under this section.

(3)      (a) A notice of a material change transaction involving the sale, merger or acquisition of a domestic health insurer shall be submitted to the Department of Consumer and Business Services as an addendum to filings required by ORS 732.517 to 732.546 or 732.576. The department shall provide to the authority the notice submitted under this subsection to enable the authority to conduct a review in accordance with subsections (5) and (7) of this section. The authority shall notify the department of the outcome of the authority's review.

        (b) The department shall make the final determination in material change transactions involving the sale, merger or acquisition of a domestic health insurer and shall coordinate with the authority to incorporate the authority's review into the department's final determination.

(4) An entity shall submit to the authority a notice of a material change transaction, other than a transaction described in subsection (3) of this section, in the form and manner prescribed by the authority, no less than 180 days before the date of the transaction and shall pay a fee prescribed in ORS 415.512.

(5) No later than 30 days after receiving a notice described in subsections (3) and (4) of this section, the authority shall conduct a preliminary review to determine if the transaction has the potential to have a negative impact on access to affordable health care in this state and meets the criteria in subsection (9) of this section.

(6) Following a preliminary review, the authority or the department shall approve a transaction or approve a transaction with conditions designed to further the goals described in subsection (1) of this section based on criteria prescribed by the authority by rule, including but not limited to:

(a) If the transaction is in the interest of consumers and is urgently necessary to maintain the solvency of an entity involved in the transaction; or

(b) If the authority determines that the transaction does not have the potential to have a negative impact on access to affordable health care in this state or the transaction is likely to meet the criteria in subsection (9) of this section.

(7)     (a) Except as provided in paragraph (b) of this subsection, if a transaction does not meet the criteria in subsection (6) of this section, the authority shall conduct a comprehensive review and may appoint a review board of stakeholders to conduct a comprehensive review and make recommendations as provided in subsections (11) to (18) of this section. The authority shall complete the comprehensive review no later than 180 days after receipt of the notice unless the parties to the transaction agree to an extension of time.

(b) The authority or the department may intervene in a transaction described in ORS 415.500 (6)(a)(C) in which the final authority rests with another state and, if the transaction is approved by the other state, may place conditions on health care entities operating in this state with respect to the insurance or health care industry market in this state, prices charged to patients residing in this state and the services available in health care facilities in this state, to serve the public good.

(8) The authority shall prescribe by rule:

(a) Criteria to exempt an entity from the requirements of subsection (4) of this section if there is an emergency situation that threatens immediate care services and the transaction is urgently needed to protect the interest of consumers;

(b) Provision for the authority's failure to complete a review under subsection (5) of this section within 30 days; and

(c) Criteria for when to conduct a comprehensive review and appoint a review board under subsection (7) of this section that must include, but is not limited to:

(A) The potential loss or change in access to essential services;

(B) The potential to impact a large number of residents in this state; or

**ADD-9**

(C) A significant change in the market share of an entity involved in the transaction.

(9) A health care entity may engage in a material change transaction if, following a comprehensive review conducted by the authority and recommendations by a review board appointed under subsection (7) of this section, the authority determines that the transaction meets the criteria adopted by the department by rule under subsection (2) of this section and:

    (a)    (A) The parties to the transaction demonstrate that the transaction will benefit the public good and communities by:

        (i) Reducing the growth in patient costs in accordance with the health care cost growth targets established under ORS 442.386 or maintain a rate of cost growth that exceeds the target that the entity demonstrates is the best interest of the public;

        (ii) Increasing access to services in medically underserved areas; or

        (iii) Rectifying historical and contemporary factors contributing to a lack of health equities or access to services; or

    (B) The transaction will improve health outcomes for residents of this state; and

    (b) There is no substantial likelihood of anticompetitive effects from the transaction that outweigh the benefits of the transaction in increasing or maintaining services to underserved populations.

(10) The authority may suspend a proposed material change transaction if necessary to conduct an examination and complete an analysis of whether the transaction is consistent with subsection (9) of this section and the criteria adopted by rule under subsection (2) of this section.

(11)    (a) A review board convened by the authority under subsection (7) of this section must consist of members of the affected community, consumer advocates and health care experts. No more than one-third of the members of the review board may be representatives of institutional health care providers. The authority may not appoint to a review board an individual who is employed by an entity that is a party to the transaction that is under

review or is employed by a competitor that is of a similar size to an entity that is a party to the transaction.

(b) A member of a review board shall file a notice of conflict of interest and the notice shall be made public.

(12) The authority may request additional information from an entity that is a party to the material change transaction, and the entity shall promptly reply using the form of communication requested by the authority and verified by an officer of the entity if required by the authority.

(13)   (a) An entity may not refuse to provide documents or other information requested under subsection (4) or (12) of this section on the grounds that the information is confidential.

(b) Material that is privileged or confidential may not be publicly disclosed if:

(A) The authority determines that disclosure of the material would cause harm to the public;

(B) The material may not be disclosed under ORS 192.311 to 192.478; or

(C) The material is not subject to disclosure under ORS 705.137.

(c) The authority shall maintain the confidentiality of all confidential information and documents that are not publicly available that are obtained in relation to a material change transaction and may not disclose the information or documents to any person, including a member of the review board, without the consent of the person who provided the information or document. Information and documents described in this paragraph are exempt from disclosure under ORS 192.311 to 192.478.

(14) The authority or the Department of Justice may retain actuaries, accountants or other professionals independent of the authority who are qualified and have expertise in the type of material change transaction under review as necessary to assist the authority in conducting the analysis of a proposed material change transaction. The authority or the Department of Justice shall designate the party or parties to the material change transaction that shall bear the reasonable and actual cost of retaining the professionals.

(15) A review board may hold up to two public hearings to seek public input and otherwise engage the public before making a determination on the proposed transaction. A public hearing must be held in the service area or areas of the health care entities that are parties to the material change transaction. At least 10 days prior to the public hearing, the authority shall post to the authority's website information about the public hearing and materials related to the material change transaction, including:

(a) A summary of the proposed transaction;

(b) An explanation of the groups or individuals likely to be impacted by the transaction;

(c) Information about services currently provided by the health care entity, commitments by the health care entity to continue such services and any services that will be reduced or eliminated;

(d) Details about the hearings and how to submit comments, in a format that is easy to find and easy to read; and

(e) Information about potential or perceived conflicts of interest among executives and members of the board of directors of health care entities that are parties to the transaction.

(16) The authority shall post the information described in subsection (15)(a) to (d) of this section to the authority's website in the languages spoken in the area affected by the material change transaction and in a culturally sensitive manner.

(17) The authority shall provide the information described in subsection (15)(a) to (d) of this section to:

(a) At least one newspaper of general circulation in the area affected by the material change transaction;

(b) Health facilities in the area affected by the material change transaction for posting by the health facilities; and

(c) Local officials in the area affected by the material change transaction.

(18) A review board shall make recommendations to the authority to approve the material change transaction, disapprove the material change transaction or approve the material change transaction subject to conditions, based on subsection (9) of this section and the criteria adopted by rule under subsection (2) of this section.

The authority shall issue a proposed order and allow the parties and the public a reasonable opportunity to make written exceptions to the proposed order. The authority shall consider the parties' and the public's written exceptions and issue a final order setting forth the authority's findings and rationale for adopting or modifying the recommendations of the review board. If the authority modifies the recommendations of the review board, the authority shall explain the modifications in the final order and the reasons for the modifications. A party to the material change transaction may contest the final order as provided in ORS chapter 183.

(19) A health care entity that is a party to an approved material change transaction shall notify the authority upon the completion of the transaction in the form and manner prescribed by the authority. One year, two years and five years after the material change transaction is completed, the authority shall analyze:

> (a) The health care entities' compliance with conditions placed on the transaction, if any;

> (b) The cost trends and cost growth trends of the parties to the transaction; and

> (c) The impact of the transaction on the health care cost growth target established under ORS 442.386.

(20) The authority shall publish the authority's analyses and conclusions under subsection (19) of this section and shall incorporate the authority's analyses and conclusions under subsection (19) of this section in the report described in ORS 442.386 (6).

(21) This section does not impair, modify, limit or supersede the applicability of ORS 65.800 to 65.815, 646.605 to 646.652 or 646.705 to 646.805.

(22) Whenever it appears to the Director of the Oregon Health Authority that any person has committed or is about to commit a violation of this section or any rule or order issued by the authority under this section, the director may apply to the Circuit Court for Marion County for an order enjoining the person, and any director, officer, employee or agent of the person, from the violation, and for such other equitable relief as the nature of the case and the interest of the public may require.

(23) The remedies provided under this section are in addition to any other remedy, civil or criminal, that may be available under any other provision of law.

(24) The authority may adopt rules necessary to carry out the provisions of this section.

**Or. Rev. Stat. § 415.900. Civil penalties**

(1) In addition to any other penalty imposed by law, the Director of the Oregon Health Authority may impose a civil penalty, as determined by the director, for a violation of ORS 413.037 or 415.501.  The amount of the civil penalty may not exceed $10,000 for each offense.  The civil penalty imposed on an individual health professional may not exceed $1,000 for each offense.

(2) Civil penalties shall be imposed and enforced in accordance with ORS 183.745.

(3) Moneys received by the Oregon Health Authority under this section shall be paid to the State Treasury and credited to the General Fund.

**Or. Admin. R. 409-070-0000. Scope and Purpose**

(1) OAR 409-070-0000 through OAR 409-070-0085 are adopted pursuant to authority in ORS 415.501. OAR 409-070-0000 through OAR 409-070-0085 govern the procedure for filing notices of material change transactions and the criteria and procedure for review of material change transactions.

(2) Pursuant to ORS 415.501(1), the purpose of these rules is to promote the public interest and to advance the goals of the Authority and the Oregon Integrated and Coordinated Care Delivery System described in ORS 414.018 and ORS 414.570.

(3) The Authority and the Department shall aim to achieve the following goals when reviewing proposed material change transactions:

(a) Improving health, increasing the quality, reliability, availability and continuity of care and reducing the cost of care for people living in Oregon.

(b) Achieving health equity and equitable access to care.

(c) A process that is transparent, robust and informed by the public, including the local community, through meaningful engagement.

(d) Using resources wisely and in collaboration with the Department when applicable.

**Or. Admin. R. 409-070-0060. Comprehensive Review of a Notice of a Material Change Transaction.**

(1) Pursuant to ORS 415.501(7), the Authority shall conduct a comprehensive review of a proposed transaction if the Authority determines not to approve the transaction at the conclusion of its preliminary review.

(2) The Authority shall notify the entity that submitted the notice of material change transaction if a comprehensive review will occur. The Authority shall notify the entity that submitted the notice of material change transaction if the Authority requires additional information from any of the parties to the transaction. The entity is required to respond to the Authority's request for additional information within 15 calendar days from the date the Authority sent such request unless the Authority and entity mutually agree on a different timeline.

(3) The Authority shall notify the entity that submitted the notice of material change transaction the fee amount associated with the comprehensive review. A party to the transaction shall pay the fee amount in full no later than 30 calendar days after the date the Authority sent such notification.

(4) The Authority shall issue proposed findings of fact and conclusion of law, along with the Authority's proposed order at the conclusion of its comprehensive review and shall allow the parties and the public a reasonable opportunity to make written comments to the proposed findings and conclusions and the proposed order. If the comprehensive review includes a community review board, recommendations of the community review board shall be in writing and appended to the proposed order. Unless otherwise directed by the Authority, written comments to the proposed findings and conclusions and the proposed order shall be filed with the Authority within thirty calendar days following publication. The Authority shall make any filed comments available to the public promptly following receipt.

(5) The Authority shall consider the parties' and the public's written exceptions and issue a final order setting forth the Authority's findings and conclusions in respect of the proposed transaction. If the comprehensive review included a community review board, the Authority's findings and conclusions shall include an explanation of the reasons why the Authority accepted, rejected or modified the recommendations of the community review board.

The final order shall include any commitments by the health care entity to continue services currently provided by the health care entity. A party to the proposed transaction may contest the final order as provided in OAR 409-070-0075.

(6) Subject to any conditions prescribed under OAR 409-070-0065, the Authority shall approve a material change transaction that does not involve a domestic insurer, or in the case of a material change transaction involving a domestic health insurer, recommend to the Department that the transaction be approved, if pursuant to ORS 415.501(9), the Authority determines that the transaction satisfies (a) below and also satisfies either (b) or (c) below:

    (a) There is no substantial likelihood that the transaction would:

        (A) Have material anticompetitive effects in the region (such as significantly increased market concentration among providers when contracting with payers, carriers, or coordinated care organizations, or among carriers when establishing health benefit premiums that is likely to increase costs for consumers) not outweighed by benefits in increasing or maintaining services to underserved populations;

        (B) Be contrary to law;

        (C) Jeopardize the financial stability of a health care entity involved in the transaction; or

        (D) Otherwise be hazardous or prejudicial to consumers or the public.

    (b) The transaction will benefit the public good and communities by:

        (A) Reducing the growth in patient costs in accordance with the health care cost growth targets established under ORS 442.386 or maintain a rate of cost growth that exceeds the target that the entity demonstrates is in the best interest of the public;

        (B) Increasing access to services in medically underserved areas; or

        (C) Rectifying historical and contemporary factors contributing to a lack of health equity or access to services.

    (c) The transaction will improve health outcomes for residents of this state.

(7) Unless extended by agreement among the Authority, the Department, as applicable, and the parties to the proposed transaction, the Authority shall issue a

proposed order following its comprehensive review within 180 calendar days of the filing of a complete notice of material change transaction, subject to tolling or extension as provided in these rules. A transaction may be disapproved if the parties do not agree to an extension of time necessary to accomplish a tribal consultation.

**Or. Admin. R. 409-070-0065. Conditional Approval; Suspension of Proposed Material Change Transaction.**

(1) Following completion of a preliminary review pursuant to OAR 409-070-0055 or a comprehensive review pursuant to OAR 409-070-0060, which may include the appointment of a community review board pursuant to OAR 409-070-0062, the Authority may approve, or recommend for approval in the case of transaction involving a domestic insurer, a material change transaction with conditions designed to further the purposes and goals described in OAR 409-070-0000.

(2) If the Authority approves a material change transaction with conditions as set forth in paragraph (1) of this rule, the Authority may suspend, or in the case of transaction involving a domestic insurer recommend that the Department suspend, the effective date of the transaction for such reasonable time as necessary to conduct an examination and complete an analysis of whether the conditions have been satisfied.