*Appeal No. 24-3770*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

OREGON ASSOCIATION OF HOSPITALS AND HEALTH SYSTEMS,

*Plaintiff-Appellant,*

v.

STATE OF OREGON, OREGON HEALTH AUTHORITY, and DR. SEJAL HATHI, in her official capacity as Director of Oregon Health Authority,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Oregon
The Honorable Michael H. Simon
Case No. 3:22-cv-01486-SI

## PLAINTIFF-APPELLANT'S EXCERPTS OF RECORD
## Volume 1 of 1

BRAD S. DANIELS
NATHAN R. MORALES
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480

WHITNEY A. BROWN
Stoel Rives LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900
Facsimile: 907.277.1920

*Attorneys for Plaintiff-Appellant*

# INDEX

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| Judgment | 5/20/2024 | 49 | 3 |
| Opinion and Order | 5/16/2024 | 48 | 4–48 |
| First Amended Complaint | 12/19/2022 | 14 | 49–80 |
| Notice of Appeal | 6/18/2024 | 51 | 81–83 |
| Civil Docket for Case No. 3:22-cv-01486-SI – United States District Court, District of Oregon (Portland (3)) – *Oregon Association of Hospitals and Health Systems v. State of Oregon, et al.* | | | 84–89 |

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OREGON ASSOCIATION OF HOSPITALS AND HEALTH SYSTEMS**, <br><br> Plaintiffs, <br><br> v. <br><br> **STATE OF OREGON, OREGON HEALTH AUTHORITY,** and **DR. SEJAL HATHI,** in her official capacity as Director of Oregon Health Authority, <br><br> Defendants. | Case No. 3:22-cv-1486-SI <br><br> **JUDGMENT** |

Based on the Court's OPINION AND ORDER,

**IT IS ADJUDGED** that this case TERMINATED as to Plaintiff's first claim, alleging

violation of the due process clause of the Fourteenth Amendment. This case is DISMISSED

without prejudice as to Plaintiff's second claim, alleging violation of the nondelegation doctrine

of the Oregon Constitution.

DATED this 20th day of May, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**OREGON ASSOCIATION OF HOSPITALS AND HEALTH SYSTEMS**,

Plaintiff,

v.

**STATE OF OREGON, OREGON HEALTH AUTHORITY,** and **DR. SEJAL HATHI,** in her official capacity as Director of Oregon Health Authority,

Defendants.

Case No. 3:22-cv-1486-SI

**OPINION AND ORDER**

Brad S. Daniels and Nathan R. Morales, STOEL RIVES LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Of Attorneys for Plaintiff.

Sara D. Van Loh and YoungWoo Joh, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

The Oregon Association of Hospitals and Health Systems (OAHHS) brings this lawsuit against the State of Oregon (State); the Oregon Health Authority (OHA), Oregon's licensing agency for health care facilities; and Dr. Sejal Hathi, M.D., M.B.A., in her official capacity as Director of the OHA (collectively, Defendants). In its First Amended Complaint (FAC), OAHHS asserts two facial challenges to Oregon House Bill (HB) 2362 (2021) (codified at OR. REV. STAT.

(ORS) § 415.500-.900), which created Oregon's Health Care Market Oversight (HCMO) program. First, OAHHS asserts that HB 2362 is unconstitutionally vague, in violation of the Due Process Clause of the Fourteenth Amendment (First Claim). Second, OAHHS contends that HB 2362 impermissibly delegates legislative powers to the OHA, a state executive agency, in violation of the nondelegation principles found in article I, section 21; article III, section 1; and article IV, section 1(1) of the Oregon Constitution (Second Claim).

OAHHS describes itself as a statewide nonprofit trade association representing Oregon hospitals and health systems. FAC ¶ 7. Its members include hospitals and health systems that are subject to the requirements of HB 2362 and have engaged or will engage in transactions that likely will trigger the requirements of HB 2362. *Id.* ¶ 8. OAHHS seeks declaratory and injunctive relief.

Before the Court are the parties' cross-motions for summary judgment. In OAHHS's motion, OAHHS seeks summary judgment on both claims. In Defendants' motion, Defendants begin by requesting summary judgment against OAHHS's First Claim, for violation of the Due Process Clause of the Fourteenth Amendment. Defendants then argue that if they prevail against OAHHS's First Claim, the Court should decline to exercise supplemental jurisdiction over OAHHS's Second Claim, which invokes only the Oregon Constitution. In the alternative, Defendants move for summary judgment on the merits against OAHHS's Second Claim. For the reasons explained below, the Court grants Defendants' motion for summary judgment against OAHHS's First Claim, declines to exercise supplemental jurisdiction over OAHHS's Second Claim, and denies OAHHS's motion for summary judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Then, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in

such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND[1]

According to Defendants, the Oregon Legislature passed HB 2362 in response to the consolidation of health care providers in recent years and concerns about increasing health care costs and decreasing services and quality of care. Defendants explain that the Oregon Legislature's purpose in enacting HB 2362 was to ensure that certain qualifying transactions involving health care entities "would not continue to negatively impact access to health care, quality of patient care, costs for consumers and payers, or health equity." The HCMO program requires certain parties that meet (or are expected to meet) minimum revenue thresholds to notify OHA and submit to a regulatory process for approval before engaging in certain kinds of business transactions (*e.g.*, mergers and acquisitions, affiliations, and certain contractual arrangements) that involve health care entities or that otherwise significantly may affect the provision of certain health care services. HB 2362 sets forth the HCMO program's requirements and procedures, and OHA has promulgated administrative rules under the statute and has issued sub-regulatory guidance documents as it has implemented the program. The HCMO program launched in March 2022.[2] As of December 2023, OHA had undertaken 17 reviews of qualifying transactions, with nine of those transactions approved and five still in progress.[3]

---

[1] This section is comprised of undisputed facts taken from the parties' motions for summary judgment, the attachments filed in support of those motions, and such other materials of which the Court can take judicial notice.

[2] OHA, Health Care Market Oversight 2023 Annual Report, at 2 (Jan. 4, 2024), https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO%202023%20Annual%20Report.pdf.

[3] *Id.* at 5. Of the nine approved transactions, five were approved without conditions, and four were approved with conditions. *Id.* Also as of December 2023, OHA had undertaken 15

## A.  Operation of HB 2362

HB 2362 requires a covered "health care entity" to provide OHA with notice before engaging in a covered "material change transaction" and prohibits that entity from engaging in a covered transaction until the transaction has been reviewed and approved by OHA. The review and approval of covered transactions is governed by criteria that are set forth within the statute and supplemented by administrative rules. Below, the Court reviews the statutory and regulatory provisions that govern which entities are covered by the HCMO program; the types of transactions for which a covered entity must provide OHA with formal notice; other aspects of OHA's decision-making process, including the criteria for approval of a transaction; and the equitable relief and civil penalties available to OHA to respond to violations of HB 2362. The Court also briefly discusses OHA's sub-regulatory guidance on the HCMO program and the availability of pre-notice inquiry about the application of the law to prospective transactions.

### 1.  Covered Entities

HB 2362 defines "health care entities"—the entities subject to the HCMO program—by listing six categories of covered entities.[4] Several of these categories are clarified in cross-referenced provisions of the ORS, by Oregon Administrative Rule (OAR), or both.

Under ORS § 415.500(4)(a), "health care entity" includes:

> (A) An individual health professional licensed or certified in this state;

preliminary reviews, two comprehensive reviews, and two follow-up reviews. *Id.* "Preliminary review" and "comprehensive review" are explained below. Regarding "follow-up review," the law requires OHA periodically to conduct post-transaction reviews to determine the effects of an approved transaction that has been completed and whether the parties to the transaction have complied with the conditions placed on the transaction, if any. ORS § 415.501(19).

[4] The statute also exempts from the definition of "health care entity" certain long-term care facilities and residential facilities and homes. *See* ORS § 415.500(4)(b).

    (B) A hospital, as defined in ORS 442.015,[5] or hospital system, as defined by the authority by rule;[6]

    (C) A carrier, as defined in ORS 743B.005,[7] that offers a health benefit plan in this state;

    (D) A Medicare Advantage plan;

    (E) A coordinated care organization or a prepaid managed care health services organization, as both terms are defined [by statute]; and

    (F) Any other entity that has as a primary function the provision of health care items or services or that is a parent organization of, or is an entity closely related to, an entity that has as a primary function the provision of health care items or services.

## 2.  Covered Transactions

HB 2362 governs review and approval of specified transactions of covered heath care entities, including qualifying mergers, acquisitions, and affiliations. The law circumscribes the scope of covered transactions—called "material change transactions"—by defining both

---

    [5] ORS § 442.015(15) defines "hospital" as: either (1) "A facility with an organized medical staff and a permanent building that is capable of providing 24-hour inpatient care to two or more individuals who have an illness or injury and that provides at least the following health services: (A) Medical; (B) Nursing; (C) Laboratory; (D) Pharmacy; and (E) Dietary," or (2) "A special inpatient care facility as that term is defined by the authority by rule."

    [6] OAR 409-70-005(20) defines "hospital system" as:

    (a) A parent corporation of one or more hospitals and any entity affiliated with the parent through ownership, governance, control, or membership; or

    (b) A hospital and any entity affiliated with the hospital through ownership, governance, control, or membership.

    [7] ORS § 743B.005(5) defines "carrier" to mean "any person who provides health benefit plans in [Oregon]," including "[a]ny . . . person or corporation responsible for the payment of benefits or provision of services."

"transaction" and the "material[ity]" standard. OHA's regulations also define several key terms found within those definitions.

### a. "Transaction"

ORS § 415.500(10) defines "transaction" as:

> (a) A merger of a health care entity with another entity;
>
> (b) An acquisition of one or more health care entities by another entity;
>
> (c) New contracts, new clinical affiliations and new contracting affiliations that will eliminate or *significantly reduce*, as defined by the authority by rule, *essential services*;
>
> (d) A corporate affiliation involving at least one health care entity; or
>
> (e) Transactions to form a new partnership, joint venture, accountable care organization, parent organization or management services organization, as prescribed by the authority by rule.[8]

(emphases added). As relevant to paragraph (c), the terms "essential services" and "significantly reduce" are defined by statute and rule.

Under ORS § 415.500(2), "essential services" means: (a) services that are on a prioritized list of health services developed by Oregon's Health Evidence Review Commission and funded by the Legislative Assembly;[9] and (b) "[s]ervices that are essential to achieve health equity." As defined by rule, "services that are essential to achieve health equity" encompasses four categories of services: "(a) Any service directly related to the treatment of a chronic condition;

---

[8] The law also categorically excludes and exempts certain transactions from the definition of "material change transaction," *See* ORS § 415.500(6)(b).

[9] ORS § 414.690 directs the Health Evidence Review Commission, which decides which services to cover on the Oregon Health Plan, to develop and maintain "a list of health services ranked by priority . . . representing the comparative benefits of each service to the population served." *See Health Evidence Review Commission*, Oregon.gov, https://www.oregon.gov/oha/hpa/dsi-herc.

(b) Pregnancy-related services; (c) Prevention services including non-clinical services; or

(d) Health care system navigation and care coordination services." OAR 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(28). Also as defined by rule, a "significant reduction of services" occurs when a transaction will result in one-third or more of eight listed harms involving access to health care services and the provision or availability of those services. *See* OAR 409-070-0010(3).[10]

[10] OAR 409-070-0010(3) provides:

A significant reduction of services occurs when the transaction will result in a change of one-third or more of any of the following:

(a) An increase in time or distance for community members to access essential services, particularly for historically or currently underserved populations or community members using public transportation;

(b) A reduction in the number of providers, including the number of culturally competent providers, health care interpreters, or traditional healthcare workers, or a reduction in the number of clinical experiences or training opportunities for individuals enrolled in a professional clinical education program;

(c) A reduction in the number of providers serving new patients, providers serving individuals who are uninsured, or providers serving individuals who are underinsured;

(d) Any restrictions on providers regarding rendering, discussing, or referring for any essential services;

(e) A decrease in the availability of essential services or the range of available essential services;

(f) An increase in appointment wait times for essential services;

(g) An increase in any barriers for community members seeking care, such as new prior authorization processes or required consultations before receiving essential services; or

(h) A reduction in the availability of any specific type of care such as primary care, behavioral health care, oral health care, specialty care, pregnancy care, inpatient care, outpatient care, or emergent care as relates to the provision of essential services.

b.  **"Materiality"**

Under ORS § 415.500(6), a "transaction" qualifies as a "material change transaction" based on specific financial thresholds involving a participating health care entity's prior or projected revenue. ORS § 415.500(6)(a) provides in part:

> "Material change transaction" means:
>
> (A) A transaction in which at least one party had average revenue of $25 million or more in the preceding three fiscal years and another party:
>
> > (i) Had an average revenue of at least $10 million in the preceding three fiscal years; or
> >
> > (ii) In the case of a new entity, is projected to have at least $10 million in revenue in the first full year of operation at normal levels of utilization or operation as prescribed by the authority by rule.

The law adds a criterion for a transaction involving "a health care entity in [Oregon] and an out-of-state entity" to qualify as a "material change transaction": the transaction will be covered by the statute only if it also "may [1] result in increases in the price of heath care or [2] limit access to health care services in [Oregon]." ORS § 415.500(6)(a)(B).

**3.  Criteria for Approval**

The core provision of HB 2362, codified at ORS § 415.501, sets forth procedures and requirements for covered health care entities to provide notice to OHA of a material change transaction and for OHA's review and approval of that transaction.[11] A transaction may be approved either after a "preliminary review" (under ORS § 415.501(6)), or a "comprehensive

---

[11] When a material change transaction involves the sale, merger, or acquisition of a domestic health insurer, the notice must be submitted to the Department of Consumer and Business Services, which then conveys the notice to OHA for review. Although OHA undertakes a review of the transaction, the Department of Consumer and Business Services makes the final determination. *See* ORS § 415.501(3).

review" (under ORS § 415.501(9)). If OHA decides not to approve a transaction after its
preliminary review, it must conduct a comprehensive review. *See* ORS § 415.501(7);
OAR 409-070-0055(3), -0060(1).

Various criteria govern: (1) approval of a under a preliminary review; and (2) approval of
a transaction under a comprehensive review. ORS § 415.501(6), (8)(c), (9). The law itself
supplies some of those criteria but also directs OHA to promulgate additional criteria consistent
with the purposes of ORS § 415.501: "to promote the public interest and to advance the goals set
forth in ORS 414.018 and the goals of the Oregon Integrated and Coordinated Health Care
Delivery system described in ORS 414.570." ORS § 415.501(1), (2). The "goals set forth" in the
cross-referenced statutory provisions include, among other things, ensuring "universal access to
an adequate level of high quality health care at an affordable cost" (under ORS § 414.018(1));
"improving health, increasing the quality, reliability, availability[,] and continuity of care and
reducing the cost of care" (under ORS § 414.018(3)); and reducing medical cost inflation and
eliminating health disparities (under ORS § 414.570(1), (3)(b)). *See also* OAR
409-070-0000(2), (3) (explaining the purpose of the implementing regulations and setting forth
specific goals OHA seeks to achieve when reviewing proposed material change transactions).

Based on these purposes and cross-referenced statutory directives, OHA's implementing
regulations set forth the criteria that govern whether approval of a transaction will follow a
preliminary review of that transaction. Those regulations, which incorporate the review criteria
that OHA is required to consider, provide that OHA must approve a material change transaction
if OHA determines that the transaction meets one or more of the following criteria[12]:

---

[12] If the material change transaction involves a domestic health insurer and OHA
determines that the transaction meets one or more of the criteria, OHA must recommend to the

(a) The material change transaction is in the interest of consumers and is urgently necessary to maintain the solvency of an entity involved in the transaction;

(b) The material change transaction is unlikely to substantially reduce access to affordable health care in Oregon;

(c) The material change transaction is likely to meet the criteria [that govern a comprehensive review of a notice of a material change transaction, as] set forth in OAR 409-070-0060;

(d) The material change transaction is not likely to substantially alter the delivery of health care in Oregon; or

(e) Comprehensive review of the material change transaction is not warranted given the size and effects of the transaction.

OAR 409-070-0055(2). Of these five criteria, the first three restate the criteria set forth in the statute. *See* ORS § 415.501(6)(a), (b).

OHA's implementing regulations also set forth the criteria that govern whether approval of a transaction will follow a *comprehensive* review of that transaction. The regulations require OHA to approve a material change transaction if the transaction "satisfies (a) below and also satisfies either (b) or (c)"[13]:

(a) There is no substantial likelihood that the transaction would:

(A) Have material anticompetitive effects in the region (such as significantly increased market concentration among providers when contracting with payers, carriers, or coordinated care organizations, or among carriers when establishing health benefit premiums that is likely to increase costs for consumers) not outweighed by benefits in

Department of Consumer and Business Services that the transaction be approved. *See* OAR 409-070-0055(2); ORS § 415.501(3).

---

[13]  If the material change transaction involves a domestic health insurer and OHA determines that the transaction similarly satisfies these criteria, OHA must recommend to the Department of Consumer and Business Services that the transaction be approved. *See* OAR 409-070-0060(6); ORS § 415.501(3).

increasing or maintaining services to underserved
populations;

(B) Be contrary to law;

(C) Jeopardize the financial stability of a health care
entity involved in the transaction; or

(D) Otherwise be hazardous or prejudicial to consumers
or the public.

(b) The transaction will benefit the public good and
communities by:

(A) Reducing the growth in patient costs in accordance with
the health care cost growth targets established under ORS
442.386[14] or maintain a rate of cost growth that exceeds the target
that the entity demonstrates is in the best interest of the public;

(B) Increasing access to services in medically
underserved areas; or

(C) Rectifying historical and contemporary factors
contributing to a lack of health equity or access to services.

(c) The transaction will improve health outcomes for residents
of [Oregon].

OAR 409-070-0060(6). Of the above provisions, paragraphs (b) and (c) are from the statute

(ORS § 415.501(9)(a)(A), (B)), and paragraph (a)(A) mirrors the statute but adds examples of

"material anticompetitive effects." *See* ORS § 415.501(9)(b). Whether under a preliminary

review or a comprehensive review, OHA must analyze information provided in a notice of a

---

[14] ORS § 442.386 contains the operative provisions establishing and governing Oregon's
Health Care Cost Target Growth program, which "establish[es] a health care cost growth target"
that must "[p]romote a predictable and sustainable rate of growth." ORS § 442.386(2), (3)(a).

material change transaction under standards published on OHA's website and that must be, among other things, "clear, fair, predictable, and consistent." OAR 409-070-0045(9), (9)(a).[15]

### 4.  Post-Review Procedures

OHA's regulations provide that after its comprehensive review, OHA must issue a proposed order, along with "proposed findings of fact and conclusion of law." OAR 409-070-0060(4). OHA must then give the parties and the public "a reasonable opportunity to make written comments to the proposed findings and conclusions and the proposed order." *Id.* OHA must consider those comments, which must be made available to the public, and then issue a final order that sets forth OHA's final findings and conclusions. *Id.*; OAR 409-070-0060(5). A party to the proposed transaction may contest a final order by way of a contested case hearing. OAR 409-070-0060(5); *see also* OAR 409-070-0075 (governing procedures for contested case hearings). The resulting decision is then subject to judicial review by the Oregon Court of Appeals. OAR 409-070-0075(11).

---

[15] OAR 409-070-0045(9) provides:

> [OHA's] review of the information provided in a notice of material change will be analyzed using the Analytic Framework, published on the [HCMO] Program website, with standards that:
>
> (a) Are clear, fair, predictable, and consistent;
>
> (b) Use measures of quality and access that can be meaningfully compared to current and past performance across Oregon and, if available, in other states; and
>
> (c) Include equity analyses that stratify cost, quality, and access data by the characteristics specified in the definition of health equity to the greatest extent allowable by data availability.

*See also* OHA, *Health Care Market Oversight Analytic Framework* (Oct. 2022), https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/OHA-HCMO-Analytic-Framework-FINAL.pdf.

### 5. Equitable Relief and Penalties

HB 2362 provides OHA with two types of remedies for covered entities' violations of the law. First, "[w]henever it appears to the Director of [OHA] that any person has committed or is about to commit a violation" of the law's core provisions or a related administrative rule, the Director may seek an appropriate injunction and "such other equitable relief as the nature of the case and the interest of the public may require." ORS § 415.501(22). Second, HB 2362 authorizes the Director to impose civil penalties for such violations, up to $10,000 for each offense. ORS § 415.900(1).

## B. Guidance Documents

OHA maintains a publicly available website that provides information and access to documents detailing the parameters and procedures of HB 2362.[16] One such document, titled "Entities Subject to Review," describes "the types of entities that may be subject to review when materiality and transaction criteria are met."[17] That document sets forth examples of entities that may be subject to review, and explains why that is so—*e.g.*, because the entity's primary function is the provision of health care; the entity is closely related to another entity that provides health care; or because the entity has control over another entity that provides health care.[18] In addition, OHA has issued a document titled "Defining Essential Services & Significant Reduction" that outlines a two-part test and provides examples to guide health care entities in

---

[16] OHA, *Health Care Market Oversight Rules and Guidance*, https://www.oregon.gov/oha/hpa/hp/pages/hcmo-rules.aspx.

[17] OHA, *Entities Subject to Review* (Oct. 2022), https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO-Entities-Subject-to-Review.pdf.

[18] *See* ORS § 415.500(4)(a)(F) (residual provision in definition of "health care entity"); OAR 409-070-0005(16)(f)-(g) (further defining and narrowing residual provision by rule).

determining whether a prospective transaction will "significantly reduce" "essential services" and thus may qualify as a covered "transaction" under ORS § 415.500(10)(c).[19] Other guidance documents made available on OHA's webpage include, among others: "Health Care Market Oversight Analytic Framework"; "Safe Harbor and Transactions Not Subject to Review"; "Are Changes in Ownership of Assets Changes in Control?"; and "Criteria for Comprehensive Review of Material Change Transactions."

## C. Pre-Notice Review

Under OHA's implementing regulations, a party to a proposed transaction may, before submitting a formal notice of the transaction, submit a written application to OHA "requesting a determination whether such transaction is a covered transaction pursuant to [OHA's] rules." OAR 409-070-0042(1). No fee is required for such an application. OAR 409-070-0042(4). OHA must notify the applicant in writing of OHA's determination within 30 days of receiving the application. OAR 409-070-0042(1). The regulations also encourage all parties to a material change transaction for which a formal notice will be filed to contact OHA to arrange for a "pre-filing conference." OAR 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(2).[20]

---

[19] OHA, *Defining Essential Services & Significant Reduction* (Jan. 31, 2022), https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO-Essential-Services-and-Significant-Reduction-Guidance-FINAL.pdf.

[20] The rules also provide that, if OHA decides to conduct a comprehensive review, the agency must offer a "comprehensive review conference." OAR 409-070-0045(2). The rules further provide that "[t]he pre-filing conference or comprehensive review conference shall preview the transaction . . . including timing, the use of outside experts, the potential involvement of a community review board . . . , and other relevant issues." *Id.*

## DISCUSSION

### A. Plaintiff's First Claim: Vagueness

As its first claim, OAHHS brings a facial challenge to HB 2362, asserting that the law is void for vagueness under the Due Process Clause of the Fourteenth Amendment. OAHHS contends that HB 2362 violates the federal void-for-vagueness doctrine because the law fails to provide fair notice and because it encourages arbitrary enforcement. Defendants' position is that OAHHS has not shown that HB 2362 is unconstitutionally vague under the applicable standard.

According to Defendants, for a plaintiff to prevail on a *facial* challenge to a law on void-for-vagueness grounds, a plaintiff must demonstrate that the law is unconstitutional in every conceivable application, and OAHHS has not done so here. Defendants add that even under a stricter vagueness standard—*i.e.*, one less permissive of vagueness, and thereby easing a challenger's burden—OAHHS would still fail to meet that lesser burden. OAHHS replies that the "every conceivable application" standard that Defendants invoke no longer applies and argues for a stricter standard (a lesser burden for OAHHS). OAHHS further argues that even under the more burdensome standard that would require a challenger to show that a law is unconstitutional in "every conceivable application," HB 2362 is impermissibly vague. For the reasons stated below, the Court agrees with Defendants that, regardless of the specific standard that governs facial challenges generally, OAHHS has not met its burden for a facial vagueness challenge to HB 2362.

### 1. Facial Challenges Generally

#### a. Background Principles

"A 'facial' challenge . . . means a claim that the law is 'invalid *in toto*—and therefore incapable of any valid application.'" *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (quoting *Steffel v. Thompson*, 415 U.S. 452, 474 (1974)); *see also*

*Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (explaining that "the facial/as-applied distinction affects the extent to which the invalidity of a statute need be demonstrated" (quotation marks omitted)); Richard H. Fallon, *Fact and Fiction About Facial Challenges*, 99 CAL. L. REV. 915, 925 (2011) [hereinafter *Fact and Fiction*] (explaining that the Supreme Court generally describes "any challenge that does not seek to establish that a statute is totally invalid" as an "as-applied" challenge). The term "facial attack" includes an attack on particular provisions or sections of a statute, even if a successful attack "could leave other aspects of [a] multipart enactment[] intact." *Fact and Fiction*, *supra*, at 925; *see also id.* at 925 n.36 (collecting cases).

Facial invalidation of legislation "is manifestly strong medicine" that should be employed "sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (quotation marks omitted); *see also Sabri v. United States*, 541 U.S. 600, 608 (2004) ("[F]acial challenges are best when infrequent."). Among other reasons, facial challenges are disfavored because they "often rest on speculation" and therefore "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri*). In addition, facial challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (quotation marks omitted).  Facial challenges also "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.[21] Accordingly, a party

---

[21] These concerns apply in this case, where OAHHS seeks facial invalidation not of isolated provisions of HB 2362, but of the statute in its entirety. OAHHS has not proposed a less severe alternative remedy.

raising a facial constitutional challenge confronts "a heavy burden." *Nat'l Endowment*, 524 U.S. at 580 (quotation marks omitted).

### b. Standard of Review

Just how heavy a burden a party raising a facial challenge confronts is disputed by the parties. Defendants invoke a standard that the Supreme Court articulated in *United States v. Salerno*, under which a challenger seeking facial invalidation of a law on vagueness grounds "must establish that no set of circumstances exists under which [the law] would be valid." 481 U.S. 739, 745 (1987). OAHHS responds that a broad "no set of circumstances" standard has been effectively repudiated by the Supreme Court and that the Ninth Circuit has recognized that repudiation.[22] Defendants reply that the cases on which OAHHS relies are distinguishable because they addressed statutes in which significant liberty interests were at stake.[23]

Neither the Supreme Court nor the Ninth Circuit has expressly limited the statements in those cases regarding the applicable standard to any specific context. The Court concludes, however, that it need not reach the issue of precisely what standard applies to a facial challenge under the circumstances presented here. Regardless of the specific standard that applies when evaluating a facial challenge in this context, OAHHS's challenge to HB 2362 would still fail. As discussed below, even under the less-demanding standard that would apply when evaluating an as-applied challenge, OAHHS has not shown that the law is unconstitutionally vague.

---

[22] ECF 31 at 18 (citing *Johnson v. United States*, 576 U.S. 591 (2015); *Sessions v. Dimaya*, 584 U.S. 148 (2018); *Guerrero v. Whitaker*, 908 F.3d 541 (9th Cir. 2018)).

[23] *Johnson* involved a clause of the Armed Career Criminal Act, which imposed an increased prison term upon a defendant with three prior convictions for a "violent felony." 576 U.S. at 593. *Dimaya* involved a similar clause in the Immigration and Nationality Act, under which any alien convicted of an "aggravated felony" could be deported. 584 U.S. at 153. *Guerrero* also involved an immigration removal statute. 908 F.3d at 542.

2. **Vagueness**

   a. **Background Principles**

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also* U.S. Const. amend. XIV (providing that no state "shall . . . deprive any person of life, liberty, or property, without due process of law"). The void-for-vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Grayned*, 408 U.S. at 108 (noting that vague laws violate the "basic principle of due process," including "fair warning" and "explicit standards for those who apply [the laws]").

As to fair notice, a court will, in many contexts, consider whether a statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited."[24] *See Hill v. Colorado*, 530 U.S. 703, 732 (2000) (evaluating whether a criminal statute prohibiting any person from knowingly approaching within eight feet of another person near a health care facility without that person's consent was void for vagueness); *see also, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999) (holding that an anti-loitering ordinance that made it unlawful "to remain in any one place with no apparent purpose" was unconstitutionally vague and explaining that "[i]t is difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose'"). As to

---

[24] As explained below, the "person of ordinary intelligence" standard may be adjusted, depending on the nature of the enactment at issue.

the second concern, the Supreme Court has stated that "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them," and that "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis." *Grayned*, 408 U.S. at 108-09.

The Supreme Court and the Ninth Circuit have recognized that "[m]any statutes will have some inherent vagueness" and that a certain quantum of vagueness is permissible—and even necessary. *See Rose v. Locke*, 423 U.S. 48, 49-50 (1975); *McSherry v. Block*, 880 F.2d 1049, 1054 (9th Cir. 1989) (quoting *Rose*); *see also Grayned*, 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language."); *Miller v. Strahl*, 239 U.S. 426, 434 (1915) ("Rules of conduct must necessarily be expressed in general terms and depend for their application upon circumstances, and circumstances vary."); *United States v. Powell*, 423 U.S. 87, 94 (1975) (explaining that a statute is not void for vagueness even when a legislature "might, without difficulty, have chosen clearer and more precise language equally capable of achieving the end which it sought" (cleaned up)).

Consistent with that recognition, "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *Parker v. Levy*, 417 U.S. 733, 757 (1974) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) (collecting cases)). Even criminal statutes, which are subject to a heightened (or more demanding) vagueness standard,[25] are not void for vagueness even if "trained lawyers . . . find it necessary to consult legal dictionaries, treatises, and judicial

---

[25] *See, e.g.*, *Hoffman*, 455 U.S. at 498-99 (noting that the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe"); *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009) ("For statutes . . . involving criminal sanctions[,] the requirement for clarity is enhanced." (quotation marks omitted)).

opinions before they may say with any certainty what [those] statutes may compel or forbid."
*Rose*, 423 U.S. at 50; *see also Nash v. United States*, 229 U.S. 373, 377 (1913) (Holmes, J.)
("[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as
the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may
he incur a fine or a short imprisonment . . . ; he may incur the penalty of death."). Similarly, even
for laws that restrict expressive activity, which are also subject to a heightened vagueness
standard,[26] "perfect clarity and precise guidance have never been required." *Holder v.
Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (quoting *United States v. Williams*, 553 U.S.
285, 304 (2008)).

Accordingly, a challenger seeking to invalidate a statute for vagueness carries a heavy
burden.[27] A statute is unconstitutionally vague if it "specifie[s]" "no standard of conduct at all."
*United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021) (quoting *Coates v. Cincinnati*, 402
U.S. 611, 614 (1971)). Thus, to prevail on a challenge on vagueness grounds, "the complainant
must prove that the enactment is vague, 'not in the sense that it requires a person to conform his
conduct to an imprecise but comprehensible normative standard, but rather in the sense that no
standard of conduct is specified at all.'" *Hoffman*, 455 U.S. at 495 n.7 (quoting *Parker*, 417 U.S.
at 756 (quoting *Coates*)); *accord United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C.

---

[26] Laws that threaten or impinge on First Amendment freedoms are, like statutes that
impose criminal penalties, subject to a heightened vagueness inquiry. *See, e.g.*, *Brown v. Ent.
Merchs. Ass'n*, 564 U.S. 786, 793 (2011) (so stating); *see also* Matthew G. Stipe, *The Sherman
Act and Avoiding Void-for-Vagueness*, 45 Fla. State Univ. L. Rev. 709, 738-39 (2019) (noting
that laws implicating "First Amendment concerns are a particularly frequent trigger for . . .
enhanced scrutiny").

[27] One scholar concluded that as of 1981, the Supreme Court had found only three civil
statutes void for vagueness. Jeffrey I. Tilden, *Big Mama Rag: An Inquiry into Vagueness*, 67 Va.
L. Rev. 1543, 1553 n.60 (1981).

Cir. 2017) (applying the burden set forth in *Hoffman*); *see also, e.g.*, *Winters v. New York*, 333

U.S. 507, 519 (1948) (striking down a clause that had "no technical or common law meaning"

and for which the meaning could not be gleaned from context and finding that the law left open

"the widest conceivable inquiry, the scope of which no one can foresee and the result of which

no one can foreshadow or adequately guard against" (quoting *United States v. L. Cohen Grocery

Co.*, 255 U.S. 81, 89 (1921))).

###      b.   Standard of Review

"The degree of vagueness that the Constitution tolerates—as well as the relative

importance of fair notice and fair enforcement—depends in part on the nature of the enactment."

*Hoffman*, 455 U.S. at 498; *accord Kashem v. Barr*, 941 F.3d 358, 370 (9th Cir. 2019) (construing

*Hoffman*). Writing for a plurality of the Supreme Court in 2018, Justice Kagan ratified this view.

*Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality opinion) (quoting *Hoffman*).

In *Hoffman*, the Supreme Court articulated four factors (the *Hoffman* factors) relevant to

whether a statute is unconstitutionally vague. A court must consider whether the statute:

(1) involves only economic regulation; (2) contains only civil penalties;[28] (3) includes a scienter

requirement; and (4) threatens constitutionally protected rights. *See Hanlester Network v.

Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (construing *Hoffman*). Discussing these factors, the

Supreme Court in *Hoffman* explained:

> [E]conomic regulation is subject to a less strict vagueness test
> because its subject matter is often more narrow, and because
> businesses, which face economic demands to plan behavior
> carefully, can be expected to consult relevant legislation in

---

[28] "A provision that nominally imposes only civil penalties but nonetheless carries a 'prohibitory and stigmatizing effect'" may also "warrant a 'relatively strict test.'" *Kashem*, 941 F.3d at 370 (quoting *Hoffman*, 455 U.S. at 499). In *Hoffman*, the municipality defending the ordinance at issue conceded that the ordinance was "quasi-criminal" and that "its prohibitory and stigmatizing effect may [have] warrant[ed] a relatively strict test." 455 U.S. at 499.

advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.

Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

455 U.S. at 498-99 (footnote citations omitted).

Although HB 2362 does not contain a scienter requirement, the three other *Hoffman* factors militate in favor of a more lenient vagueness standard here. HB 2362 regulates only economic activity, imposes only civil penalties,[29] and does not inhibit or threaten to inhibit the

_____

[29] OAHHS points out that some courts have "recognized that imposition of civil penalties can raise the same concerns as statutes classified as criminal" and asks this Court to apply a stricter standard of review based on HB 2362's civil penalty provision, which imposes fines of up to $10,000 for each offense. *See* ECF 39 at 15-16; ORS § 415.900. In support, OAHHS cites two cases from other circuits, neither of which meaningfully support applying a stricter standard of review in this case. In *Advance Pharmaceutical, Inc. v. United States*, 391 F.3d 377 (2d Cir. 2004), the court did not address the issue of whether the provision at issue was, in fact, quasi-criminal (nor did the defendant contend that it was). *See id.* at 396. In addition, both cases on which OAHHS relies involved substantial penalties available under the federal Controlled Substances Act. *See id.* at 390 (addressing provision of the Controlled Substances Act for which the violators who challenged the provision on vagueness grounds had been fined $2 million); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991) (finding, in a vagueness challenge asserted by defendants who had been fined $615,000 for violations of the Controlled Substances Act, that the "prohibitory effect" of penalties under 21 U.S.C. § 822(e) were "quasi-criminal" and therefore warranting a "relatively strict" vagueness test). OAHHS has pointed to no case from the Supreme Court or the Ninth Circuit indicating that a civil penalty, simply because of its "penal" nature, warrants a strict test, or any other such case suggesting that the civil penalties available under HB 2362 should otherwise be regarded as "quasi-criminal." Even if the Court were to apply a "relatively strict test," *see Hoffman*, 455 U.S. at 499, the Court would nonetheless conclude that HB 2362 is not impermissibly vague under that standard—especially considering the high bar for a facial challenge.

exercise of constitutionally protected rights. The Supreme Court found that the ordinance at issue in *Hoffman*, which made unlawful the unlicensed sale of any "accessory or thing which is designed or marketed for use with illegal . . . drugs," was not impermissibly vague even though only the first and fourth *Hoffman* factors favored a more lenient standard of review[30]—as they do here. *See* 455 U.S. at 499-500.

Three aspects of the first *Hoffman* factor (whether the statute involves only economic regulation) warrant emphasis. First, although courts must often consider whether a statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited," *see Hill*, 530 U.S. at 732, the Supreme Court applies a different standard to laws that regulate economic activity: whether a "*business person* of ordinary intelligence would understand" the conduct prohibited. *Hoffman*, 455 U.S. at 501 (emphasis added); *accord Great Am. Houseboat Co. v. United*

Relatedly, OAHHS relies on the Supreme Court's decision in *Fox* to argue for a stricter standard of review. OAHHS notes that the Supreme Court in *Fox* upheld an as-applied vagueness challenge in part because of the "reputational injury" to Fox Television that resulted from a Federal Communication Commission (FCC) order sanctioning the network for broadcasting indecent content. *See* ECF 39 at 16 (quoting *Fox*, 567 U.S. at 255). OAHHS, however, has not presented evidence—let alone explained in its briefing—how OAHHS might suffer a "reputational injury" resulting from enforcement of HB 2362 comparable to that suffered by Fox Television. *See Fox*, 567 U.S. at 256 (describing the FCC's orders sanctioning Fox Television for, among other things, failing to protect children from being exposed to "explicit, graphic, vulgar, and shocking" content and noting that "[FCC] sanctions on broadcasters for indecent material are widely publicized" and "could have an adverse impact on Fox's reputation that audiences and advertisers alike are entitled to take into account" (quotation marks omitted)); *also cf. Hoffman*, 455 U.S. at 499 n.16 (acknowledging the "prohibitory and stigmatizing effects" of the challenged ordinance, which governed the sale of drug paraphernalia). Accordingly, the Court rejects OAHHS's argument that the availability of civil penalties under HB 2362 warrants application of a stricter vagueness standard.

[30] The ordinance at issue in *Hoffman* regulated only economic activity; the village conceded that the ordinance was 'quasi-criminal' (and the Court found the ordinance sufficiently clear as applied, even under a test "appropriate to either a quasi-criminal or a criminal law"); the ordinance did not include a scienter requirement; and the ordinance did not threaten the exercise of constitutionally protected rights. *See* 455 U.S. at 492, 499-500.

*States*, 780 F.2d 741, 747 (9th Cir. 1986) (rejecting vagueness challenge to regulation banning "commercial use" of houseboats on Shasta Lake, concluding that although the regulations were "not without ambiguity," a "business person of ordinary intelligence would understand" the scope of activities that would be considered "commercial use"[31]); *Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 809 F. Supp. 747, 761 (N.D. Cal. 1992) (applying the "businessperson of ordinary intelligence" standard to challengers to a law criminalizing certain commercial speech), *aff'd*, 44 F.3d 726 (9th Cir. 1994); *cf. Brockert v. Skornicka*, 711 F.2d 1376, 1381 (7th Cir. 1983) ("Like a businessman, plaintiff would be expected to consult the law governing his employment and seek clarification if necessary."); *see also United States v. Facteau*, 89 F.4th 1, 33 n.20 (1st Cir. 2023) (explaining that "[c]ourts are less likely to conclude that statutes and regulations addressed to sophisticated businessmen and corporations are unconstitutionally vague" in part "because of an assumption that, given the complexity of economic regulation, such parties necessarily consult counsel in planning their activities" (quotation marks omitted)).

Relatedly, courts—including the Supreme Court—consistently evaluate the vagueness of a law in light of the sophistication of the persons or entities subject to that law. *See, e.g.*, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162-63 (1972) (striking down a vagrancy law under the "person of ordinary intelligence" standard, noting that "[t]he poor among us, . . . the average householder[,] are not in business and not alerted to the regulatory schemes of vagrancy laws");[32] *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) (applying a "doctors of ordinary

---

[31] Although *Great American Houseboat Co.* addressed a vagueness challenge to a federal administrative regulation, not a statute, the Ninth Circuit relied on several cases addressing vagueness challenges to state and federal statutes—including *Stoianoff v. Montana*, 695 F.2d 1214 (9th Cir. 1983), in which the court evaluated a vagueness challenge to a state law under the framework set forth in *Hoffman*.

[32] OAHHS relies on *Fox*, in which the Supreme Court invoked the "person of ordinary intelligence" standard even though the regulated entities who challenged the statute were major

intelligence" standard to a law prohibiting certain medical procedures (quotation marks omitted)); *Omaechevarria v. Idaho*, 246 U.S. 343, 345 n.4, 348 (1918) (rejecting vagueness challenge to state statute prohibiting any person having charge of sheep from allowing them to graze "upon any range usually occupied by any cattle grower," explaining that persons "familiar with range conditions and desirous of observing the law will have little difficulty in determining what is prohibited by it"); *Henry v. Radius Glob. Sols., LLC*, 357 F. Supp. 3d 446, 460 (E.D. Pa. 2019) ("Debt collectors are sophisticated parties involved in a business requiring them to understand the law in the jurisdiction where they conduct such business."); *see also* Daniel B. Rice, *Reforming Variable Vagueness*, 23 U. PA. J. CONST. L. 960, 1015-16 (2021) (collecting cases applying "[t]he principle of customized ordinary intelligence" and noting that "[i]nnumerable decisions endorse the technique of class-based fair notice"). This consideration militates in favor of a lenient standard of review here. HB 2362 governs complex business activities and applies only to transactions in which at least one participating entity has had, or is projected to have, substantial revenue. *See* ORS § 415.500(6)(a). HB 2362 is not a law directed at "[t]he poor among us . . . [or] the average householder[,] [who] are not in business and not alerted to the regulatory schemes." *See Papachristou*, 405 U.S. 162-63.

Second, *Hoffman* teaches that a vagueness challenge to a law that regulates only economic activity cannot succeed if "administrative regulations . . . sufficiently narrow potentially vague or arbitrary interpretations of the [law]." 455 U.S. at 504. That principle

---

broadcast networks. *See* 567 U.S. at 254. The sophistication of the regulated entities in that case, however, was irrelevant. First, the statute at issue in *Fox* was not a civil statute governing complex economic activity: it was a criminal statute banning the broadcast of "any obscene, indecent, or profane language by means of radio communication." *Id.* at 243 (quoting 18 U.S.C. § 1464). Second, the Supreme Court found a lack of fair notice because the FCC had made an abrupt change in its enforcement policy without providing fair notice to Fox or ABC. *See id.* at 254.

applies not only to an agency's promulgated regulations, but also to additional "guidelines" and "enforcement policy," which might clarify the law. *See id.* at 502.[33] The Supreme Court has considered a range of agency-promulgated rules and guidance when addressing vagueness challenges to statutes. *See, e.g.*, *Fox*, 567 U.S. at 254 (addressing the purported vagueness of a law banning the broadcast of "any obscene, indecent, or profane language" and considering whether "the [Federal Communication] Commission *policy* in place at the time of . . . broadcasts" that resulted in the challenged enforcement actions gave notice about whether certain words or pictures could be actionably indecent (emphasis added)); *Buckley v. Valeo*, 424 U.S. 1, 40 n.47 (1976) (in addressing a statutory provision restricting political expenditures "relative to a clearly identified candidate," noting that "a comprehensive series of *advisory opinions or a rule*" clarifying the scope of the challenged statute "might alleviate the provision's vagueness problems"[34] (emphasis added)); *see also Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 571 (9th Cir. 2018) ("[A]n agency-issued *instruction manual*, even if lacking the force of law itself, can clarify what conduct is expected of a person subject to a particular regulation and thus mitigate against vagueness." (emphasis added)). The lesson from these cases is that any challenge to HB 2362 on vagueness grounds must be evaluated using not only OHA's implementing regulations but also any pertinent sub-regulatory guidance.

---

[33] Because the Supreme Court in *Hoffman* found that under the ordinance and then-existing guidelines covered "at least some of the items sold by Flipside," the Court did not reach whether "further guidelines, administrative rules, or enforcement policy [would] clarify the more ambiguous scope of the [ordinance] in other respects." 455 U.S. at 500, 502.

[34] In *Buckley*, the Supreme Court concluded that the availability of advisory opinions would not cure the statute's vagueness problems, but that was because the statute authorized only narrow classes of individuals and groups to request an advisory opinion. *See* 424 U.S. at 40, n.47. *Buckley* was superseded by statute on other grounds. *See generally McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003).

Third and perhaps most important, the Supreme Court in *Hoffman* concluded that a less strict vagueness test should apply to economic regulation in part because "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." 455 U.S. at 498. Although the Supreme Court in *Hoffman* did not hold that a regulated party's ability to obtain pre-enforcement guidance about a vague statutory provision would, standing alone, defeat a vagueness challenge, the Supreme Court has consistently found the availability of such a process to weigh heavily against a finding of unconstitutional vagueness. *See, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 160 (1974) (rejecting vagueness challenge to a statutory provision authorizing removal of certain employees from the federal service for "such cause as will promote the efficiency of the service," noting that by regulation, the agency in which the plaintiff worked, had "provided by regulation that its Office of General Counsel [was] available to counsel employees who seek advice on the interpretation of the [statute] and its regulations"); *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 580 (1973) (rejecting a vagueness challenge to the Hatch Act and its implementing regulations, finding "important . . . that the [Civil Service] Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law"); *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 48-49 (1966) (rejecting a claim of vagueness centered on the meaning of "principal or substantial" in the statutory definition of "related person," explaining that "where the determination of 'related persons' is unclear, the appellants will have access to the [New York State Liquor] Authority for a ruling to clarify the issue"), *abrogated on other grounds by Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989); *see also Roark & Hardee LP v. City of Austin*, 522

F.3d 533, 552 (5th Cir. 2008) (rejecting vagueness challenge to an ordinance, finding that "the owners and operators regulated by the ordinance may clarify the meaning of its provisions by their own inquiry" (citing *Hoffman*)); *Facteau*, 89 F.4th at 33 n.20 (explaining that "[c]ourts are less likely to conclude that statutes and regulations addressed to sophisticated businessmen and corporations are unconstitutionally vague" in part because "some administrative process will often be available to secure advisory interpretations of the statute or regulation at issue" (cleaned up)). The availability of such a process to parties subject to HB 2362—who may obtain without fee or other charge a determination whether a prospective transaction will be covered—is yet another factor that favors applying a more lenient vagueness standard.

Based on the *Hoffman* factors and their application, the Court concludes that a lenient standard of review applies here. Three of the four *Hoffman* factors favor leniency. First, the considerations that dictate a more lenient standard of review for laws that regulate only economic activity apply in force here: the statute applies to a limited class of businesses with specialized knowledge; OHA has issued detailed regulations and guidance clarifying the scope of the statute; and a regulated party may obtain even further clarification of the meaning or applicability of the statute through an administrative process. Second, the law imposes only civil penalties. Third, under what is "perhaps the most important factor," the law does not "threaten[] to inhibit the exercise of constitutionally protected rights." *See Hoffman*, 455 U.S. at 499.[35]

---

[35] For the reasons explained below, even under a "relatively strict test" that would apply to a "quasi-criminal" statute with a "prohibitory and stigmatizing effect," *see Hoffman* 455 U.S. at 499, the Court would nonetheless conclude that HB 2362 is not unconstitutionally vague. *See supra* note 29.

### c.  Application

OAHHS argues that HB 2362 violates the void-for-vagueness doctrine because it fails to provide fair notice and encourages arbitrary enforcement. With the *Hoffman* factors in mind, the Court now turns to these arguments made by OAHHS.

### i.  Fair Notice

As to fair notice, OAHHS argues that HB 2362 fails to provide fair notice because it does not sufficiently define which entities will be subject to the statute's requirements; does not sufficiently define the scope of the conduct it regulates; and does not sufficiently circumscribe the criteria that OHA applies when conducting preliminary and comprehensive reviews. The Court considers each of these arguments in turn.

### (A)  "Health Care Entity"

As to the entities subject to HB 2362's requirements, OAHHS makes three arguments. First, OAHHS asserts that the definition of "health care entity" is impermissibly vague because it is "entirely open-ended." Second, OAHHS objects to the definition of "hospital system" because that term is not defined in the statute (which directs OHA to define "hospital system" by rule). Third, OAHHS argues that terms in the residual provision of the definition of "health care entity" fail to provide a sufficiently ascertainable standard.

OAHHS does not, however, argue that the definition of "health care entity" is vague as applied to any of its members—*i.e.*, that any of its members are unsure whether HB 2362 would apply to them if they engaged in a qualifying transaction. As a general rule, a party lacks standing to challenge a law on the asserted ground that the law "would be unconstitutionally applied to different parties and different circumstances from those at hand." *Sabri*, 541 U.S. at 609; *see also, e.g.*, *United States v. Van Hawkins*, 899 F.2d 852, 854 (9th Cir. 1990) ("Brown and Hawkins cannot establish a constitutional violation by asserting that the law is unclear with

respect to those who distribute other, more exotic forms of cocaine; instead, they must

demonstrate the statutes are vague in their case."). OAHHS has not identified any applicable

exception to that general rule, nor is the Court aware of any such exception. *Cf. Sabri*, 541 U.S.

at 609-10 (listing the "relatively few settings" in which the Supreme Court has "recognized the

validity of facial attacks alleging overbreadth" and noting that "[o]utside these limited settings,

and absent a good reason, we do not extend an invitation to bring overbreadth claims"[36]).

Accordingly, the Court finds that OAHHS lacks standing to bring a facial challenge to the

definition of "health care entity."

### (B)  "Material Change Transaction"

OAHHS also argues that HB 2362 is fatally vague as to the specific transactions subject

to its provisions—*i.e.*, "material change transactions." Among other things, OAHHS points to

the statutory definition of "transaction," which includes "[n]ew contracts, new clinical

affiliations[,] and new contracting affiliations that will *eliminate or significantly reduce*, as

defined by [OHA] by rule, *essential services*." ORS § 415.500(10) (emphases added). OAHHS

contends that the definition of "material change transaction" is impermissibly vague because the

statute itself does not define "eliminate or significantly reduce." OAHHS also points to the term

"essential services," which is defined by statute to include "*services that are essential to achieve

health equity*." ORS § 415.500(2)(b) (emphasis added). According to OAHHS, the term "health

---

[36] "[O]verbreadth challenges call for relaxing familiar requirements of standing, to allow
a determination that the law would be unconstitutionally applied to different parties and different
circumstances from those at hand." *Sabri*, 541 U.S. at 609; *see also* ERWIN CHEMERINSKY,
CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 100-01 (7th ed. 2023) (explaining that the
overbreadth doctrine is an exception to the prohibition against third-party standing and
discussing its application).

equity" is impermissibly vague because it has "no common or ascertainable meaning" but instead must be defined by the Oregon Health Policy Board[37] and OHA. *See* ORS 415.500(5).

These terms, however, are all clarified by OHA by rule. *See* OAR 409-070-0010(3) (defining "significant reduction in services"); OAR 409-070-0005(28) (defining "services that are essential to achieve health equity" to include four categories of health care services); OAR 409-070-0005(18) (defining "health equity");[38] *see also* OHA, *Defining Essential Services and Significant Reduction* (Jan. 31, 2022)[39] (guidance document outlining a two-part test for health care entities to determine whether a proposed transaction will reduce an essential service and whether that reduction is "significant").

The gravamen of OAHHS's arguments is that HB 2362 impermissibly *delegates* to OHA the authority to define those terms. *See, e.g.*, ECF 31 at 24 (asserting that OHA "has complete and standardless discretion" to define what qualifies as a "transaction"); *id.* at 25 (asserting that "whether a contract will qualify as a 'material change transaction' depends entirely on undefined impacts that [OHA], in its complete and sole discretion, will identify"). For the reasons

---

[37] The Oregon Health Policy Board is a nine-member citizen board the oversees OHA. *See* OHA, Oregon Health Policy Board: About the Oregon Health Policy Board, OREGON.GOV, https://www.oregon.gov/oha/ohpb/pages/index.aspx.

[38] Insofar as OAHHS challenges the definition of "material change transaction" for lack of fair notice, OHS's definition of "health equity" has no direct relevance. The statutory definition of "transaction" includes, among other things, certain contracts and affiliations "that will eliminate or significantly reduce . . . essential services." ORS § 415.500. The statute defines "essential services" to include, among other things, "services that are essential to achieve health equity." ORS § 415.500(2). Although OHS's regulations include a separate definition of "health equity," *see* OAR 409-070-0005(18), the regulations also directly define "services that are essential to achieve health equity" to include four discrete categories of services, *see* OAR 409-070-0005(28).

[39] https://www.oregon.gov/oha/HPA/HP/HCMOPageDocs/HCMO-Essential-Services-and-Significant-Reduction-Guidance-FINAL.pdf.

explained below, the Court finds OAHHS's delegation arguments inapposite in this facial

vagueness challenge.

The Court acknowledges that a statute that delegates authority to an enforcing agency to

clarify the statute's scope may raise delegation issues, and the principles underlying the doctrines

of vagueness and nondelegation overlap. *See Dimaya*, 584 U.S. at 156 (plurality opinion)

(recognizing that the void-for-vagueness doctrine "is a corollary of the separation of powers—

requiring that Congress, rather than the executive or judicial branch, define what conduct is

sanctionable and what is not"); *id.* at 182 (Gorsuch, J., concurring in part) ("[V]ague laws risk

allowing judges to assume legislative power. Vague laws also threaten to transfer legislative

power to police and prosecutors, leaving to them the job of shaping a vague statute's contours

through their enforcement decisions."). Thus, as the Supreme Court has explained, a criminal

statute that "impermissibly delegates basic policy matters to policemen, judges, and juries for

resolution on an *ad hoc* and subjective basis" is void for vagueness. *Grayned*, 408 U.S. at

108-09.

The Supreme Court has clarified, however, that at least for a law that regulates economic

activity, an enforcing agency's implementing regulations and sub-regulatory guidance, and the

availability of a pre-enforcement inquiry process, may mitigate or even cure otherwise

impermissible statutory vagueness. *See, e.g.*, *Hoffman*, 455 U.S. at 504 (holding that a challenge

to a law regulating economic activity cannot succeed if "administrative regulations . . .

sufficiently narrow potentially vague or arbitrary interpretations of the [law]"); *id.* at 502

(applying the same principle to additional "guidance" and "enforcement policy"); *id.* at 498

(explaining that a regulated entity's "ability to clarify the meaning" of a law "by resort to an

administrative process" weighs against a finding of vagueness). Thus, when some combination

of extra-statutory regulations or guidance or the availability of a pre-enforcement inquiry process

sufficiently mitigates concerns of fair notice and arbitrary enforcement related to an otherwise

vague statute, a plaintiff may challenge the statute as violating principles of nondelegation, but

not due process. In this case, for the reasons explained below, the Court concludes that OAHHS

has failed to establish that the definition of "material change transaction," when considered in

light of OHA's rules and guidance and the availability of a pre-enforcement inquiry process, is

impermissibly vague. OAHHS may therefore assert its delegation arguments only under its

Second Claim—arguing that the law violates the nondelegation requirements of the Oregon

Constitution.[40]

OAHHS argues that the statute's definition of "material change transaction," even as

clarified by the OHA, is unconstitutionally vague because, in some cases, a transaction may be

subject to review because of "the possibility that something may occur in the future, meaning

there is no way for a party to a transaction to determine, ex ante, whether they may be subject to

penalties for failing to seek approval." ECF 31 at 25; *see also* ORS § 415.500(6)(a)(A)(ii)

("material change transactions" include specified transactions in which a participating "new

entity[] *is projected to have* at least $10 million in revenue in the first full year of operation at

normal levels of utilization or operation as prescribed by [OHA] by rule" (emphasis added)); *id.*

§ 415.500(6)(a)(B) ("material change transaction" includes, "[i]f a transaction involves a health

care entity in this state and an out-of-state entity, a transaction that otherwise qualifies as a

material change transaction . . . that *may result* in increases in the price of health care or limit

access to health care services in [Oregon]" (emphasis added)).

---

[40] *See generally*, Benjamin Silver, *Nondelegation in the States*, 75 VAND. L. REV. 1211 (2022) (contrasting state nondelegation doctrines, which apply against state laws, with the federal nondelegation doctrine, which applies against federal laws).

In light of Supreme Court and Ninth Circuit decisions evaluating statutory provisions challenged for vagueness on similar grounds, and especially considering the availability of pre-notice inquiry, the Court finds unpersuasive OAHHS's argument that the definition of "material change transaction" is unconstitutionally vague because it requires a prediction of future events. OAHHS has cited no case standing for the proposition that a statute fails to provide fair notice because it requires such a prediction or does so without precise guidance. Rather, relevant authorities indicate otherwise. *See, e.g.*, *Kashem*, 941 F.3d at 364 ("Here, the No Fly List criteria are not impermissibly vague merely because they require a prediction of future criminal conduct, or because they do not delineate what factors are relevant to that determination[.] The criteria are 'reasonably clear[.]'" (citations omitted) (quoting *Hoffman*)); *Dimaya*, 584 U.S. at 159 ("Many perfectly constitutional statutes use imprecise terms like 'serious potential risk' . . . or 'substantial risk' . . . .").

In addition, even if any of OAHHS's member entities might be unsure whether a prospective transaction might fall within the law's ambit, that entity may avail itself of OHA's pre-notice inquiry process. *See* OAR 409-070-0042(1) (providing that "[a]ny party to a proposed transaction may . . . request[] a determination whether such transaction is a covered transaction," and requiring OHA to notify the inquiring party in writing of the agency's determination with 30 calendar days). As discussed above, the Supreme Court has consistently found the availability of such a process to weigh heavily against a finding of unconstitutional vagueness. In fact, the Court is unaware of any federal or state court decision holding that an analogous provision was void for vagueness when the agency responsible for enforcing the statute made available a reasonable process for pre-enforcement inquiry about the provision's scope. *Cf. Sanimax USA, LLC v. City of South Saint Paul*, 95 F.4th 551, 570-71 (8th Cir. 2024) (concluding that "extra-

statutory communications" in the form of a warning letter and instructions on what was needed to comply with a zoning ordinance were enough to provide "fair warning"); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122-23 (5th Cir. 1991) ("The courts are ill disposed to entertain the vagueness challenges of a party who had ample warning that his actions violated statutory requirements." (citing *Hoffman*)), *cited with approval in Craft v. Nat'l Park Serv.*, 34 F.3d 918, 923 (9th Cir. 1994). Moreover, even if the Court were to agree with OAHHS that the specific statutory provisions in the definition of "material change transaction" that require a prediction of future conduct *were* impermissibly vague, that would not justify granting the only relief OAHHS seeks: facial invalidation of HB 2362 in its entirety.[41]

OAHHS also argues that OHA's regulations clarifying the scope of covered "material change transactions" are impermissibly vague and therefore fail to cure the (purported) vagueness in one of the five types of "transactions" enumerated in the statute: certain contracts and affiliations "that will eliminate or significantly reduce . . . essential services." *See* ORS § 415.500(10)(c). As explained, the statue defines "essential services" to include, among other things, "services that are essential to achieve health equity," ORS § 415.500(2); in turn, OHS's regulations define "services that are essential to achieve health equity" to include four types of services:

> (a) Any service directly related to the treatment of a chronic condition;
>
> (b) Pregnancy-related services;

---

[41] Under the statutory definition of "material change transaction," the materiality determination does not always require a prediction of future events. *See* ORS § 415.500(6)(a) (defining "material change transaction" to include, among other things, "[a] transaction in which at least one party had average revenue of $25 million or more in the preceding three fiscal years and another party . . . [h]ad an average revenue of at least $10 million in the preceding three fiscal years").

      (c) Prevention services including non-clinical services; or

      (d) Health care system navigation and care coordination services.

OAR 409-070-0005(28). According to OAHHS, "the breadth of that definition, which includes a

vast swath of health-care related services, demonstrates the complete absence of any statutory

guidance," and regulated entities must guess whether the services they provide fall within that

definition. As the Ninth Circuit has explained, however, "breadth is not the same thing as

vagueness." *Pac. Choice Seafood Co. v. Ross*, 976 F.3d 932, 945 (9th Cir. 2020); *see also Pa.*

*Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he fact that a statute can be applied in

situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates

breadth." (quotation marks omitted)). Nor has OAHHS identified any case in which a court

found a statute or regulation with analogous provisions void for vagueness in a similar context.

      In light of OHA's regulations clarifying the scope of "material change transaction,"

especially when combined with the availability of pre-notice inquiry, OAHHS has failed to

demonstrate that HB 2362 is facially invalid for vagueness based on the statutory definition of

"services that are essential to achieve health equity." *See Hoffman*, 455 U.S. at 504 (noting that

"administrative regulations" may "sufficiently narrow potentially vague or arbitrary

interpretations" of a law); *id.* at 498 (explaining that a "regulated enterprise may have the ability

to clarify the meaning of the regulation . . . by resort to an administrative process"). Further, even

if the Court agreed with OAHHS that the statutory definition of "essential services" is

impermissibly vague and that its vagueness is not cured by OHS's regulations, that would not

support granting the relief OAHHS seeks: facial invalidation of HB 2362 in its entirety.[42] For all

---

[42] As relevant here, OAHHS challenges on vagueness grounds the term "essential services," which is found in only one of the five enumerated types of "transactions" listed in the statute: certain contracts and affiliations "that will eliminate or significantly reduce . . . essential services." ORS § 415.500(10)(c). "Essential services," in turn, is defined by statute to include

the above reasons, the Court rejects OAHHS's facial vagueness challenge to HB 2362 arising

from the definition of "material change transaction."

### (C)   Review Criteria

OAHHS also argues that HB 2362 fails to provide fair notice because the law itself does

not include sufficiently circumscribed criteria for OHA to apply when conducting preliminary

and comprehensive reviews. Again, OAHHS's argument is mainly one of delegation: OAHHS

challenges HB 2362 on the ground that the law delegates too much authority to OHS to develop

additional criteria that govern approval of covered transactions. *See, e.g.*, ECF 31 at 27

(challenging the criteria applicable to a comprehensive review on the ground that "parties might

be able to satisfy every requirement that the legislature imposed, but the transaction would *still*

not be approved because it did not satisfy [OHA's] additional requirements" (emphasis in

original)). According to OAHHS, HB 2362 is impermissibly vague because the law "provides no

standard or guidance for what [OHA's promulgated additional criteria] must require." *Id.*

In so arguing, OAHHS disregards the guidance to OHA set forth in the statute. *See* ORS

§ 415.501(2) (directing OHA to develop rule criteria consistent with subsection (1), which sets

forth the purposes of ORS § 415.501); *cf. Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558

F.3d 1301, 1309-10 (11th Cir. 2009) (concluding that a statutory purpose of "ensur[ing] the

orderly and efficient operation of public vehicles upon the public highways" was sufficient to

guide a transportation commission's enforcement of a provision requiring that a waiver be

granted "when the person subject to [a] rule demonstrates that the purpose of the underlying

statute will be or has been achieved by other means" (quotation marks omitted)). More important

two categories of services, only one of which ("services that are essential to achieve health
equity") OAHHS challenges on vagueness grounds.

for purposes of fair notice, OAHHS has pointed to no case in which a court concluded that a law failed to provide fair notice because it delegated to an enforcing agency authority to develop, in addition to criteria enumerated by statute, additional criteria to regulate covered entities. The Court sees no basis for applying such a rule in this case.[43]

Notably, the criteria that OAHHS challenges govern *only* whether a transaction will be *approved or denied* after a formal notice has been filed. As relevant here, a covered entity is not subject to an enforcement action under HB 2362 unless the entity has (1) failed to submit notice of a covered transaction in which the entity engages; (2) engaged in a transaction for which the entity has submitted notice but which has not been approved; or (3) engaged in a transaction that the entity knows—after the completion of a comprehensive review—is prohibited. In other words, an entity is not subject to an enforcement action simply because OHA, applying the

---

[43] Given the ubiquity of similar legislative grants of authority to enforcing entities, such a rule could have sweeping implications. *See, e.g.*, *Fife v. Harmon*, 171 F.3d 1173, 1174-75 (9th Cir. 1999) (discussing the "extensive regulations" issued by the Secretary of Labor under the Fair Labor Standards Act, including "additional criteria" promulgated by rule that govern exemptions to federal overtime requirements); *Khamooshpour v. Holder*, 781 F. Supp. 2d 888, 894 (D. Ariz. 2011) (discussing Immigration and Nationality Act regulations that supplement non-exclusive criteria enumerated in the statute with "additional criteria" governing "when a naturalization applicant shall be found to lack good moral character"); ORS §§ 307.517(2), 518(2) (in statute governing property tax exemptions, granting certain governing bodies broad authority to "adopt additional criteria for exemption," provided that the criteria do not conflict with enumerated criteria); D.C. CODE § 8-231.10 (requiring certification for entities conducting lead-based paint activities and for which violators may be subject to civil fines and penalties, and granting mayor broad authority to establish, in addition to certification criteria enumerated by statute, "additional criteria and procedures for certification by rule"); KAN. STAT. ANN. § 65-16,130 (provision of state pharmacy act—which provides for civil fines of up to $5,000 for violations of the act or the rules promulgated by the state board of pharmacy—granting the board authority to impose requirements on certain pharmacies in the form of criteria that include but are not limited to those enumerated by statute); *see also* ORS § 819.120(9) (directing the Oregon Transportation Commission to establish, in addition to criteria enumerated by statute, "additional criteria for determining when vehicles on state highways, interstate highways[,] and state property are subject to being taken into immediate custody"); *cf. Maldonado v. Lopez*, 2011 WL 1630824, at *2 (C.D. Cal. 2011) (discussing state penal code's implementing regulations, which "set forth additional criteria for determining whether a prisoner is suitable for parole").

criteria that OAHHS challenges, decides not to approve a proposed transaction. The law's requirement that OHA develop additional approval criteria consistent with the purposes of HB 2362 therefore does not create a risk of "trap[ping] the innocent by not providing fair warning." *See Grayned*, 408 U.S. at 108; *cf. Papachristou*, 405 U.S. at 166 (criticizing vagrancy statutes that permit *arrest and prosecution* without "notice of conduct to be avoided" (quoting *Winters*, 333 U.S. at 540 (Frankfurter, J., dissenting)).

For all the above reasons, the Court finds unpersuasive OAHHS's argument that HB 2362 fails to provide fair notice on the asserted ground that the law requires OHA to develop extra-statutory criteria to govern approval of covered transactions.[44]

### ii. Arbitrary Enforcement

A statute also can be void for vagueness under the Due Process Clause if it poses a "*significant* risk" of arbitrary enforcement. *Skilling v. United States*, 561 U.S. 358, 412 (2010) (emphasis added) (rejecting vagueness challenge to criminal statute in absence of a "significant risk" of arbitrary enforcement); *see also Stoianoff v. Montana*, 695 F.2d 1214, 1222 (9th Cir. 1983) (rejecting vagueness challenge in absence of a "clear indication" that the challenged law would be enforced arbitrarily). Even criminal laws delegate a permissible degree of discretion to those responsible for enforcement. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) (discussing the "broad discretion" retained by the Attorney General and U.S. Attorneys to enforce federal laws); *Hill*, 530 U.S. at 733 ("As always, enforcement requires the exercise of some degree of police judgment[.]" (quoting *Grayned*)); *Ward v. Rock Against*

---

[44] OAHHS also argues, in part, that some of the additional criteria promulgated by rule are impermissibly vague. Even if the Court were to agree with OAHHS that some of the additional criteria developed by OHA are unconstitutionally vague, that would not warrant facial invalidation of HB 2362.

*Racism*, 491 U.S. 781, 794 (1989) (upholding law that restricted expressive activity even though it provided "undoubtedly flexible standards" and granted "considerable discretion" to the officials responsible for implementing those standards). Thus a mere "*possibility* that [a law] will be enforced arbitrarily[] 'is of no due process significance unless the possibility ripens into a prosecution." *Stoianoff*, 695 F.2d at 1222 (emphasis added) (quoting *Hoffman*, 455 U.S. at 503 n.21).

As to the danger of arbitrary enforcement, OAHHS mainly focuses on a purported "absence of legislatively[] enacted review criteria." Here, again, OAHHS's argument is effectively one of delegation: OAHHS argues that HB 2362 invites arbitrary enforcement because it delegates too much authority to OHA to develop the criteria that ultimately guide OHA's implementation of the law. OAHHS does not point to any authority to support the proposition that a risk of arbitrary enforcement that violates due process may be found only because a statute delegates to an agency the authority to develop rules to guide implementation.[45] In any event, even if the Court were to entertain that theory in this facial vagueness challenge, for the reasons explained below, OAHHS has not met its burden to show a "significant risk" of arbitrary enforcement with respect to the provisions governing review criteria—or any other provision of HB 2362. *See Skilling*, 561 U.S. at 412.

No provision of HB 2362 "delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis," as the Supreme Court cautioned against in *Grayned*. 408 U.S. at 108-09; *see also Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (striking

---

[45] Nor does the Court agree with OAHHS that HB 2362 fails to provide OHA with sufficient guidance to ensure that the agency-promulgated rule criteria are not themselves arbitrary. *See* ORS § 415.501(2) (directing OHA to develop rule criteria consistent with subsection (1), which sets forth the purposes of ORS § 415.501).

down law that "necessarily entrust[ed] lawmaking to the moment-to-moment judgment of the policeman on his beat" (quotation marks omitted)). Nor is HB 2362 a law that raises the specter of "discriminatory enforcement . . . against those who may hold politically unpopular beliefs or lead unusual lifestyles." *See Stoianoff*, 695 F.2d at 1222 (evaluating vagueness of law prohibiting the manufacture or delivery of drug paraphernalia); *see also Papachristou*, 405 U.S. at 171 (striking down anti-vagrancy ordinance with "imprecise terms" that "generally implicated . . . poor people, nonconformists, dissenters, [and] idlers"). Nor, for that matter, has OAHHS presented any evidence that HB 2362 has been employed in an arbitrary manner in any instance following its enactment. Even if there is a "*possibility* that [HB 2362] may be enforced arbitrarily," there is no "clear indication" that the law will be enforced arbitrarily. *See Stoianoff*, 695 F.2d at 1222.

In addition, any possibility of arbitrary enforcement is mitigated by the processes available to regulated parties and under which OHA implements the law. Regulated entities can avail themselves of pre-notice review. *See* OAR 409-070-0042. Parties to a material change transaction for which a formal notice must be filed may participate in a pre-filing conference. OAR 409-070-0045(2). If OHA decides to conduct a comprehensive review, the agency must offer a "comprehensive review conference." *Id.* By rule, OHA must analyze information provided in a notice of a material change transaction under standards published on OHA's website and that must be "clear, fair, predictable, and consistent." OAR 409-070-0045(9), (9)(a). At the conclusion of a comprehensive review, OHA must issue a proposed order and proposed factual findings and conclusions of law, and the parties and the public are given a chance to make written comments to the proposed findings and conclusions and the proposed order. OAR 409-070-0060(4). Before issuing a final order, OHA must consider these comments, which

must be made available to the public. *See* OAR 409-070-0060(4), (5). In sum, HB 2362 is not a law that "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *See Grayned*, 408 U.S. at 108-09. Even under a strict standard of review, OAHHS has failed to show a "significant risk" of arbitrary enforcement that would justify facial invalidation of HB 2362. *See Skilling*, 561 U.S. at 412.

### d. Conclusion

Regardless of the specific standard that applies when evaluating facial challenges generally, OAHHS has failed to show that HB 2362 is unconstitutionally vague on its face on the asserted grounds that the law fails to provide fair notice or poses a significant risk of arbitrary enforcement. Accordingly, the Court grants summary judgment for Defendants on OAHHS's First Claim, alleging a violation of the Due Process Clause of the Fourteenth Amendment.

## B. Plaintiff's Second Claim

Because the Court grants partial summary judgment for Defendants on OAHHS' First Claim, which is brought under federal law, the only matter that remains is OAHHS's Second Claim. In that claim, OAHHS alleges that HB 2362 violates the nondelegation principles found in the Oregon Constitution, which are different from the nondelegation principles contained in the U.S. Constitution. *See generally Corvallis Lodge No. 1411 v. Or. Liquor Contr. Comm'n*, 67 Or. App. 15 (1984). Under 28 U.S.C. § 1367(c), a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."

A district court's exercise of discretion in these circumstances "is informed by whether declining jurisdiction comports with the underlying objective of most sensibly accommodating the values of economy, convenience, fairness, and comity." *O'Connor v. Nevada*, 27

F.3d 357, 363 (9th Cir. 1994) (cleaned up). In deciding whether to exercise supplemental

jurisdiction over a state-law claim, a court must weigh "considerations of judicial economy,

convenience[,] and fairness to litigants; if these are not present a federal court should hesitate to

exercise jurisdiction over state claims." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726

(1966). "In the usual case in which federal-law claims are eliminated before trial, the balance of

factors will point toward declining to exercise jurisdiction over the remaining state law

claims." *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994) (cleaned up;

emphasis omitted).

The Supreme Court also has cautioned that "[n]eedless decisions of state law should be

avoided both as a matter of comity and to promote justice between the parties, by procuring for

them a surer-footed reading of applicable law" and indicated in dicta that "if the federal claims

are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims

should be dismissed as well." *Gibbs*, 383 U.S. at 726. The Court recognizes that requiring

OAHHS to refile this case in state court will impose some additional cost and delay on OAHHS.

Even so, no factor weighs heavily in favor of retaining supplemental jurisdiction over OAHHS's

purely state-law claim. Further, because OAHHS asks this federal court to invalidate a state law

solely on state constitutional grounds, considerations of comity strongly favor the conclusion that

a federal court should decline jurisdiction. Accordingly, the Court declines to exercise

supplemental jurisdiction over OAHHS's state-law claim and dismisses that claim without

prejudice. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (explaining that when

the balance of factors "indicates that a case properly belongs in state court, . . . the federal court

should decline the exercise of jurisdiction by dismissing the case without prejudice"); *accord

Gini*, 40 F.3d at 1046.

## CONCLUSION

The Court GRANTS Defendants' motion for summary judgment (ECF 28). The Court grants summary judgment for Defendants against Plaintiff's First Claim, which alleges a violation of due process under the Fourteenth Amendment of the U.S. Constitution. The Court declines to exercise supplemental jurisdiction over Plaintiff's Second Claim, which alleges a state-law violation of Oregon's nondelegation doctrine under the Oregon Constitution. The Court DENIES Plaintiff's cross-motion for summary judgment (ECF 31).

**IT IS SO ORDERED**.

DATED this 16th day of May, 2024.

_/s/ Michael H. Simon_
Michael H. Simon
United States District Judge

Brad S. Daniels, OSB No. 025178
brad.daniels@stoel.com
Nathan R. Morales, OSB No. 145763
nathan.morales@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone:  503-294-9496
Facsimile:  503-220-2480

       Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON ASSOCIATION OF HOSPITALS AND HEALTH SYSTEMS, | Case No. 3:22-cv-01486-SI |
|        Plaintiff, | |
|   v. | FIRST AMENDED COMPLAINT[1] |
| STATE OF OREGON; OREGON HEALTH AUTHORITY; and PATRICK ALLEN, in his official capacity as Director of Oregon Health Authority, | |
|        Defendants. | |

       Oregon Association of Hospitals and Health Systems ("Plaintiff" or "OAHHS") hereby

brings this Complaint against the State of Oregon ("State"), Oregon Health Authority ("OHA"),

and Patrick Allen ("Allen"), in his official capacity as Director of OHA, and alleges as follows:

---

[1] Pursuant to Federal Rule of Civil Procedure 15(a)(2), Defendants have provided their written
consent to the filing of this amended pleading.

## I. INTRODUCTION

1.       For over a century, Oregon hospitals and health systems have cared for their local communities.  They have pursued innovative transactions designed to increase patient access to care, establish new services to meet changing patient needs, serve patients in rural and historically marginalized communities, and manage health care costs, all for the benefit of Oregonians living in every region of the State.  Although the State has regulated certain aspects of health care, it has historically allowed hospitals, clinics, and health care providers to meet the needs of their patients and local communities—from rural to urban—without undue government interference.  That approach has ended.  In its place, the Oregon legislature has created a regime in violation of the United States Constitution and the Oregon Constitution.

2.       On July 27, 2021, the Governor signed House Bill 2362 (2021) ("HB 2362") into law.  *See* Or. Laws 2021, ch. 615.[2]  *See* Appendix A.  HB 2362 is not simply a policy choice about regulating the health care market.  It does not merely authorize OHA to fill in the gaps of a statute that otherwise provides clear direction to the agency that enforces it and the parties who are subject to its requirements.  And it is not a licensing regime that empowers an agency to regulate health care providers based on objective criteria related to patient safety, scope of practice, or financial stability.

3.       Instead, HB 2362 gives OHA the unprecedented authority to approve, deny, and dictate the terms of a broad array of transactions and relationships involving "health care entities."  In doing so, the law fails to establish the standards or criteria that OHA must use to either identify or evaluate such transactions.  HB 2362 erects barriers to exactly the types of

---

[2] HB 2362 is codified at Oregon Revised Statutes §§ 415.500 – 415.900.  For ease of reference, OAHHS will refer to the law in narrative form as HB 2362, but will cite directly to the relevant sections of the Oregon Revised Statutes.

collaborative partnerships and arrangements that local hospitals and clinics have historically pursued to increase access to quality care. Furthermore, HB 2362 threatens to deter or delay transactions that would benefit Oregon communities, will result in unnecessary interventions and micromanagement by OHA, and will add costs to our already strained health care system.

4.     At its core, the Due Process Clause of the Fourteenth Amendment requires that a law must give persons fair notice of what it prohibits, and not be so vague that it authorizes random or discriminatory enforcement. HB 2362 fails that requirement. It prohibits conduct and imposes penalties for non-compliance, but establishes no standards for what conduct is prohibited or when those penalties are triggered. Consequently, HB 2362 violates the Due Process Clause.

5.     For similar reasons, HB 2362 also violates a basic principle of the Oregon Constitution: the nondelegation doctrine. Article III, section 1, and related provisions, of the Oregon Constitution prevent the legislature from delegating legislative authority to executive agencies. In short, to preserve the constitutional separation of powers, the legislature cannot give agencies the power to make law. HB 2362, however, does exactly that. In a major sector of Oregon's economy that affects every Oregonian, HB 2362 leaves it entirely up to OHA to choose the entities subject to the law, the types of health care transactions subject to review, and the criteria OHA will use to approve, deny, or dictate conditions on such transactions.

6.     OAHHS, therefore, brings this case to vindicate its rights and the rights of its members (and through them, their patients, caregivers, and communities), to have this Court declare HB 2362 unconstitutional and prospectively enjoin its continued administration.

## II. PARTIES

7.     Plaintiff OAHHS is a statewide nonprofit trade association representing Oregon hospitals and health systems.  In 1934, a number of Oregon's hospitals and health systems formed OAHHS to work closely with local and national government leaders, businesses, community coalitions, and other professional health care organizations; to enhance and promote community health; and to continue improving Oregon's innovative health care community. OAHHS's members include hospitals and health systems throughout Oregon.  OAHHS supports hospitals so that hospitals can support their communities.

8.     OAHHS's members include many of Oregon's hospitals and health systems that are subject to the requirements of HB 2362.  OAHHS's members have engaged in and will engage in a range of transactions—including contracts, affiliations, partnerships, and ventures—designed to maintain or grow access to health care and serve their communities.  Many of those transactions would have and will likely trigger the requirements of HB 2362 (though, as explained further below, the scope and nature of the law's requirements are unconstitutionally vague).

9.     OAHHS's Mission Statement is to "[p]rovide leadership in health policy through analysis, advocacy and member engagement to strengthen Oregon hospitals and health systems, deliver quality care and best serve our communities."  OAHHS spends its own resources to effect that mission.  Prior to, during, and after the enactment of HB 2362, OAHHS diverted its resources to address the unconstitutional policies and practices included in HB 2362.  But for those unconstitutional policies and practices, OAHHS would have spent its resources elsewhere.

10.     As noted, a core component of OAHHS's Mission Statement is "to strengthen Oregon hospitals and health systems, deliver quality care and best serve our communities."

HB 2362, however, weakens Oregon's hospitals and health systems by deterring innovation, increasing risk and cost, and reducing their ability to provide quality health care and serve our communities, thus frustrating OAHHS's mission.

11.    OAHHS is bringing this action directly on behalf of itself and in a representational capacity on behalf of its members.  OAHHS is authorized to bring this action because the legality of HB 2362 is directly linked and germane to OAHHS's purpose and mission.  Because this action concerns only the legality of HB 2362, OAHHS's claims for relief do not require the participation of its individual members.

12.    This is an action only for prospective injunctive and declaratory relief against Defendants the State, OHA, and Allen in his official capacity as current Director of OHA.  OHA and Allen constitute the political subdivisions of the State responsible for administering and enforcing HB 2362.  Defendant Allen's official administration and enforcement of HB 2362 has resulted in a continuous constitutional violation, which OAHHS now seeks to remedy.

### III.  JURISDICTION AND VENUE

13.    This Court has subject-matter jurisdiction over OAHHS's First Claim for Relief pursuant to 28 U.S.C. § 1331, because that claim arises under the United States Constitution. The Court has supplemental jurisdiction over OAHHS's Second Claim for Relief pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in the United States District Court, District of Oregon, Portland Division, because the events giving rise to OAHHS's claims took place within this district.

## IV.  FACTUAL BACKGROUND

### A.    Oregon's Hospitals and Health Systems

15.    Oregon's hospitals began in the late 1800s and achieved their current success through the ability to freely associate and contract with other hospitals, providers, and clinics. Oregon has more than 60 hospitals.  Of those, more than 30 are rural hospitals.  Or. Rev. Stat. § 442.470(6)(a).  Fifty-eight of the hospitals in Oregon are not-for-profit.  Hospitals are more than just buildings; they are cornerstones within the communities they serve.  In addition to providing direct, acute patient care on a daily basis, Oregon hospitals have employed hundreds of thousands of Oregonians, advanced community care, and provided services to generation after generation of Oregonians.  Over the years, Oregon hospitals have engaged in many transactions with other health care entities to increase health care innovations in Oregon through expanded access and increased technologies, and to fulfill their respective missions.

16.    OAHHS's members provide access to high-quality care for people in Oregon.  In the past, OAHHS's members have recognized significant cost savings by being able to associate with other hospitals and health care networks.  Nearly every OAHHS member has, at some point, taken actions that now could trigger the requirements under HB 2362.

### B.    Health Care-Related Collaborations and Partnerships

17.    Through separate and preexisting statutes (not HB 2362), the change of control of an Oregon hospital is already subject to review and approval by OHA (Oregon's licensing body for health care facilities) and, in the case of a hospital operated by a charitable entity, the Oregon Department of Justice.  *See* Or. Rev. Stat. § 65.800, *et seq*; Or. Rev. Stat. § 441.025.  In addition, under another law that is separate and distinct from HB 2362, OHA must issue a certificate of

need prior to the creation of, or expansion of services at, an Oregon hospital.  Or. Rev. Stat. § 442.310, *et seq*.

18.  The regulatory regime existing prior to HB 2362 allowed Oregon to maintain a vibrant ecosystem of hospitals and health systems that could innovate, collaborate, partner, and expand without undue government interference to respond to the changing needs of Oregon's patients and providers.

19.  Health care transactions proceeded with an appropriate level of government review.  The proponents of HB 2362, however, believed that Oregon needed a new and unprecedented regulatory regime that would allow government micromanagement of the health care marketplace—a large and critically important piece of the state's economy that is vital to the health of everyone in Oregon.

20.  HB 2362 imposes significant increased costs on OAHHS's members and other health care entities through unchecked oversight and cost-shifting related to the transactions that OHA chooses to review.

21.  HB 2362 deters innovations that OAHHS's members have pursued and will pursue.  It also adds market uncertainty and increased cost to transactions that OAHHS's members will pursue.

22.  HB 2362 has had these effects and will continue to have these effects, because it creates an unprecedented and unchecked regime that will prevent Oregon's hospitals and health systems from engaging in collaborative relationships, unless they first obtain costly review and approval from OHA, based on some unspecified legislative criteria and agency guidance that can change at will.  Even if transactions are approved, they may be subject to conditions imposed by OHA that make the transaction infeasible.

C.      **The Enactment of HB 2362**

23.      In 2021, some Oregon legislators and others questioned whether the State should further regulate health-care-related transactions.  Shortly thereafter, HB 2362 was introduced in the Oregon legislature.

24.      HB 2362 first was referred to the Oregon House of Representatives on January 1, 2021, during the 81st Oregon Legislative Assembly's regular session.  On June 25, 2021, the bill passed in the House and was referred to the Senate.  The Senate voted to pass HB 2362 the next day, on June 26, and the Governor signed it on July 27.

25.      The bill on its face appears somewhat similar to other laws governing health care transactions in Oregon.  Unlike the authority under those existing laws, however, HB 2362 is not focused on long-standing legal principles related to blocking monopolies, preventing private inurement, or ensuring that licensees adhere to applicable licensing standards.

26.      Instead, HB 2362 provides OHA with new and boundless authority to deny or dictate conditions on a wide array of health care transactions without any statutory limits on either the criteria that OHA may use to review transactions, or the types of conditions it may place on such transactions.

27.      The law allows OHA's appointees to conduct the initial factfinding and create the official factual record, which OHA relies on to determine whether a proposed health care transaction should proceed.  There is also unchecked ability of those appointees to shift the cost of such factfinding, including through the use of outside experts, to health care entities.  The law does not, however, inform regulated entities how, why, or how much, they might actually have to spend to comply with HB 2362.

28.     HB 2362 establishes a regime not found in any other state.  Through HB 2362, the
Oregon legislature has unconstitutionally delegated to an administrative agency (with the
factfinding assistance of a potentially conflicted "community review" board of OHA
appointees) its own obligation to legislatively (a) define what "health care entities" will
potentially be subject to the law's requirements; (b) define which "material change transactions"
are subject to review and approval; and (c) establish the criteria by which OHA will approve,
deny, or dictate changes to such transactions, including those involving OAHHS's members.

29.     The text of HB 2362 makes it clear that the legislature's intent was not cost
control or anti-monopolization.  HB 2362 is titled the "Equal Access to Care Act," and its
proponents drafted the language so broadly that the agency is given no criteria by which to
determine when to deny or restrict transactions.  That approach ensures that OHA and the OHA-
constituted "community review" board of OHA's appointees may deny or dictate conditions on a
proposed transaction for any reason, without proper notice to OAHHS and its members.

30.     OAHHS and its members participated in the legislative process to, among other
things, identify various legal issues with the proposed bill, but were drowned out by the louder
voices at the table.  Among many issues, OAHHS and its members expressly pointed out that
HB 2362 did not provide OHA or Oregon's hospitals with clear and objective standards for
identifying and reviewing transactions under the new law.  Despite those valid protestations,
HB 2362 passed with 32 votes in the House and 16 in the Senate, and was signed by the
Governor.  *See* Or. Laws 2021, ch. 615.

**D.    Provisions of HB 2362**

31.     HB 2362 provides OHA with virtually limitless authority to deny, approve, or
approve with conditions a wide array of health care-related relationships (including contracts),

partnerships, and transactions.  The law imposes four primary requirements on any "health care

entity" that wishes to engage in a "material change transaction":  (1) notice, (2) preliminary

review, (3) comprehensive review, and (4) fees and penalties.

32.    With respect to notice, HB 2362 requires any "health care entity" to provide OHA

not less than 180 days' advanced notice of any "material change transaction."  Or. Rev. Stat.

§ 415.501(3), (4).  Although the statute includes definitions for both "health care entity" and

"material change transaction," those definitions are so broad and ambiguous that it is impossible

from the text of the law to determine the scope of its requirements and prohibitions.

33.    Specifically, the legislature's definition of the term "health care entity" includes a

non-exclusive list of persons and entities—all licensed or certified individual health

professionals, hospitals and hospital systems, coordinated care organizations, and other specified

payors.  Critically, however, the definition is not limited to those entities.  It also includes any

"other entity that has as a primary function the provision of health care items or services or that

is a parent organization of, or is *an entity closely related to*, an entity that has as a *primary*

*function* the provision of *health care items or services*."  Or. Rev. Stat. § 415.500(4)(a)(F)

(emphasis added).  Because it left key terms such as "health care items or services," "primary

function," and "closely related to" undefined, the legislature failed to answer a critical question:

To whom does this law apply?

34.    Moreover, the law vaguely defines "transaction" as any (a) merger of a health

care entity with another health care entity, (b) acquisition of one or more health care entities by

another entity, (c) *new contract*, clinical affiliation, or *contracting affiliation* "that will eliminate

or significantly reduce, as defined by the authority by rule, essential services," (d) "corporate

affiliations" involving at least one health care entity; or (e) transactions to form a new

partnership, joint venture, accountable care organization, parent organization, or management services organization, as prescribed by the authority by rule.  Or. Rev. Stat. § 415.500(10).  The legislature delegates to OHA and other bodies the authority to define most of the operative terms of this definition, including "corporate affiliation," "eliminate or significantly reduce . . . essential services," and transactions creating a new entity.  Thus, the agencies themselves, not the legislature, are determining, on an *ad hoc* basis, both who is covered by the statute and what transactions are regulated.[3]

35.    Concerning preliminary review, the legislature delegated to OHA (after receiving the required notice from the parties) the authority to conduct a preliminary review of a proposed "material change transaction."  The preliminary review is "to determine if the transaction has the potential to have a negative impact on access to affordable health care in this state **and** meets the criteria in subsection (9) of this section."  Or. Rev. Stat. § 415.501(5) (emphasis added).  As outlined below, the criteria in subsection (9) include whatever criteria OHA determines by rule.

---

[3] The definition of "material change transaction" also includes, *inter alia*, a revenue threshold:

"Material change transaction" means:

(A)  A transaction in which at least one party had average revenue of $25 million or more in the preceding three fiscal years and another party:

(i)  Had an average revenue of at least $10 million in the preceding three fiscal years; or

(ii)  In the case of a new entity, is projected to have at least $10 million in revenue in the first full year of operation at normal levels of utilization or operation as prescribed by the authority by rule.

Or. Rev. Stat. § 415.500(6)(a).

36.    The legislature outlined criteria when transactions, following a preliminary review, "shall" be approved or approved with conditions.  Those criteria include, but are not limited to:

> (a) If the transaction is in the interest of consumers and is urgently necessary to maintain the solvency of an entity involved in the transaction; or
>
> (b) If the authority determines that the transaction does not have the potential to have a negative impact on access to affordable health care in this state or the transaction is likely to meet the criteria in subsection (9) of this section.

Or. Rev. Stat. § 415.501(6)(a)-(b).

37.    If a transaction fails to meet whatever standards OHA may establish for preliminary approval, then OHA conducts a "comprehensive review."  Or. Rev. Stat. § 415.501(7).

38.    At the comprehensive review stage, the legislature delegated to OHA complete and unlimited power for determining how to review a proposed transaction, and for determining whether the proposed transaction would be approved.  Exemplifying HB 2362's circularity, the criteria for approval are:

- The transaction will "benefit the public good and communities" by reducing the growth in patient costs in accordance with another law or maintaining a rate of cost growth that exceeds the target that the entity demonstrates is in the "best interest" of the public, increasing access to services in medically underserved areas, or rectifying historical and contemporary factors that contribute to a lack of health equities or access to services, or will improve health outcomes for residents of this state; *and*

- That there is no substantial likelihood of anticompetitive effects that outweigh the benefits of the transaction in increasing or maintaining services to underserved populations; *and*

- OHA "*determines that the transaction meets the criteria adopted by the department by rule*" under subsection (2). Or. Rev. Stat. § 415.501(9) (emphasis added).

39.    The end result of that textual mishmash of cross-references is that OHA has unlimited ability to set the standard for approval, approval with conditions, or denial. In fact, OHA may establish any criteria it wishes, with no limit or standard from the legislature as to what its rules must contain. Even if the transaction satisfies *all* of the conditions that the *legislature* has established for comprehensive approval, if OHA does not determine that the transaction meets *its* criteria (whatever those may be), the transaction will fail.

40.    At the comprehensive review stage, the legislature also empowered OHA to "appoint a review board of stakeholders to conduct a comprehensive review" of the proposed transaction. Or. Rev. Stat. § 415.501(7). For this comprehensive review, the "community review" board of OHA's appointees engages in factfinding concerning the proposed transaction, and then OHA may approve the transaction only if it "determines that the transaction meets the criteria adopted by the department by rule" based on the board's factfinding. The law does not, however, provide OHA (or the board of its appointees) with any guidance or standards for adopting the "criteria." It also does not include any true conflict-of-interest provisions applicable to the new board of OHA's handpicked appointees.[4]

---

[4] HB 2362 provides only that "[a] member of a review board shall file a notice of conflict of interest and the notice shall be made public." Or. Rev. Stat. § 415.501(11)(b). Unlike the provision applicable to OHA's officers and employees, however, it does not identify what

41.    At both the preliminary and comprehensive review stages, OHA has the authority to impose "conditions" on its approval.  HB 2362 does not specify what conditions may be imposed, however, nor does it specify any criteria or limits regarding those conditions.  As a result, in an effort to understand and implement the statute's vague and broad requirements, OHA may impose conditions that make the transaction impossible or infeasible.

42.    And finally, in regard to the fees and penalties, HB 2362 authorizes OHA to collect a "fee" that is "proportionate to the size of the parties to the transaction, sufficient to reimburse the costs of administering" HB 2362.  Or. Rev. Stat. § 415.512.  Those "fees" are deposited to the Oregon Health Authority Fund.  Additionally, OHA may seek injunctive relief and "may impose a civil penalty, as determined by the director, for a violation of" HB 2362, including the notice requirement.  *Id.* §§ 415.501(22), 415.900.  OHA also may retain experts to assist with the transaction review, and "designate the party or parties . . . that shall bear the reasonable and actual cost of retaining the professionals."  *Id.* § 415.501(14).

43.    Those provisions effectively give OHA a blank check to impose costs on Oregon hospitals and health care providers for any amount, without providing Oregon's hospitals sufficient notice concerning the calculation of those costs, the amount of those costs, or their relationship to the transaction.[5]

constitutes a conflict of interest requiring notice and how any such conflict should be resolved. *Cf. id.* § 415.505 (providing that, for an "officer or employee of" OHA, it is a conflict of interest to, for example, be financially interested in a party to a proposed transaction under HB 2362).

[5] In rules effective January 1, 2023, OHA has established a scale of comprehensive review fees, Or. Admin. R. 409-070-0030(3), but, as with other provisions of the statute, OHA's attempt to supply administrative criteria does not substitute for legislative action.

**E.    Results of HB 2362's Unconstitutional Vagueness and the Legislature's Unconstitutional Delegation**

44.    Because the legislature has failed to provide OHA with sufficient legislative guidance on how to administer HB 2362, OHA has attempted to create its own criteria and standards, which only have created more confusion and lack of fair notice.  Indeed, even between the filing of the Complaint and this First Amended Complaint, OHA continues to update and change guidance documents and rules.  The result is a shifting regulatory landscape caused by HB 2362's impossibly vague, and unconstitutionally broad, delegation of authority.

**1.    Determining What Constitutes a "Material Change Transaction"**

45.    Under HB 2362, a regulated entity must notify OHA of a "material change transaction" or be subject to civil penalties.  For a transaction subject to the notice requirement, the review and approval requirements of HB 2362 also apply.

46.    HB 2362 provides that a "material change transaction" includes any new contract, new clinical affiliation, or new contracting affiliation that will "***eliminate or significantly reduce***, as defined by the authority by rule, essential services."  Or. Rev. Stat. § 415.500(10)(c) (emphasis added).

47.    The law does not, however, define the phrase "eliminate or significantly reduce," so it is impossible for OAHHS's members to determine when that condition has been or might be triggered.  Instead, OHA has issued rules and multiple purported "sub-regulatory guidance documents."

48.    Although HB 2362 defined the phrase "essential services," that definition simply refers to a separate statutory term, by defining those services as ones (a) funded on the prioritized

list of services created by the Health Evidence Review Commission pursuant to ORS 414.690[6] and (b) "[s]ervices that are ***essential*** to achieve ***health equity***." Or. Rev. Stat. § 415.500(2) (emphasis added). It is impossible from the text of the law to determine what "health equity" means and what is "essential" to achieve it. For example, in rule changes effective January 1, 2023, OHA defines "[s]ervices that are essential to achieve health equity," but that definition is not tied to any legislative text, and it is entirely unclear how the agency could determine that its definition was or was not consistent with HB 2362. Or. Admin. R. 409-070-0005(28).

49.     HB 2362 does not define "health equity." Instead, the law provides that the statutory definition of "health equity" is whatever OHA and the Oregon Health Policy Board determine that phrase means. *See* Or. Rev. Stat. § 415.500(5) ("'Health equity' has the meaning prescribed by the Oregon Health Policy Board and adopted by the authority by rule.").

50.     In the rules effective January 1, 2023, OHA broadly defined "health equity" by rule as "a health system having and offering infrastructure, facilities, services, geographic coverage, affordability and all other relevant features, conditions and capabilities that will provide all people with the opportunity and reasonable expectation that they can reach their full health potential and well-being and are not disadvantaged by their race, ethnicity, language, disability, age, gender, gender identity, sexual orientation, social class, intersections among these communities or identities, or their socially determined circumstances." Or. Admin. R. 409-070-0005(17). OAHHS supports health equity. The concern is that the definitions in this law and rule do not notify parties of the standard or criteria by which a transaction will be assessed.

---

[6] The Health Evidence Review Commission is a 13-person body appointed by the governor and confirmed by the Senate. It develops a prioritized list of health services that the legislature uses to guide funding decisions for Oregon's Medicaid program (the Oregon Health Plan).

51.     For example, to determine whether they are about to enter into a "material change transaction," which requires notice to and review by OHA, an entity must determine whether it is a "health care entity."  Then it must guess whether the potential new contract or affiliation will "eliminate or significantly reduce" any services, without legislative guidance on what that means.  Then, if the answer to that question is yes, it next must undertake the impossible task of determining whether those are "essential services," by trying to figure out whether any services being significantly reduced somehow are "essential to achieve" a health system "having and offering infrastructure, facilities, services, geographic coverage, affordability and all other relevant features, conditions and capabilities that will provide all people with the opportunity and reasonable expectation that they can reach their full health potential and well-being and are not disadvantaged by their race, ethnicity, language, disability, age, gender, gender identity, sexual orientation, social class, intersections among these communities or identities, or their socially determined circumstances."

52.     That vagueness arises in other circumstances.  HB 2362 defines "transactions" to include "[t]ransactions to form a new partnership, joint venture, accountable care organization, parent organization or management services organization, as prescribed by the authority by rule." Or. Rev. Stat. § 415.500(10)(e).  Although the legislature did not write "[e]liminate or significantly reduce services" into this portion of the law, OHA wrote it into the rule.  Or. Admin. R. 409-070-0010(1)(e)(A).

**2.     How OHA has Attempted to Define "Essential Services" and "Significantly Reduce," Without the Legislature's Guidance**

53.     Because the legislature did not provide any guidance on how to define "essential services" and "significantly reduce," OHA unilaterally has attempted to resolve the ambiguities. For example, OHA's sub-regulatory documents include, among others, hypothetical examples

that exemplify the types of scenarios OHA would consider to constitute a transaction that "significantly reduces" what it believes are "essential services." Oregon Health Authority, *Defining Essential Services & Significant Reduction* (Jan. 31, 2022), HCMO-Essential-Services-and-Significant-Reduction-Guidance-FINAL.pdf (oregon.gov).

54.    For example, one of the documents references a hypothetical "contracting affiliation," whereby an existing hospital and clinic want to enter into a relationship, allowing some existing clinic doctors to move to see patients on the hospital's campus. In that example, OHA concludes that the services being provided in this hypothetical are "essential."

55.    OHA then analyzes eight criteria to determine whether the transaction will result in a reduction of essential services that is "significant." There is no indication of where or how OHA came up with those criteria, but it considers them regardless.

56.    After viewing the hypothetical facts through the lens of its newly created criteria, OHA concludes that the transactions would have numerous and clear benefits:

(i) There would be no reduction of providers;

(ii) There would be no reduction of providers serving new patients and individuals who are uninsured and underinsured;

(iii) There would be no restrictions regarding rendering, discussing, or referring to any essential services;

(iv) There would be no decrease in the availability of essential services;

(v) There would be no increase in appointment wait times;

(vi) There would be no increase in any barriers for community member seeking care, such as prior authorizations or required consultations before receiving essential services; and

(vii) There would be no reduction of a specific type of care.

57.    Despite those findings of no adverse patient impacts, OHA then concludes that the hypothetical affiliation actually would result in a "significant reduction" of essential services, making it subject to the extensive and costly review under HB 2362.  The only basis for that counterintuitive result cited by OHA is an increase of five miles in the median distance traveled by patients to the new hospital location, from 10 to 15 miles.  OHA concludes this is greater than an increase in time and distance of one-third, and therefore it is "significant."

58.    The median distance metric and the one-third standard (and many of the other criteria used by OHA to decide that this hypothetical transaction is subject to review and approval) are nowhere to be found in HB 2362.

59.    In rules to be effective January 1, 2023, OHA has included some concepts from the sub-regulatory guidance documents, including its invented criteria that a "significant reduction in services" occurs when a transaction will result in a change of one-third or more of, *inter alia*, increase of time or distance, providers, or availability of essential services. Or. Admin. R. 409-070-0010(3).  Whether those criteria are in sub-regulatory guidance or rules, however, the point is the same:  OHA is developing binding, legislative criteria on its own without any limits or guardrails in the enabling statute.

60.    OHA's own example illustrates (1) the complete lack of defining criteria with respect to critical aspects of HB 2362's applicability and (2) the legislature's decision to give OHA complete authority to arbitrarily determine the scope of HB 2362.  The result will be lack of fair notice and arbitrary enforcement and definitions, such as those illustrated above, which are wholly untethered to any actual legislative standards or criteria.

3.    **The Criteria OHA Applies When Reviewing and Approving (or Denying) a Proposed "Material Change Transaction"**

61.    Once OHA and regulated entities finally determine whether something is a "material change transaction," HB 2362 requires that OHA review the transaction "based on criteria prescribed by the authority by rule."  Thus, the new law delegates the authority to develop the criteria and procedures used for OHA's evaluation of a "material change transaction" to OHA and the Oregon Health Policy Board.  *See* Or. Rev. Stat. § 415.501(2) ("Oregon Health Authority shall adopt by rule criteria approved by the Oregon Health Policy Board for the consideration of requests by health care entities to engage in a material change transaction and procedures for the review of material change transactions under this section.").

62.    Because the legislature did not provide OHA with any standards or criteria to govern its review under HB 2362, OHA has promulgated its own administrative standards, which give it unchecked ability to deny, or dictate the terms of, a proposed transaction for almost any reason.

63.    For example, in its administrative rules effective January 1, 2023, OHA provides that it "may" appoint a community review board to participate in a comprehensive review. Or. Admin. R. 409-070-0062(1).  Whether it will do so, however, is entirely up to OHA.  The rule simply states that OHA "shall consider the potential impacts of the proposed transaction" without specifying what those impacts are or how they will be measured.  The rule (and the non-exclusive list that OHA included) does not provide any meaningful limit on OHA or notice to the parties regarding when a community review board will be required.

64.    The rule further provides that "[a] community review board shall make written recommendations to [OHA] on a proposed transaction based on the criteria listed in paragraph

(1) of this rule." Or. Admin. R. 409-070-0062(6). Paragraph (1) contains no meaningful "criteria" at all.

65.     The rule identifying OHA's criteria for approving (or denying or adding conditions to) a proposed transaction includes a separate list of criteria for OHA to consider, which expand on the already vague criteria of HB 2362. Or. Admin. R. 409-070-0060(6).

66.     Thus, again, because the legislature has not provided any meaningful or applicable standards, OHA unilaterally has created its own legislative criteria through rulemaking and sub-regulatory guidance, and done so in a way that makes it unclear what criteria will actually apply to review a proposed transaction. OHA's approach not only fails to give parties fair notice of what may be required of them, it creates an unacceptable risk of arbitrary and unfair decision-making.

## V.  FIRST CLAIM FOR RELIEF AGAINST DEFENDANT ALLEN– 42 U.S.C. § 1983

### (Violation of the Due Process Clause of the Fourteenth Amendment to

### the United States Constitution)

67.     OAHHS realleges all the preceding paragraphs as if fully set forth herein.

68.     This case involves an "actual controversy" between OAHHS and Defendant Allen concerning the constitutionality of HB 2362. OAHHS's members are subject to HB 2362 because they are "health care entities" as defined under that law. OAHHS's members engage in mergers and acquisitions, new contracts, clinical affiliations, contracting affiliations, corporate affiliations, and other transactions potentially subject to review under HB 2362. As such, OAHHS's members now must provide 180 days' notice of material change transactions and subject the transaction to OHA for denial or conditions, or suffer the imposition of fees and penalties by OHA.

69.     HB 2362 also has frustrated OAHHS's mission, and forced OAHHS to divert its resources, all as described above.

70.     Under the Due Process Clause, "[n]o state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law."  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns:  first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television*, 567 U.S. 239, 254 (2012).

71.     HB 2362 imposes costs and contains a penalty provision.  Or. Rev. Stat. § 415.900 ("In addition to any other penalty imposed by law, the Director of the Oregon Health Authority may impose a civil penalty, as determined by the director, for a violation of ORS 413.037 or 415.501.").  Section 2 of HB 2362 contains the notice and approval provisions applicable to "material change transactions."

72.     HB 2362 prohibits any entity from consummating a "material change transaction" without providing notice to, and receiving approval from, OHA.  The law, however, lacks any adequate definition of what constitutes a "health care entity" or "material change transaction," thus precluding parties from being able to determine whether they are required to provide OHA notice of, or face penalties for completing, a health care transaction.  Moreover, the legislature has not provided any criteria for OHA to use to determine whether a proposed transaction will be approved, denied, or approved with conditions.  That allows OHA to enforce the notice and penalty provisions, which includes forcing OAHHS's members to pay some undisclosed amount

of money, in an unconstitutionally arbitrary manner. It, also, fails to provide sufficient notice of the specific criteria OHA will apply to prohibit one of OAHHS's members from entering into a proposed transaction.

73.    At all relevant times, Defendant Allen acted under color of state law when administering and enforcing HB 2362. Specifically, Defendant Allen was exercising the authority given to him by the State of Oregon, and his actions were taken with the appearance that the State of Oregon authorized them.

74.    Defendant Allen's official conduct as the director of OHA, in administering and enforcing HB 2362, has deprived OAHHS and its members of their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as described above.

75.    OAHHS is entitled to (1) a declaration that HB 2362 is an unconstitutionally vague law, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and (2) prospective injunctive relief, prohibiting Defendant Allen from continuing to administer and enforce HB 2362.

## VI.  SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS STATE OF OREGON AND OREGON HEALTH AUTHORITY – 28 U.S.C. § 2201

### (Violation of the Nondelegation Doctrine Under the Oregon Constitution)

76.    OAHHS realleges all the preceding paragraphs as if fully set forth herein.

77.    This case involves an "actual controversy" between OAHHS and the State and OHA concerning the constitutionality of HB 2362. OAHHS's members are subject to HB 2362 because they are "health care entities" as defined under that law. OAHHS's members engage in mergers and acquisitions, new contracts, clinical affiliations, contracting affiliations, corporate affiliations, and other transactions potentially subject to review under HB 2362. As such, OAHHS's members now must provide 180 days' notice of any such transaction, partnership,

affiliation, or relationship, and subject the transaction to OHA denial or conditions, or suffer the imposition of fees and penalties by OHA.

78.     HB 2362 also has frustrated OAHHS's mission, and forced OAHHS to divert its resources, all as described above.

79.     Under Oregon law, the nondelegation doctrine is based on Article III, section 1; Article IV, section 1; and Article I, section 21, of the Oregon Constitution.  Pursuant to that doctrine, a law is unconstitutional for either one of following two independent reasons:  the law (1) fails to contain objective legislative standards or a fully expressed legislative policy that guides the exercise of the delegated authority or (2) fails to furnish adequate safeguards to those who are affected by the administrative action.

80.     Accordingly, under the Oregon Constitution, the legislature was prohibited from drafting and enacting HB 2362 without also including both (1) sufficient objective legislative standards or a fully expressed legislative policy that guides the exercise of the delegated authority and (2) adequate safeguards to OAHHS's members.  HB 2362, however, does not include either, in violation of the nondelegation doctrine.

### Count 1:  Failure to Include Objective Legislative Standards

81.     Under HB 2362, OHA will prohibit a health care entity from consummating a transaction if the transaction fails to meet "criteria prescribed by the authority by rule."

82.     The legislature, then, has wholly delegated the adoption of those legislative requirements and standards to OHA.  *See* Or. Rev. Stat. § 415.501(2) ("Oregon Health Authority shall adopt by rule criteria approved by the Oregon Health Policy Board for the consideration of requests by health care entities to engage in a material change transaction and procedures for the review of material change transactions under this section.").

83.    The legislature, through HB 2362, failed to provide OHA or Oregonians with any standards or guidance concerning what entities are subject to its notice and approval requirements, or what, specifically, OHA can or cannot consider when reviewing a transaction. Nor does the statute include any limits on OHA's authority to place conditions on a transaction. Thus, HB 2362 grants OHA broad authority to enact and enforce sweeping changes to Oregon's health care delivery system without any legislative involvement or oversight.

84.    Therefore, OAHHS is entitled to a declaration that HB 2362 unconstitutionally fails to include sufficient objective legislative standards to guide OHA in exercising its authority to deny, approve, or place conditions on the approval of a covered transaction, in violation of the nondelegation doctrine under the Oregon Constitution.

**Count 2:  Failure to Furnish Adequate Safeguards**

85.    HB 2362 delegates specific responsibilities to two different boards.  First, the law delegates to the Oregon Health Policy Board, a "nine-member citizen board," https://www.oregon.gov/oha/ohpb/pages/index.aspx, the determination of certain review criteria and the ability to define an important term, "health equity."  Second, the law delegates to an OHA-chosen "community review board" consisting of "members of the affected community, consumer advocates and health care experts" the important initial factfinding responsibilities in the comprehensive review process.

86.    The law also includes a conflict-of-interest provision, but it applies only to "an officer or employee" of OHA, not the Oregon Health Policy Board or the factfinding community review board.

87.    Unlike the provision for OHA, HB 2362 does not include any conflict-of-interest policy or other standards designed to ensure that the statutorily required lawmaking and

factfinding done by stakeholders and others under the statute is neutrally and objectively completed.

88.    In the absence of such safeguards, OAHHS is entitled to a declaration that HB 2362 violates the nondelegation doctrine under the Oregon Constitution.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

1.    On the First Claim for Relief, declare that HB 2362 is an unconstitutionally vague law, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and enter an injunction enjoining enforcement or application of HB 2362.

2.    On the Second Claim for Relief, declare that HB 2362 is in violation of the nondelegation doctrine under the Oregon Constitution.

3.    Award costs of suit and attorney fees.

4.    Award such other and further relief as the Court deems just and equitable.


DATED:  December 19, 2022

STOEL RIVES LLP


_s/ Brad S. Daniels_
BRAD S. DANIELS, OSB No. 025178
brad.daniels@stoel.com
NATHAN R. MORALES, OSB No. 145763
nathan.morales@stoel.com
Telephone:  503-294-9496

Attorneys for Plaintiff

OREGON LAWS 2021 | Chap. 615

CHAPTER 615

AN ACT                                    HB 2362

Relating to health care providers; creating new provisions; and amending ORS 413.032, 413.037, 413.101, 413.181, 415.013, 415.019 and 415.103.

Be It Enacted by the People of the State of Oregon:

SECTION 1. As used in this section and sections 2 and 3 of this 2021 Act:

(1) "Corporate affiliation" has the meaning prescribed by the Oregon Health Authority by rule, including:

(a) Any relationship between two organizations that reflects, directly or indirectly, a partial or complete controlling interest or partial or complete corporate control; and

(b) Transactions that merge tax identification numbers or corporate governance.

(2) "Essential services" means:

(a) Services that are funded on the prioritized list described in ORS 414.690; and

(b) Services that are essential to achieve health equity.

(3) "Health benefit plan" has the meaning given that term in ORS 743B.005.

(4)(a) "Health care entity" includes:

(A) An individual health professional licensed or certified in this state;

(B) A hospital, as defined in ORS 442.015, or hospital system, as defined by the authority by rule;

(C) A carrier, as defined in ORS 743B.005, that offers a health benefit plan in this state;

(D) A Medicare Advantage plan;

(E) A coordinated care organization or a prepaid managed care health services organization, as both terms are defined in ORS 414.025; and

(F) Any other entity that has as a primary function the provision of health care items or services or that is a parent organization of, or is an entity closely related to, an entity that has as a primary function the provision of health care items or services.

(b) "Health care entity" does not include:

(A) Long term care facilities, as defined in ORS 442.015.

(B) Facilities licensed and operated under ORS 443.400 to 443.455.

(5) "Health equity" has the meaning prescribed by the Oregon Health Policy Board and adopted by the authority by rule.

(6)(a) "Material change transaction" means:

(A) A transaction in which at least one party had average revenue of $25 million or more in the preceding three fiscal years and another party:

(i) Had an average revenue of at least $10 million in the preceding three fiscal years; or

(ii) In the case of a new entity, is projected to have at least $10 million in revenue in the first full year of operation at normal levels of utilization or operation as prescribed by the authority by rule.

(B) If a transaction involves a health care entity in this state and an out-of-state entity, a transaction that otherwise qualifies as a material change transaction under this paragraph that may result in increases in the price of health care or limit access to health care services in this state.

(b) "Material change transaction" does not include:

(A) A clinical affiliation of health care entities formed for the purpose of collaborating on clinical trials or graduate medical education programs.

(B) A medical services contract or an extension of a medical services contract.

(C) An affiliation that:

(i) Does not impact the corporate leadership, governance or control of an entity; and

(ii) Is necessary, as prescribed by the authority by rule, to adopt advanced value-based payment methodologies to meet the health care cost growth targets under ORS 442.386.

(D) Contracts under which one health care entity, for and on behalf of a second health care entity, provides patient care and services or provides administrative services relating to, supporting or facilitating the provision of patient care and services, if the second health care entity:

(i) Maintains responsibility, oversight and control over the patient care and services; and

(ii) Bills and receives reimbursement for the patient care and services.

(E) Transactions in which a participant that is a health center as defined in 42 U.S.C. 254b, while meeting all of the participant's obligations, acquires, affiliates with, partners with or enters into any agreement with another entity unless the transaction would result in the participant no longer qualifying as a health center under 42 U.S.C. 254b.

(7)(a) "Medical services contract" means a contract to provide medical or mental health services entered into by:

(A) A carrier and an independent practice association;

(B) A carrier, coordinated care organization, independent practice association or network of providers and one or more providers, as defined in ORS 743B.001;

(C) An independent practice association and an individual health professional or an organization of health care providers;

(D) Medical, dental, vision or mental health clinics; or

(E) A medical, dental, vision or mental health clinic and an individual health profes-

sional to provide medical, dental, vision or mental health services.

(b) "Medical services contract" does not include a contract of employment or a contract creating a legal entity and ownership of the legal entity that is authorized under ORS chapter 58, 60 or 70 or under any other law authorizing the creation of a professional organization similar to those authorized by ORS chapter 58, 60 or 70, as may be prescribed by the authority by rule.

(8) "Net patient revenue" means the total amount of revenue, after allowance for contractual amounts, charity care and bad debt, received for patient care and services, including:

(a) Value-based payments;

(b) Incentive payments;

(c) Capitation payments or payments under any similar contractual arrangement for the prepayment or reimbursement of patient care and services; and

(d) Any payment received by a hospital to reimburse a hospital assessment under ORS 414.855.

(9) "Revenue" means:

(a) Net patient revenue; or

(b) The gross amount of premiums received by a health care entity that are derived from health benefit plans.

(10) "Transaction" means:

(a) A merger of a health care entity with another entity;

(b) An acquisition of one or more health care entities by another entity;

(c) New contracts, new clinical affiliations and new contracting affiliations that will eliminate or significantly reduce, as defined by the authority by rule, essential services;

(d) A corporate affiliation involving at least one health care entity; or

(e) Transactions to form a new partnership, joint venture, accountable care organization, parent organization or management services organization, as prescribed by the authority by rule.

**SECTION 2.** (1) The purpose of this section is to promote the public interest and to advance the goals set forth in ORS 414.018 and the goals of the Oregon Integrated and Coordinated Health Care Delivery System described in ORS 414.570.

(2) In accordance with subsection (1) of this section, the Oregon Health Authority shall adopt by rule criteria approved by the Oregon Health Policy Board for the consideration of requests by health care entities to engage in a material change transaction and procedures for the review of material change transactions under this section.

(3)(a) A notice of a material change transaction involving the sale, merger or acquisition of a domestic health insurer shall be submitted

to the Department of Consumer and Business Services as an addendum to filings required by ORS 732.517 to 732.546 or 732.576. The department shall provide to the authority the notice submitted under this subsection to enable the authority to conduct a review in accordance with subsections (5) and (7) of this section. The authority shall notify the department of the outcome of the authority's review.

(b) The department shall make the final determination in material change transactions involving the sale, merger or acquisition of a domestic health insurer and shall coordinate with the authority to incorporate the authority's review into the department's final determination.

(4) An entity shall submit to the authority a notice of a material change transaction, other than a transaction described in subsection (3) of this section, in the form and manner prescribed by the authority, no less than 180 days before the date of the transaction and shall pay a fee prescribed in section 4 of this 2021 Act.

(5) No later than 30 days after receiving a notice described in subsections (3) and (4) of this section, the authority shall conduct a preliminary review to determine if the transaction has the potential to have a negative impact on access to affordable health care in this state and meets the criteria in subsection (9) of this section.

(6) Following a preliminary review, the authority or the department shall approve a transaction or approve a transaction with conditions designed to further the goals described in subsection (1) of this section based on criteria prescribed by the authority by rule, including but not limited to:

(a) If the transaction is in the interest of consumers and is urgently necessary to maintain the solvency of an entity involved in the transaction; or

(b) If the authority determines that the transaction does not have the potential to have a negative impact on access to affordable health care in this state or the transaction is likely to meet the criteria in subsection (9) of this section.

(7)(a) Except as provided in paragraph (b) of this subsection, if a transaction does not meet the criteria in subsection (6) of this section, the authority shall conduct a comprehensive review and may appoint a review board of stakeholders to conduct a comprehensive review and make recommendations as provided in subsections (11) to (18) of this section. The authority shall complete the comprehensive review no later than 180 days after receipt of the notice unless the parties to the transaction agree to an extension of time.

(b) The authority or the department may intervene in a transaction described in section 1 (6)(a)(C) of this 2021 Act in which the final au-

thority rests with another state and, if the transaction is approved by the other state, may place conditions on health care entities operating in this state with respect to the insurance or health care industry market in this state, prices charged to patients residing in this state and the services available in health care facilities in this state, to serve the public good.

(8) The authority shall prescribe by rule:

(a) Criteria to exempt an entity from the requirements of subsection (4) of this section if there is an emergency situation that threatens immediate care services and the transaction is urgently needed to protect the interest of consumers;

(b) Provision for the authority's failure to complete a review under subsection (5) of this section within 30 days; and

(c) Criteria for when to conduct a comprehensive review and appoint a review board under subsection (7) of this section that must include, but is not limited to:

(A) The potential loss or change in access to essential services;

(B) The potential to impact a large number of residents in this state; or

(C) A significant change in the market share of an entity involved in the transaction.

(9) A health care entity may engage in a material change transaction if, following a comprehensive review conducted by the authority and recommendations by a review board appointed under subsection (7) of this section, the authority determines that the transaction meets the criteria adopted by the department by rule under subsection (2) of this section and:

(a)(A) The parties to the transaction demonstrate that the transaction will benefit the public good and communities by:

(i) Reducing the growth in patient costs in accordance with the health care cost growth targets established under ORS 442.386 or maintain a rate of cost growth that exceeds the target that the entity demonstrates is the best interest of the public;

(ii) Increasing access to services in medically underserved areas; or

(iii) Rectifying historical and contemporary factors contributing to a lack of health equities or access to services; or

(B) The transaction will improve health outcomes for residents of this state; and

(b) There is no substantial likelihood of anticompetitive effects from the transaction that outweigh the benefits of the transaction in increasing or maintaining services to underserved populations.

(10) The authority may suspend a proposed material change transaction if necessary to conduct an examination and complete an analysis of whether the transaction is consistent with subsection (9) of this section and the criteria adopted by rule under subsection (2) of this section.

(11)(a) A review board convened by the authority under subsection (7) of this section must consist of members of the affected community, consumer advocates and health care experts. No more than one-third of the members of the review board may be representatives of institutional health care providers. The authority may not appoint to a review board an individual who is employed by an entity that is a party to the transaction that is under review or is employed by a competitor that is of a similar size to an entity that is a party to the transaction.

(b) A member of a review board shall file a notice of conflict of interest and the notice shall be made public.

(12) The authority may request additional information from an entity that is a party to the material change transaction, and the entity shall promptly reply using the form of communication requested by the authority and verified by an officer of the entity if required by the authority.

(13)(a) An entity may not refuse to provide documents or other information requested under subsection (4) or (12) of this section on the grounds that the information is confidential.

(b) Material that is privileged or confidential may not be publicly disclosed if:

(A) The authority determines that disclosure of the material would cause harm to the public;

(B) The material may not be disclosed under ORS 192.311 to 192.478; or

(C) The material is not subject to disclosure under ORS 705.137.

(c) The authority shall maintain the confidentiality of all confidential information and documents that are not publicly available that are obtained in relation to a material change transaction and may not disclose the information or documents to any person, including a member of the review board, without the consent of the person who provided the information or document. Information and documents described in this paragraph are exempt from disclosure under ORS 192.311 to 192.478.

(14) The authority or the Department of Justice may retain actuaries, accountants or other professionals independent of the authority who are qualified and have expertise in the type of material change transaction under review as necessary to assist the authority in conducting the analysis of a proposed material change transaction. The authority or the Department of Justice shall designate the party or parties to the material change transaction that shall bear the reasonable and actual cost of retaining the professionals.

(15) A review board may hold up to two public hearings to seek public input and otherwise engage the public before making a determination on the proposed transaction. A public

hearing must be held in the service area or areas of the health care entities that are parties to the material change transaction. At least 10 days prior to the public hearing, the authority shall post to the authority's website information about the public hearing and materials related to the material change transaction, including:

(a) A summary of the proposed transaction;

(b) An explanation of the groups or individuals likely to be impacted by the transaction;

(c) Information about services currently provided by the health care entity, commitments by the health care entity to continue such services and any services that will be reduced or eliminated;

(d) Details about the hearings and how to submit comments, in a format that is easy to find and easy to read; and

(e) Information about potential or perceived conflicts of interest among executives and members of the board of directors of health care entities that are parties to the transaction.

(16) The authority shall post the information described in subsection (15)(a) to (d) of this section to the authority's website in the languages spoken in the area affected by the material change transaction and in a culturally sensitive manner.

(17) The authority shall provide the information described in subsection (15)(a) to (d) of this section to:

(a) At least one newspaper of general circulation in the area affected by the material change transaction;

(b) Health facilities in the area affected by the material change transaction for posting by the health facilities; and

(c) Local officials in the area affected by the material change transaction.

(18) A review board shall make recommendations to the authority to approve the material change transaction, disapprove the material change transaction or approve the material change transaction subject to conditions, based on subsection (9) of this section and the criteria adopted by rule under subsection (2) of this section. The authority shall issue a proposed order and allow the parties and the public a reasonable opportunity to make written exceptions to the proposed order. The authority shall consider the parties' and the public's written exceptions and issue a final order setting forth the authority's findings and rationale for adopting or modifying the recommendations of the review board. If the authority modifies the recommendations of the review board, the authority shall explain the modifications in the final order and the reasons for the modifications. A party to the material change transaction may contest the final order as provided in ORS chapter 183.

(19) A health care entity that is a party to an approved material change transaction shall notify the authority upon the completion of the transaction in the form and manner prescribed by the authority. One year, two years and five years after the material change transaction is completed, the authority shall analyze:

(a) The health care entities' compliance with conditions placed on the transaction, if any;

(b) The cost trends and cost growth trends of the parties to the transaction; and

(c) The impact of the transaction on the health care cost growth target established under ORS 442.386.

(20) The authority shall publish the authority's analyses and conclusions under subsection (19) of this section and shall incorporate the authority's analyses and conclusions under subsection (19) of this section in the report described in ORS 442.386 (6).

(21) This section does not impair, modify, limit or supersede the applicability of ORS 65.800 to 65.815, 646.605 to 646.652 or 646.705 to 646.805.

(22) Whenever it appears to the Director of the Oregon Health Authority that any person has committed or is about to commit a violation of this section or any rule or order issued by the authority under this section, the director may apply to the Circuit Court for Marion County for an order enjoining the person, and any director, officer, employee or agent of the person, from the violation, and for such other equitable relief as the nature of the case and the interest of the public may require.

(23) The remedies provided under this section are in addition to any other remedy, civil or criminal, that may be available under any other provision of law.

(24) The authority may adopt rules necessary to carry out the provisions of this section.

SECTION 3. (1) An officer or employee of the Oregon Health Authority who is delegated responsibilities in the enforcement of section 2 of this 2021 Act or rules adopted pursuant to section 2 of this 2021 Act may not:

(a) Be a director, officer or employee of or be financially interested in an entity that is a party to a proposed material change transaction except as an enrollee or patient of a health care entity or by reason of rights vested in compensation or benefits related to services performed prior to affiliation with the authority; or

(b) Be engaged in any other business or occupation interfering with or inconsistent with the duties of the authority.

(2) This section does not permit any conduct, affiliation or interest that is otherwise prohibited by public policy.

SECTION 4. (1) The Oregon Health Authority shall prescribe by rule a fee to be paid under section 2 (3) of this 2021 Act, proportionate to the size of the parties to the transaction, sufficient to reimburse the costs of administering section 2 of this 2021 Act.

(2) Moneys received by the authority under this section shall be deposited to the Oregon Health Authority Fund established in ORS 413.101 to be used for carrying out section 2 of this 2021 Act.

**SECTION 5.** (1) In addition to any other penalty imposed by law, the Director of the Oregon Health Authority may impose a civil penalty, as determined by the director, for a violation of ORS 413.037 or section 2 of this 2021 Act. The amount of the civil penalty may not exceed $10,000 for each offense. The civil penalty imposed on an individual health professional may not exceed $1,000 for each offense.

(2) Civil penalties shall be imposed and enforced in accordance with ORS 183.745.

(3) Moneys received by the Oregon Health Authority under this section shall be paid to the State Treasury and credited to the General Fund.

**SECTION 6.** Every four years, the Oregon Health Authority shall commission a study of the impact of health care consolidation in this state. The study must review consolidation occurring during the previous four-year period and include an analysis of:

(1) The impact on costs to consumers for health care either to the benefit or the detriment of consumers; and

(2) Any increases or decreases in the quality of care, including:

(a) Improvement or reductions in morbidity;

(b) Improvement or reductions in the management of population health;

(c) Changes to health and patient outcomes, particularly for underserved and uninsured individuals, recipients of medical assistance and other low-income individuals and individuals living in rural areas, as measured by nationally recognized measures of the quality of health care, such as measures used or endorsed by the National Committee for Quality Assurance, the National Quality Forum, the Physician Consortium for Performance Improvement or the Agency for Healthcare Research and Quality.

**SECTION 6a.** The Oregon Health Authority shall commission the first study under section 6 of this 2021 Act no later than September 15, 2026.

**SECTION 7.** ORS 413.101 is amended to read:

413.101. The Oregon Health Authority Fund is established in the State Treasury, separate and distinct from the General Fund. Interest earned by the Oregon Health Authority Fund shall be credited to the fund. Moneys in the fund are continuously appropriated to the Oregon Health Authority for carrying out the duties, functions and powers of the authority under ORS 413.032 and 431A.183 **and section 2 of this 2021 Act**.

**SECTION 8.** ORS 413.032 is amended to read:

413.032. (1) The Oregon Health Authority is established. The authority shall:

(a) Carry out policies adopted by the Oregon Health Policy Board;

(b) Administer the Oregon Integrated and Coordinated Health Care Delivery System established in ORS 414.570;

(c) Administer the Oregon Prescription Drug Program;

(d) Develop the policies for and the provision of publicly funded medical care and medical assistance in this state;

(e) Develop the policies for and the provision of mental health treatment and treatment of addictions;

(f) Assess, promote and protect the health of the public as specified by state and federal law;

(g) Provide regular reports to the board with respect to the performance of health services contractors serving recipients of medical assistance, including reports of trends in health services and enrollee satisfaction;

(h) Guide and support, with the authorization of the board, community-centered health initiatives designed to address critical risk factors, especially those that contribute to chronic disease;

(i) Be the state Medicaid agency for the administration of funds from Titles XIX and XXI of the Social Security Act and administer medical assistance under ORS chapter 414;

(j) In consultation with the Director of the Department of Consumer and Business Services, periodically review and recommend standards and methodologies to the Legislative Assembly for:

(A) Review of administrative expenses of health insurers;

(B) Approval of rates; and

(C) Enforcement of rating rules adopted by the Department of Consumer and Business Services;

(k) Structure reimbursement rates for providers that serve recipients of medical assistance to reward comprehensive management of diseases, quality outcomes and the efficient use of resources and to promote cost-effective procedures, services and programs including, without limitation, preventive health, dental and primary care services, web-based office visits, telephone consultations and telemedicine consultations;

(L) Guide and support community three-share agreements in which an employer, state or local government and an individual all contribute a portion of a premium for a community-centered health initiative or for insurance coverage;

(m) Develop, in consultation with the Department of Consumer and Business Services, one or more products designed to provide more affordable options for the small group market;

(n) Implement policies and programs to expand the skilled, diverse workforce as described in ORS 414.018 (4); and

(o) Implement a process for collecting the health outcome and quality measure data identified by the

Health Plan Quality Metrics Committee and report the data to the Oregon Health Policy Board.

(2) The Oregon Health Authority is authorized to:

(a) Create an all-claims, all-payer database to collect health care data and monitor and evaluate health care reform in Oregon and to provide comparative cost and quality information to consumers, providers and purchasers of health care about Oregon's health care systems and health plan networks in order to provide comparative information to consumers.

(b) Develop uniform contracting standards for the purchase of health care, including the following:

(A) Uniform quality standards and performance measures;

(B) Evidence-based guidelines for major chronic disease management and health care services with unexplained variations in frequency or cost;

(C) Evidence-based effectiveness guidelines for select new technologies and medical equipment;

(D) A statewide drug formulary that may be used by publicly funded health benefit plans; and

(E) Standards that accept and consider tribal-based practices for mental health and substance abuse prevention, counseling and treatment for persons who are Native American or Alaska Native as equivalent to evidence-based practices.

(3) The enumeration of duties, functions and powers in this section is not intended to be exclusive nor to limit the duties, functions and powers imposed on or vested in the Oregon Health Authority by ORS 413.006 to 413.042, 415.012 to 415.430 and 741.340 **and section 2 of this 2021 Act** or by other statutes.

**SECTION 9.** ORS 413.037 is amended to read:
413.037. (1) The Director of the Oregon Health Authority, each deputy director and authorized representatives of the director may administer oaths, take depositions and issue subpoenas to compel the attendance of witnesses and the production of documents or other written information necessary to carry out the provisions of ORS 413.006 to 413.042, 415.012 to 415.430 and 741.340 **and section 2 of this 2021 Act**.

(2) If any person fails to comply with a subpoena issued under this section or refuses to testify on matters on which the person lawfully may be interrogated, the director, deputy director or authorized representative may follow the procedure set out in ORS 183.440 to compel obedience.

**SECTION 10.** ORS 413.181 is amended to read:
413.181. (1) The Department of Consumer and Business Services and the Oregon Health Authority may enter into agreements governing the disclosure of information reported to the department by insurers with certificates of authority to transact insurance in this state and the disclosure of information reported to the Oregon Health Authority by coordinated care organizations.

(2) The authority may use information disclosed under subsection (1) of this section for the purpose of carrying out ORS 413.032, 414.572, 414.591, 414.605, 414.609, 414.638 and 415.012 to 415.430 **and section 2 of this 2021 Act**.

**SECTION 11.** ORS 415.013 is amended to read:
415.013. (1) The Oregon Health Authority shall enforce the provisions of ORS 415.012 to 415.430 **and section 2 of this 2021 Act** and rules adopted pursuant to ORS 415.011 **and 415.012 to 415.430 and section 2 of this 2021 Act** for the public good.

(2) The authority has the powers and authority expressly conferred by or reasonably implied from the provisions of ORS 415.012 to 415.430 **and section 2 of this 2021 Act** and rules adopted pursuant to ORS 415.011 **and 415.012 to 415.430 and section 2 of this 2021 Act**.

(3) The authority may conduct examinations and investigations [*of matters concerning the regulation of coordinated care organizations as the authority considers proper to determine whether any person has violated any provision of ORS 415.012 to 415.430 or rules adopted pursuant to ORS 415.011 or to secure information useful in the lawful administration of any of ORS 415.011 the provisions*] **and require the production of books, records, accounts, papers, documents and computer and other recordings the authority considers necessary to administer and enforce ORS 415.012 to 415.430 or section 2 of this 2021 Act and any rules adopted pursuant to ORS 415.011 or 415.012 to 415.430 or section 2 of this 2021 Act**.

**SECTION 12.** ORS 415.019 is amended to read:
415.019. (1) The Oregon Health Authority shall hold a contested case hearing upon written request for a hearing by a person aggrieved by any act, threatened act or failure of the authority to act under ORS 415.012 to 415.430 **or section 2 of this 2021 Act** or rules adopted pursuant to ORS 415.011 **or 415.012 to 415.430 or section 2 of this 2021 Act**.

(2) The provisions of ORS chapter 183 govern the hearing procedures and any judicial review of a final order issued in a contested case hearing.

**SECTION 13.** ORS 415.103 is amended to read:
415.103. A person may not file or cause to be filed with the Oregon Health Authority any article, certificate, report, statement, application or other information required or permitted to be filed under ORS 415.012 to 415.430 **or section 2 of this 2021 Act** or rules adopted pursuant to ORS 415.011 **or 415.012 to 415.430 or section 2 of this 2021 Act** that is known by the person to be false or misleading in any material respect.

**SECTION 14. Section 2 of this 2021 Act becomes operative on March 1, 2022.**
Approved by the Governor July 27, 2021
Filed in the office of Secretary of State August 2, 2021
Effective date January 1, 2022
——————————

BRAD S. DANIELS, OSB No. 025178
brad.daniels@stoel.com
NATHAN R. MORALES, OSB No. 145763
nathan.morales@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON ASSOCIATION OF HOSPITALS AND HEALTH SYSTEMS, | Case No.:  3:22-cv-01486-SI |
| Plaintiff, | **PLAINTIFF'S NOTICE OF APPEAL** |
| v. | |
| STATE OF OREGON; OREGON HEALTH AUTHORITY; and DR. SEJAL HATHI, in her official capacity as Director of Oregon Health Authority, | |
| Defendants. | |

PLEASE TAKE NOTICE that Oregon Association of Hospitals and Health Systems,

doing business as Hospital Association of Oregon, Plaintiff in the above-captioned case, hereby

appeals to the United States Court of Appeals for the Ninth Circuit from the District Court's

/ / /

/ / /

Opinion and Order (ECF No. 48), dated May 16, 2024, and Judgment (ECF No. 49), dated

May 20, 2024.

DATED:  June 18, 2024                    STOEL RIVES LLP


                                         ___s/ Brad S. Daniels_____
                                         BRAD S. DANIELS, OSB No. 025178
                                         brad.daniels@stoel.com
                                         NATHAN R. MORALES, OSB No. 145763
                                         nathan.morales@stoel.com

                                         Attorneys for Plaintiff

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
Form 6. Representation Statement**

<u>**Appellant**</u>

<u>Name of Party</u>:

    Oregon Association of Hospitals and Health Systems

<u>Name of counsel</u>:

    Brad S. Daniels, OSB No. 025178

    Nathan R. Morales, OSB No. 145763

    STOEL RIVES LLP

    760 SW Ninth Avenue, Suite 3000

    Portland, OR 97205

    Telephone: 503.224.3380

    Email: brad.daniels@stoel.com

    Email: nathan.morales@stoel.com

    (Counsel are registered for electronic filing in the Ninth Circuit)


<u>**Appellees**</u>

<u>Name of Party</u>:

State of Oregon, Oregon Health Authority, and Dr. Sejal Hathi, in her official capacity as Director of Oregon Health Authority

<u>Name of counsel</u>:

    Sara D. Van Loh, OSB No. 044398

    Youngwoo Joh, OSB No. 164105

    Department of Justice

    100 SW Market Street

    Portland, OR 97201

    Telephone: (971) 673-1880

    Email: sara.van.loh@doj.state.or.us

    Email: youngwoo.joh@doj.state.or.us

APPEAL,TERMINATED

# U.S. District Court
## District of Oregon (Portland (3))
## CIVIL DOCKET FOR CASE #: 3:22–cv–01486–SI

Oregon Association of Hospitals and Health Systems v. State of Oregon, et al
Assigned to: Judge Michael H. Simon
Demand: $0
Case in other court:  Ninth Circuit Court of Appeals, 24–03770
Cause: 28:1331 Fed. Question: Review Agency Decision

Date Filed: 10/03/2022
Date Terminated: 05/20/2024
Jury Demand: None
Nature of Suit: 950 Constitutional – State Statute
Jurisdiction: Federal Question

**Plaintiff**

| **Oregon Association of Hospitals and Health Systems** | represented by | **Nathan R. Morales**<br>Stoel Rives LLP<br>760 S.W. Ninth Ave.<br>Suite 3000<br>Portland, OR 97205<br>503–294–9496<br>Email: nathan.morales@stoel.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Brad S. Daniels**<br>Stoel Rives LLP<br>760 S.W. Ninth Ave.<br>Suite 3000<br>Portland, OR 97205<br>503–224–3380<br>Fax: 503–220–2480<br>Email: brad.daniels@stoel.com<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| **State of Oregon** | represented by | **Sara D. Van Loh**<br>Oregon Department of Justice<br>100 SW Market St<br>Portland, OR 97201<br>503–947–4700<br>Email: sara.vanloh@doj.oregon.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**YoungWoo Joh**<br>Oregon Department of Justice<br>Trial Division, Special Litigation Unit<br>100 SW Market St.<br>Portland, OR 97201<br>503–689–5696<br>Email: youngwoo.joh@doj.oregon.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Shannon M. Vincent**<br>Oregon Department of Justice<br>Trial Division, CLS<br>1162 Court Street NE<br>Salem, OR 97301<br>503–947–4700<br>Fax: 503–947–4791 |

Email: shannon.m.vincent@doj.state.or.us
*TERMINATED: 02/01/2023*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Oregon Health Authority**            represented by  **Sara D. Van Loh**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **YoungWoo Joh**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Shannon M. Vincent**
                                                      (See above for address)
                                                      *TERMINATED: 02/01/2023*
                                                      *ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Sejal Hathi**                    represented by  **Sara D. Van Loh**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **YoungWoo Joh**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Shannon M. Vincent**
                                                      (See above for address)
                                                      *TERMINATED: 02/01/2023*
                                                      *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/03/2022 | 1 | Complaint. Filing fee in the amount of $402 collected. Agency Tracking ID: AORDC−8675284. Jury Trial Requested: No. Filed by Oregon Association of Hospitals and Health Systems against State of Oregon, Oregon Health Authority, and Patrick Allen. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons, # 3 Proposed Summons, # 4 Proposed Summons). (Daniels, Brad) Modified docket text on 10/3/2022 to update party names and add payment information. (eo) (Entered: 10/03/2022) |
| 10/04/2022 | 2 | Notice of Case Assignment to Judge Michael H. Simon and Discovery and Pretrial Scheduling Order. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3−5.** Discovery is to be completed by 2/1/2023. Joint Alternate Dispute Resolution Report is due by 3/3/2023. Pretrial Order is due by 3/3/2023. Ordered by Judge Michael H. Simon. (kgc) (Entered: 10/04/2022) |
| 10/04/2022 | 3 | Summons Issued Electronically as to Patrick Allen, Oregon Health Authority, State of Oregon. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3−5.** (kgc) (Entered: 10/04/2022) |
| 10/12/2022 | 4 | Affidavit of Service of Summons Issued, 3 upon State of Oregon served on 10/6/2022 Filed by Oregon Association of Hospitals and Health Systems. (Daniels, Brad) (Entered: 10/12/2022) |
| 10/12/2022 | 5 | Affidavit of Service of Summons Issued, 3 upon Oregon Health Authority served on 10/6/2022 Filed by Oregon Association of Hospitals and Health Systems. (Daniels, |

| | | |
|---|---|---|
| | | Brad) (Entered: 10/12/2022) |
| 10/12/2022 | 6 | Affidavit of Service of Summons Issued, 3 upon Patrick Allen served on 10/6/2022 Filed by Oregon Association of Hospitals and Health Systems. (Daniels, Brad) (Entered: 10/12/2022) |
| 10/24/2022 | 7 | Acceptance/Acknowledgement of Service of Complaint, 1 on Patrick Allen served on 10/24/2022 Filed by Oregon Association of Hospitals and Health Systems. (Morales, Nathan) (Entered: 10/24/2022) |
| 10/25/2022 | 8 | Motion for Extension of Time to Answer Complaint, 1 . Filed by Patrick Allen, Oregon Health Authority, State of Oregon. (Vincent, Shannon) (Entered: 10/25/2022) |
| 10/25/2022 | 9 | Declaration of Shannon M. Vincent *in Support of Unopposed Motion for Extension of Time to File Response to Complaint*. Filed by Patrick Allen, Oregon Health Authority, State of Oregon. (Related document(s): Motion for Extension of Time to Answer a Complaint/Petition 8 .) (Vincent, Shannon) (Entered: 10/25/2022) |
| 10/25/2022 | 10 | **ORDER** – The Court GRANTS Defendants' Unopposed Motion for Extension of Time to Answer. ECF 8 . Defendants' answer or other responsive pleading is due by November 28, 2022. Ordered by Judge Michael H. Simon. (mja) (Entered: 10/25/2022) |
| 11/22/2022 | 11 | Unopposed Motion for Extension of Time to Answer Complaint, 1 . Filed by Patrick Allen, Oregon Health Authority, State of Oregon. (Vincent, Shannon) (Entered: 11/22/2022) |
| 11/22/2022 | 12 | Declaration of Shannon M. Vincent *in Support of Unopposed Motion for Extension of Time to File Response to Complaint*. Filed by Patrick Allen, Oregon Health Authority, State of Oregon. (Related document(s): Motion for Extension of Time to Answer a Complaint/Petition 11 .) (Vincent, Shannon) (Entered: 11/22/2022) |
| 11/22/2022 | 13 | **ORDER** – The Court GRANTS Defendants' Unopposed Motion for Extension of Time to Answer, ECF 11 . Defendants' answer or other responsive pleading is due by December 19, 2022. Ordered by Judge Michael H. Simon. (mja) (Entered: 11/22/2022) |
| 12/19/2022 | 14 | First Amended Complaint . Filed by Oregon Association of Hospitals and Health Systems against Patrick Allen, Oregon Health Authority, State of Oregon. (Daniels, Brad) (Entered: 12/19/2022) |
| 12/21/2022 | 15 | Unopposed Motion for Extension of Time to Answer Amended Complaint 14 . Filed by Patrick Allen, Oregon Health Authority, State of Oregon. (Vincent, Shannon) (Entered: 12/21/2022) |
| 12/21/2022 | 16 | Declaration of Shannon M. Vincent *in Support of Unopposed Motion for Extension of Time to File Response to First Amended Complaint*. Filed by Patrick Allen, Oregon Health Authority, State of Oregon. (Related document(s): Motion for Extension of Time to Answer a Complaint/Petition 15 .) (Vincent, Shannon) (Entered: 12/21/2022) |
| 12/22/2022 | 17 | **ORDER** – The Court GRANTS Defendants' Unopposed Motion for Extension of Time to Answer. ECF 15 . Answer or other responsive pleading is due by January 24, 2023. Ordered by Judge Michael H. Simon. (mja) (Entered: 12/22/2022) |
| 01/24/2023 | 18 | Answer to 14 Amended Complaint . Filed by Oregon Health Authority, State of Oregon, James Schroeder. (Vincent, Shannon) (Entered: 01/24/2023) |
| 01/31/2023 | 19 | Unopposed Motion for Extension of Time *of Case Deadlines*. Filed by Oregon Association of Hospitals and Health Systems. (Morales, Nathan) (Entered: 01/31/2023) |
| 01/31/2023 | 20 | **ORDER** – The Court GRANTS Plaintiff's Unopposed Motion for Extension of Time of Case Deadlines (ECF 19 ) as follows: Discovery is to be completed by June 1, 2023; Joint Alternate Dispute Resolution Report is due by July 3, 2023; and Pretrial Order is due by July 3, 2023. Ordered by Judge Michael H. Simon. (mja) (Entered: 01/31/2023) |
| 02/01/2023 | 21 | Notice of Attorney Substitution: Sara D. Van Loh is substituted as counsel of record in place of Attorney Shannon M. Vincent . Filed by on behalf of All Defendants. (Van Loh, Sara) (Entered: 02/01/2023) |

| | | |
|---|---|---|
| 02/03/2023 | 22 | ORDER – To clarify the in the Court's Order (ECF 20 ) all deadlines in listed in the Court's Discovery and Pretrial Scheduling Order (ECF 2 ) have been extended 120 days. Ordered by Judge Michael H. Simon. (mja) (Entered: 02/03/2023) |
| 03/31/2023 | 23 | Fed. R. Civ. P. 26(a)(1) Agreement . Filed by Oregon Association of Hospitals and Health Systems. (Morales, Nathan) (Entered: 03/31/2023) |
| 04/17/2023 | 24 | Unopposed Motion for Extension of Time *Unopposed Motion for Entry of Case Management Order and Extension of Case Deadlines*. Filed by Oregon Association of Hospitals and Health Systems. (Daniels, Brad) (Entered: 04/17/2023) |
| 04/17/2023 | 25 | **ORDER –** The Court GRANTS Plaintiff's unopposed motion for entry of case management order and for extension of case deadlines (ECF 24 ) as follows: (1) Defendants' motion for summary judgment is due by May 12, 2023; (2) Plaintiff's combined opposition to Defendants' motion for summary judgment and cross–motion for summary judgment is due by June 9, 2023; (3) Defendants' combined opposition to Plaintiff's motion for summary judgment and reply in support of Defendants' motion for summary judgment is due by July 14, 2023; and (4) Plaintiff's reply in support of its motion for summary judgement is due by July 28, 2023. All other pending deadlines are stricken. Ordered by Judge Michael H. Simon. (mja) (Entered: 04/17/2023) |
| 05/01/2023 | 26 | Unopposed Motion for Extension of Time . Filed by Oregon Health Authority, James Schroeder, State of Oregon. (Van Loh, Sara) Modified on 5/1/2023 (mja). (Entered: 05/01/2023) |
| 05/01/2023 | 27 | **ORDER –** The Court GRANTS Defendants' unopposed motion for extension of time (ECF 26 ) as follows: (1) Defendants' motion for summary judgment is due by May 26, 2023; (2) Plaintiff's combined opposition to Defendants' motion for summary judgment and cross–motion for summary judgment is due by June 23, 2023; (3) Defendants' combined opposition to Plaintiff's cross–motion for summary judgment and reply in support of Defendants' motion for summary judgment is due by July 28, 2023; and (4) Plaintiff's reply in support of its motion for summary judgement is due by August 11, 2023. Ordered by Judge Michael H. Simon. (mja) (Entered: 05/01/2023) |
| 05/26/2023 | 28 | Motion for Summary Judgment . Filed by Patrick Allen, Oregon Health Authority, James Schroeder, State of Oregon. (Van Loh, Sara) (Entered: 05/26/2023) |
| 06/08/2023 | 29 | Unopposed Motion for Extension of Time . Filed by Oregon Association of Hospitals and Health Systems. (Morales, Nathan) (Entered: 06/08/2023) |
| 06/08/2023 | 30 | **ORDER:** The Court GRANTS Plaintiff's unopposed motion for extension of time (ECF 29 ) as follows: (1) Plaintiff's combined opposition to Defendants' motion for summary judgment and cross–motion for summary judgment are due by July 14, 2023; (2) Defendants' combined opposition and reply to Plaintiff's cross–motion for summary judgment and reply in support of Defendant's motion for summary judgment are due by August 11, 2023; and (3) Plaintiff's reply in support of its motion for summary judgment is due by August 25, 2023. Ordered by Judge Michael H. Simon. (mja) (Entered: 06/08/2023) |
| 07/14/2023 | 31 | Motion for Summary Judgment *Plaintiff's Cross–Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment*. Oral Argument requested. Filed by Oregon Association of Hospitals and Health Systems. (Daniels, Brad) (Entered: 07/14/2023) |
| 08/08/2023 | 32 | Unopposed Motion for Extension of Time to File a Response/Reply to Motion for Summary Judgment *Plaintiff's Cross–Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment* 31 . Filed by All Defendants. (Van Loh, Sara) (Entered: 08/08/2023) |
| 08/08/2023 | 33 | **ORDER –** The Court GRANTS Defendants' unopposed motion for extension of time (ECF 32 ) as follows: Defendants' combined opposition to Plaintiff's cross–motion for summary judgment and reply in support of Defendants' motion for summary judgment is due by August 18, 2023, and Plaintiff's reply in support of motion for summary judgment is due by September 14, 2023. Ordered by Judge Michael H. Simon. (mja) (Entered: 08/08/2023) |

| 08/18/2023 | <u>34</u> | Response in Opposition *to Plaintiff's Cross−Motion for Summary Judgment and Reply in Support of Defendants' Motion for Summary Judgment* to Motion for Summary Judgment *Plaintiff's Cross−Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment* <u>31</u> . Filed by All Defendants. (Joh, YoungWoo) (Entered: 08/18/2023) |
|---|---|---|
| 08/18/2023 | <u>35</u> | Declaration of YoungWoo Joh . Filed by All Defendants. (Related document(s): Response in Opposition to Motion, <u>34</u> .) (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10) (Joh, YoungWoo) (Entered: 08/18/2023) |
| 08/18/2023 | <u>36</u> | Supplement *Appendix to Defendants' Combined Opposition to Plaintiff's Cross−Motion for Summary Judgment and Reply in Support of Defendants' Motion for Summary Judgment*. Filed by All Defendants. (Related document(s): Response in Opposition to Motion, <u>34</u> .) (Joh, YoungWoo) (Entered: 08/18/2023) |
| 09/08/2023 | <u>37</u> | Unopposed Motion for Extension of Time to File a Response/Reply to Motion for Summary Judgment *Plaintiff's Cross−Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment* <u>31</u> . Filed by Oregon Association of Hospitals and Health Systems. (Daniels, Brad) (Entered: 09/08/2023) |
| 09/08/2023 | 38 | **ORDER −** The Court GRANTS Plaintiff's Unopposed Motion for Extension of Time to File Reply in Support of Motion for Summary Judgment, ECF <u>37</u> . Plaintiff's reply is due by September 21, 2023. Ordered by Judge Michael H. Simon. (mja) (Entered: 09/08/2023) |
| 09/21/2023 | <u>39</u> | Reply *Plaintiff's Reply in Support of Cross−Motion for Summary Judgment* to Motion for Summary Judgment *Plaintiff's Cross−Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment* <u>31</u> . Filed by Oregon Association of Hospitals and Health Systems. (Daniels, Brad) (Entered: 09/21/2023) |
| 03/08/2024 | 40 | **SCHEDULING ORDER** – The Court sets oral argument on the parties' pending cross motions for summary judgment (ECF <u>28</u> & <u>31</u> ) for Wednesday, April 3, 2024 at 2:00 p.m. in Courtroom 15B before Judge Michael H. Simon. Ordered by Judge Michael H. Simon. (mja) (Entered: 03/08/2024) |
| 03/11/2024 | <u>41</u> | **ORDER** – The Court has scheduled oral argument on the parties' motions for Wednesday, April 3, 2024. The parties should file supplemental briefing not later than March 25th, addressing the issues described in this order. Signed on 3/11/2024 by Judge Michael H. Simon. (mja) (Entered: 03/11/2024) |
| 03/25/2024 | <u>42</u> | Supplemental Brief *in Response to Court's March 11, 2024 Order*. Filed by All Defendants. (Related document(s): Scheduling Order, <u>41</u> .) (Van Loh, Sara) (Entered: 03/25/2024) |
| 03/25/2024 | <u>43</u> | Supplemental Brief *in Response to March 11, 2024, Order*. Filed by Oregon Association of Hospitals and Health Systems. (Related document(s): Scheduling Order, <u>41</u> .) (Daniels, Brad) (Entered: 03/25/2024) |
| 03/25/2024 | <u>44</u> | Declaration of Rebecca Hultberg *in Support of Plaintiff's Supplemental Briefing in Response to March 11, 2024, Order*. Filed by Oregon Association of Hospitals and Health Systems. (Related document(s): Brief <u>43</u> .) (Daniels, Brad) (Entered: 03/25/2024) |
| 03/29/2024 | 45 | ORDER – The Court substitutes the current Director of Oregon Health Authority, Dr. Sejal Hathi, for the originally named defendant Patrick Allen, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. Ordered by Judge Michael H. Simon (mja) (Entered: 03/29/2024) |
| 04/02/2024 | 46 | **SCHEDULING ORDER** – At the unopposed email request of Defendants, the Court is resetting Oral Argument on the parties' pending motions (ECF <u>28</u> <u>31</u> ) from 4/3/2024 to 5/7/2024 at 2:00 p.m. in Courtroom 15B before Judge Michael H. Simon. Ordered by Judge Michael H. Simon. (mja) (Entered: 04/02/2024) |
| 05/07/2024 | 47 | **MINUTES OF ORAL ARGUMENT HEARING:** ORDER – The parties' cross motions for summary judgment (ECF <u>28</u> <u>31</u> ) are taken under advisement on May 7, 2024. Brad S. Daniels present as counsel for Plaintiff. Sara D. Van Loh present as counsel for Defendants. Court Reporter: Dennis Apodaca. Judge Michael H. Simon |

| | | presiding. (mja) (Entered: 05/07/2024) |
|---|---|---|
| 05/16/2024 | 48 | Opinion and Order – The Court GRANTS Defendants' motion for summary judgment (ECF 28 ). The Court grants summary judgment for Defendants against Plaintiff's First Claim, which alleges a violation of due process under the Fourteenth Amendment of the U.S. Constitution. The Court declines to exercise supplemental jurisdiction over Plaintiff's Second Claim, which alleges a state–law violation of Oregon's nondelegation doctrine under the Oregon Constitution. The Court DENIES Plaintiff's cross–motion for summary judgment (ECF 31 ). Signed on 5/16/2024 by Judge Michael H. Simon. (mja) (Entered: 05/16/2024) |
| 05/20/2024 | 49 | **JUDGMENT –** Based on the Court's OPINION AND ORDER, IT IS ADJUDGED that this case TERMINATED as to Plaintiff's first claim, alleging violation of the due process clause of the Fourteenth Amendment. This case is DISMISSED without prejudice as to Plaintiff's second claim, alleging violation of the nondelegation doctrine of the Oregon Constitution. Signed on 5/20/2024 by Judge Michael H. Simon. (mja) (Entered: 05/20/2024) |
| 05/21/2024 | 50 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Motion Hearing held on May 7, 2024, before Judge Michael H. Simon, Court Reporter Dennis W. Apodaca, telephone number (503) 326–8182 or dennis_apodaca@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through PACER. See Policy at ord.uscourts.gov. Notice of Intent to Redact Transcript is due by 5/28/2024. Redaction Request due 6/11/2024. Redacted Transcript Deadline set for 6/21/2024. Release of Transcript Restriction set for 8/19/2024. (Apodaca, Dennis) (Entered: 05/21/2024) |
| 06/18/2024 | 51 | Notice of Appeal to the 9th Circuit Filing fee $605 collected; Agency Tracking ID AORDC–9457753: . Filed by Oregon Association of Hospitals and Health Systems. (Daniels, Brad) (Entered: 06/18/2024) |
| 06/18/2024 | | USCA Case Number and Notice confirming Docketing Record on Appeal re Notice of Appeal 51 . **Case Appealed to Ninth Circuit Court of Appeals Case Number 24–3770** assigned. (ecp) (Entered: 06/18/2024) |
| 06/24/2024 | 52 | Transcript Designation and Order Form for the hearing held on 5/7/24 before Judge Simon. Court Reporter: Dennis Apodaca. regarding Notice of Appeal 51 . Filed by Oregon Association of Hospitals and Health Systems. Transcript is due by 7/24/2024. (Daniels, Brad) (Entered: 06/24/2024) |